1  CHARLES M. TEBBUTT, *pro hac vice*
   DANIEL C. SNYDER, *pro hac vice*
2  Law Offices of Charles M. Tebbutt, P.C.
   941 Lawrence St.
3  Eugene, OR 97401
   Tel. 541.344.3505
4
   BRAD J. MOORE, WSBA #21802
5  Stritmatter Kessler Whelan Coluccio
   200 Second Avenue West
6  Seattle, WA  98119
   Tel.  206.448.1777
7
   *Additional Plaintiffs' counsel on signature page*
8

9             IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF WASHINGTON
10

11 | | |
   |---|---|
   | COMMUNITY ASSOCIATION FOR RESTORATION OF THE ENVIRONMENT, INC., a Washington Non-Profit Corporation *and* CENTER FOR FOOD SAFETY, INC., a Washington, D.C. Non-Profit Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> COW PALACE, LLC, a Washington Limited Liability Company, THE DOLSEN COMPANIES, a Washington Corporation, and THREE D PROPERTIES, LLC, a Washington Limited Liability Company, <br><br> Defendants. | Case No.  CV-13-3016-TOR <br><br> THIRD AMENDED COMPLAINT |

THIRD AMENDED COMPLAINT                                    1

## THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     This is a citizen suit for declaratory and injunctive relief against Cow Palace, LLC, The Dolsen Companies, and Three D Properties, LLC, (hereinafter, "Defendants") for violations of the Solid Waste Disposal Act, also known as the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*. ("RCRA"), at two dairy facilities, Cow Palace I and Cow Palace II, collectively referred to as "Cow Palace Dairy."

2.     This civil action is brought pursuant to the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a)(1) (A) and (B).

3.     As detailed below, Plaintiffs allege that Defendants have violated and continue to violate Section 7002(a) of RCRA by their contribution to the past or present handling, storage, treatment, transportation, and/or disposal of solid or hazardous waste at Cow Palace Dairy in such a manner that may present an imminent and substantial endangerment to health or the environment.  42 U.S.C. § 6972(a).

4.     Plaintiffs further allege that the Defendants employ or allow improper manure management practices at Cow Palace Dairy, including storage or disposal of manure at non-agronomic levels on land owned or previously owned by

Defendants, which practices constitute "open dumping" of solid waste in violation of Section 4005(a) of RCRA.  42 U.S.C. § 6945(a).

5.     Plaintiffs seek declaratory relief establishing that Defendants have violated RCRA.  Plaintiffs also seek injunctive relief directing Defendants to modify the handling, storage, treatment, transportation, and disposal of solid and hazardous waste at Cow Palace Dairy such that these practices no longer present an imminent and substantial endangerment to health and the environment.  Additionally, Plaintiffs seek injunctive relief obligating Defendants to remediate the environmental contamination they have caused and/or contributed to at or near Cow Palace Dairy, including widespread soil and groundwater contamination. Finally, Plaintiffs request that the Court award Plaintiffs reasonable attorneys and expert witness fees and costs incurred in bringing this action.

## JURISDICTION

6.     This Court has subject matter jurisdiction over this lawsuit pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a).

7.     The Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under RCRA and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

8.     On October 17, 2012, Plaintiffs gave notice of the violations and their intent to file suit to the Defendant Cow Palace, LLC, Defendant's registered agent,

THIRD AMENDED COMPLAINT                                                      3

United States Attorney General, United States Environmental Protection Agency (EPA), EPA Region X, Washington State Office of the Governor, Washington State Office of the Attorney General, and Washington State Department of Ecology as required by Section 7002(a) of RCRA, 42 U.S.C. § 6972(a).

9.      On July 3, 2013, Plaintiffs gave supplemental notice of the violations and their intent to file suit to the Defendant Cow Palace, LLC, Defendant's registered agent, the United States Attorney General, United States Environmental Protection Agency (EPA), EPA Region X, Washington State Office of the Governor, Washington State Office of the Attorney General, and Washington State Department of Ecology as required by Section 7002(a) of RCRA, 42 U.S.C. § 6972(a).

10.     On April 17, 2014, Plaintiffs gave notice of violations and their intent to file suit to The Dolsen Companies and Three D Properties, LLC, their registered agents, the United States Environmental Protection Agency, (EPA), EPA Region X, and Washington State Department of Ecology as required by Section 7002(a) of RCRA, 42 U.S.C. § 6972(a).

11.     More than ninety days have passed since these notices, including the April 17, 2014 notice to The Dolsen Companies and Three D Properties, LLC, were served, and the violations complained of in the notices are continuing at this time, or Defendants are reasonably likely to continue to remain in violation of RCRA.

THIRD AMENDED COMPLAINT                                                          4

Neither the EPA nor the State of Washington has commenced or is diligently prosecuting a civil or criminal action to redress the violations. Any administrative action undertaken by EPA does not address the relief requested by Plaintiffs that is necessary to abate the imminent and substantial endangerment caused by Defendants' practices.

## VENUE

12.    Venue properly vests in this Court pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), because the alleged violations of the aforementioned statutes occurred and continue to occur within the Eastern District of Washington.

## PARTIES

13.    Upon information and belief, Cow Palace, LLC is a Washington limited liability company with one member, The Dolsen Companies, that, in part, owns and operates the dairies Cow Palace I and Cow Palace II (collectively "Cow Palace Dairy"). Cow Palace I and II share common manure and other waste management practices. The Cow Palace Dairy is located at or near 1631 North Liberty Road, Granger, WA 98932.

14.    Upon information and belief, the Cow Palace Dairy is jointly owned, operated, and/or controlled by Cow Palace, LLC, The Dolsen Companies and Three D Properties, LLC.

15.    Upon information and belief, Three D Properties, LLC, is a Washington

THIRD AMENDED COMPLAINT                                                                  5

limited liability company that owned or owns all or a part of the following parcels of real property located at or near the Cow Palace Dairy, some of all of which are utilized by the Dairy (parcels identified by Yakima County Assessor's parcel number): 211000-11419, 211001-11414, 211001-11415, 211001-11416, 211001-11421, 211001-11422, 211125-42004, 211126-41001, 211136-12001, 211136-21001, 211136-31001, 211136-34001, 211136-41001, 211136-43401, 211136-43404, 211136-44002, 211136-44005.

16.    Upon information and belief, Three D Properties, LLC acquired parcels of real property on or about November 7, 2013, after the current litigation began.

17.    Upon information and belief, The Dolsen Companies is a Washington corporation and the sole member of Cow Palace, LLC.  Until approximately November 7, 2013, The Dolsen Companies owned certain parcels of real property that were utilized and may be utilized by the Cow Palace Dairy.

18.    Upon information and belief, The Dolsen Companies transferred its ownership interest in a number of parcels of real property to Cow Palace, LLC, on or about November 7, 2013, after the current litigation began, including, but not limited to, the following parcels of real property located at or near the Cow Palace Dairy (identified by Yakima County Assessor's parcel number): 211000-11419, 211001-11401, 211001-11404, 211001-11405, 211001-11411, 211001-11413, 211001-11414, 211001-11415, 211001-11416, 211001-11420, 211001-11421,

211001-11422, 211001-11423, 211125-24002, 211125-31001, 211125-32001, 211125-33001, 211125-42004, 211125-43403, 211125-43404, 211126-41001, 211136-11002, 211136-12001, 211136-14001, 211136-21001, 211136-31001, 211136-34001, 211136-41001, 211136-43401, 211136-43404, 211136-44002, 211136-44003, 211136-44005, and portions of Tract 29 of Zillah Heights Orchard Tracts.

19.    Cow Palace, LLC is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

20.    The Dolsen Companies is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

21.    Three D Properties, LLC is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

22.    Plaintiff CARE is a non-profit corporation organized under the laws of the State of Washington.  CARE's principal office is located in Outlook, Washington.

23.    CARE is a grassroots organization composed of concerned community members.  Its mission is to inform Washington state residents about activities that endanger the health, welfare, and quality of life for current and future Washingtonians through education and citizen empowerment.  CARE also acts as an advocate to protect and restore the economic, social, and environmental resources of the region.  In carrying out its mission, CARE has appeared in

THIRD AMENDED COMPLAINT                                                                7

numerous local, state, and federal proceedings.

24.    CARE's organizational purposes are adversely affected by Cow Palace Dairy's violations of RCRA.  These violations have caused significant environmental contamination of the soil and groundwater.  Furthermore, but for Cow Palace Dairy's unlawful actions, CARE would not have to spend as much of its resources on the environmental problems created by illegal discharges from individual large-scale industrial farming operations, and could direct these resources to other priorities.

25.    CARE has individual members that reside in Yakima County and in proximity to the Cow Palace Dairy.  The environmental, health, aesthetic, economic, and recreational interests of CARE's members have been and will continue to be adversely affected by Cow Palace Dairy's violations of RCRA.  For instance:

a.    Members of CARE obtain their drinking water from aquifers that have been contaminated with nitrates, phosphorus, and other pollutants, including hormones and antibiotics, by Cow Palace Dairy's improper handling, storage, treatment, transportation, and disposal of solid and hazardous waste.  As a result, drinking water that CARE's members rely upon has been rendered unsafe for human consumption. Consequently, CARE's members have been forced to obtain, or

THIRD AMENDED COMPLAINT                                                          8

should be obtaining but may not be able to afford, alternative sources of drinking water. CARE's members are concerned that consuming this water is harming or could harm them and their families' health, as well as other community members' health.

b. Members of CARE also make domestic and agricultural use of groundwater that has been contaminated with nitrates, phosphorus, and other pollutants as a result of Cow Palace Dairy's improper handling, storage, treatment, transportation, and disposal of solid and hazardous waste. As a result, water that CARE's members' rely upon has been rendered unsafe for domestic and agricultural use. Consequently, CARE's members have been forced to obtain, or should be obtaining but may not be able to afford, alternative sources of water for these uses. CARE's members are concerned that the water used in their homes is harming them and their families' health. CARE's members are concerned that the food they produce and rely upon for sustenance using this water is not safe to consume.

c. Members of CARE also live, work, and recreate in the environment that has been negatively impacted by Cow Palace Dairy's improper handling, storage, treatment, transportation, and disposal of solid and hazardous waste. This has lessened CARE's members' enjoyment of

THIRD AMENDED COMPLAINT                                                    9

1          their environment.  CARE's members' are concerned that their

2          environment has been irreparably injured by Cow Palace Dairy's

3          improper practices.

4    26.    Plaintiff Center for Food Safety (CFS) is a public interest, non-profit,

5    membership organization that works to protect human health and the environment

6    by curbing the proliferation of harmful food production technologies and by

7    promoting organic and other forms of sustainable agriculture.  CFS's

8    organizational purposes are adversely affected by Cow Palace Dairy's violations of

9    RCRA.  These violations have caused significant environmental contamination of

10   the soil and groundwater.  Furthermore, but for Cow Palace Dairy's unlawful

11   actions, CFS would not have to spend as much of its resources on the problems

12   created by illegal discharges from individual large-scale industrial farming

13   operations, and could direct these resources to other priorities.

14   27.    CFS represents nearly 500,000 members throughout the country that support

15   safe, sustainable and organic agriculture and regularly purchase organic products.

16   CFS has nearly 20,000 members in the state of Washington.  CFS members live,

17   work, recreate, and grow food in, and consume food and water from, the Yakima

18   Valley.  The environmental, health, aesthetic, economic, and recreational interests

19   of CFS's members have been and will continue to be adversely affected by Cow

20   Palace Dairy's violations of RCRA.  CFS members support the public's right to

THIRD AMENDED COMPLAINT                                                    10

1  choose food and crops not sourced from or by industrial farming practices, such as

2  CAFOs.  CFS's members are impacted by CAFOs through destructive discharges

3  of CAFO pollution into groundwater, air and public waterways, which affects the

4  suitability of drinking water and fish in these waterways for consumption.

5  28.    At all relevant times, Plaintiffs were and are "persons" within the meaning

6  of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

7                    **STATUTORY AND REGULATORY FRAMEWORK**

8  29.    Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), provides that

9  citizens may commence a citizen suit against "any person," "including any past or

10  present generator, past or present transporter, or past or present owner or operator

11  of a treatment, storage, or disposal facility who has contributed or who is

12  contributing to the past or present handling, storage, treatment, transportation, or

13  disposal of any solid or hazardous waste which may present an imminent and

14  substantial endangerment to health or the environment."

15  30.    Section 1002(b) of RCRA states that "disposal of solid waste… in or on the

16  land without careful planning and management can present a danger to human

17  health and the environment;" and that "open dumping is particularly harmful to

18  health, contaminates drinking water from underground and surface supplies, and

19  pollutes the air and the land…."  42 U.S.C. § 6901(b).

20  31.    As required by statute, EPA has promulgated criteria under RCRA §

THIRD AMENDED COMPLAINT                                                      11

6907(a)(3) defining solid waste management practices that constitute open dumping.  *See* 42 U.S.C. § 6944(a); 40 C.F.R. Parts 257 and 258.  These regulations outline certain solid waste disposal practices which, if violated, pose a reasonable probability of adverse effects on health or the environment. 40 C.F.R. § 257.3.

32.    The purpose of RCRA is "to promote the protection of health and the environment[.]"  RCRA seeks to accomplish this by "prohibiting future open dumping on the land and requiring the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health…."  42 U.S.C. § 6902(a).

33.    Section 4005(a) of RCRA prohibits "any solid waste management practice or disposal of solid waste… which constitutes the open dumping of solid waste…." 42 U.S.C. § 6945(a).

34.    Under section 1004(3), "[t]he term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste… into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground-waters."  42 U.S.C. § 6903(3).

35.    RCRA defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant… and other discarded material, including solid, liquid, semisolid,

1  or contained gaseous material resulting from… *agricultural operations*…." 42

2  U.S.C. § 6903(27) (emphasis added).

3  36.    EPA criteria for solid waste disposal practices prohibit the contamination of

4  any underground drinking water source beyond the solid waste boundary of a

5  disposal site.  40 C.F.R. § 257.3-4(a).

6  37.    An "underground drinking water source" includes (1) an aquifer supplying

7  drinking water for human consumption or (2) any aquifer in which the ground-

8  water contains less than 10,000 milligrams per liter of total dissolved solids.  40

9  C.F.R. § 257.3-4(c)(4).

10 38.    "Contaminate" an underground drinking water source means to cause the

11 groundwater concentration of a listed substance to exceed its corresponding

12 maximum contaminant level specified in Appendix I to 40 C.F.R. Part 257, or

13 cause an increase in the concentration of that substance where the existing

14 concentration already exceeds the maximum contaminant level in Appendix I.

15                                        **FACTS**

16 39.    Cow Palace Dairy was founded by Robert and R. William Dolsen and

17 commenced operations in 1972.  Dolsen family members own The Dolsen

18 Companies, a Washington corporation.  The Dolsen Companies is the only

19 member of Cow Palace, LLC.   Cow Palace Dairy is presently managed by Jeff

20 Boivin.

THIRD AMENDED COMPLAINT                                          13

40.    Cow Palace Dairy is a large dairy CAFO under federal and state law.  40 C.F.R. § 412.2; WAC 173-224-030.

41.    As of January 19, 2011, Cow Palace Dairy has over 6840 milking cows and between 700-1699 dry cows, 300-999 heifers, and 2000-2999 calves housed at the facility.  In total, Cow Palace Dairy had a herd size of at least 9,840 animals as of January, 2011.  These animals are confined 365 days per year.

42.    Despite due diligence on the Plaintiffs' part to obtain these documents, Cow Palace Dairy's Nutrient Management Plan ("DNMP") and related documents have either not been provided or been partially redacted by various Washington State agencies, thereby preventing citizens from having access to information critical to determining the adequacy of the DNMP itself.

43.    Upon information and belief, there are two main aquifers underlying Cow Palace Dairy and the surrounding area.  These aquifers include a surficial unconfined to semi-confined alluvial aquifer and an extensive basalt aquifer of great thickness underlying sedimentary deposits.  Groundwater flows through the surficial aquifer in a manner that generally follows surface topography.  Groundwater flows through the upper portions of the underlying basalt aquifer also generally follow surface topography.

44.    Plaintiffs' members obtain groundwater from one or both of these aquifers.

45.    The manure generated at Cow Palace Dairy contains numerous organic and

inorganic compounds, including phosphorus, veterinary pharmaceuticals, hormones, pathogens (including bacteria, viruses, and protozoa), and steroids. These contaminants are hereinafter collectively referred to as "Other Contaminants." A list of the possible contaminants is located in Plaintiffs' July 3, 2013 protective supplemental notice of intent to sue, incorporated by reference herein. Attachment 2, pp. 2-3 & pp. 5-6.

### *Manure Storage Practices*

46.    Like all large dairy CAFOs, Cow Palace Dairy generates significant quantities of solid and liquid wastes, including manure wastes.

47.    It is estimated that Cow Palace Dairy produces more than 188,570 tons of manure annually.

48.    Cow Palace Dairy composts the solid manure wastes generated by its herd on-site. Composted manure is then used as bedding at the facility or sold off-site.

49.    Solid manure that is not composted by Cow Palace Dairy is land-applied to agricultural fields.

50.    Solid manure is stored and/or composted at Cow Palace Dairy on permeable surfaces.

51.    Cow Palace Dairy stores the liquid manure wastes generated by its herd in one of at least nine manure storage lagoons. Wastes are held in these lagoons until such time they are applied to fields through various land-application techniques.

THIRD AMENDED COMPLAINT                                                                 15

52.    Cow Palace Dairy's nine manure storage lagoons are impoundments containing no synthetic liner or other artificial barrier.

53.    These lagoons have an estimated holding capacity of approximately 40.8 million gallons.

54.    According to National Resource Conservation Service ("NRCS") standards, manure lagoons should not be constructed above an aquifer that serves as a domestic water supply.  If no reasonable alternative exists, however, NRCS recommends that manure lagoons be built with either (1) a clay liner with a permeability less than 1 x 10-6 centimeters per second; (2) a flexible membrane liner over a clay liner; (3) a geosynthetic clay liner; or (4) a concrete liner designed in accordance with slab on grade criteria for fabricated structures requiring water tightness.

55.    Cow Palace Dairy's manure lagoons are constructed above an aquifer that serves as a domestic water supply.  Upon information and belief, Cow Palace Dairy's manure storage lagoons do not meet NRCS standards.  Under any circumstances, Cow Palace Dairy's manure storage lagoons leak to groundwater.

56.    The NRCS standards for manure lagoons are not designed to protect, nor are capable of protecting, human health or the environment.  The standards are not scientifically established to protect groundwater.

57.    Upon information and belief, the NRCS standards for municipal wastewater

THIRD AMENDED COMPLAINT                                                    16

treatment plant lagoons are more protective of groundwater than those for manure

lagoons.  Municipal lagoons are required to be lined with, at the very least,

synthetic, geomembrane liners.  This is true even though municipal waste has far

less concentrated effluent than the effluent generated by dairies such as Cow

Palace Dairy.

58.    Upon information and belief, Cow Palace Dairy's nine manure storage

lagoons are leaking at least 720,000 gallons of manure into groundwater per year,

but potentially as high as 8,600,000 gallons, or more, per year.

59.    Upon information and belief, seepage from the manure waste storage areas

has been ongoing since the date these storage areas were brought into operation,

some more than 20 years ago, and has been continuous since put into operation.

60.    The seepage of manure waste from the lagoons has contributed and is

contributing to the excessive contamination of the groundwater, which is posing, or

may pose, an imminent and substantial endangerment to health or the environment.

61.     Cow Palace Dairy's storage and/or composting of solid manure on

permeable surfaces causes runoff and leachate from the solid manure to enter

groundwater, further contributing to the contamination of the groundwater.

62.    Cow Palace Dairy's storage of solid and/or liquid manure in lagoons and

other permeable surfaces has caused and is continuing to cause the discharge of

manure contaminated water into surface water and groundwater.

THIRD AMENDED COMPLAINT                                                    17

63.    Manure that has been permitted to leach, leak, or otherwise discharge into groundwater, such as from a leaking lagoon, solid manure storage area, compost storage area, confinement pen, or other permeable surface, is a "discarded material" from an "agricultural operation," and is therefore a "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

64.    Defendants' improper manure storage practices at Cow Palace Dairy have caused irreparable injury to the environment, contaminating soils, groundwater, and surface waters with excessively high levels of nitrates and related nitrogen compounds and, possibly, Other Contaminants.

### *Manure Application Practices*

65.    Upon information and belief, Cow Palace Dairy and/or its agents have applied, continue to apply, and are reasonably likely to continue to apply liquid and solid manure wastes to nearby agricultural fields in amounts that exceed agronomic rates.

66.    The surface soils to which Cow Palace Dairy applies manure have a high saturated hydraulic conductivity.

67.    The EPA has conducted a study entitled "Relation Between Nitrate in Water Wells and Potential Sources in the Lower Yakima Valley, Washington," EPA-910-R-12-003 (September 27, 2012).  The purpose of that study was to investigate the contribution from various land uses to the high nitrate levels in groundwater and

THIRD AMENDED COMPLAINT                                                            18

residential drinking water wells, the predominant source of drinking water for many residents in the Lower Yakima Valley. Plaintiffs hereby incorporate by reference the content of the EPA study into this Complaint. The EPA study may be accessed at

<http://www.epa.gov/region10/pdf/sites/yakimagw/nitrate_in_water_wells_study_9-27-2012.pdf>.

68.      The EPA study found that within the approximate property boundary of the Cow Palace Dairy, six soil units have been mapped by the NRCS. All six soil units have a silt loam texture with a "well-drained" classification. Three of the soil units (Esquatzel, Shano, and Warden) represent approximately 81 percent of the surface area. These units have a saturated hydraulic conductivity in the range of 1.1 to 4.0 feet per day, which is characterized as "moderately high to high" in their capacity to transmit water. Two of the soil units (Burke and Scoon) represent approximately 19 percent of the surface area and have a saturated hydraulic conductivity in the range of 0.0 to 0.12 feet per day, which is characterized as "very low to moderately low." One of the soil units (Finlay) represents less than 1 percent of the surface area and has a saturated hydraulic conductivity of 4 to 11.9 feet per day, which is characterized as "high."

69.      The well drained nature of these soils along with high hydraulic conductivity make for highly susceptible soil conditions for groundwater contamination and

THIRD AMENDED COMPLAINT                                                                    19

1    very low potential for any denitrification to decrease nitrate contamination of

2    groundwater.

3    70.    Dairy effluent concentrations of ammonia and nitrate can be considerable, as

4    ammonia is produced by hydrolysis of waste fluids.  Ammonia is rapidly converted

5    to nitrate when the manure encounters aerobic soils or groundwater.  Due to their

6    high solubility, ammonia and nitrate can readily leach into groundwater.  Other

7    Contaminants may also bind to soil and leach through soils and into groundwater

8    when manure is applied above agronomic rates.

9    71.    Plants can uptake nitrate and nitrite only in limited quantities.  Quantities of

10   nitrate and nitrite in the soil in excess of concentrations which can be used by the

11   currently active crop migrate into the vadose zone and the water table, where they

12   adversely impact ground water quality and its use as a drinking water source.

13   Migration to the vadose zone and water table may also occur where well-drained

14   soils cannot hold the nitrate and nitrite in the root zone for a sufficient amount of

15   time to allow for the crops' natural uptake process.

16   72.    Elevated nutrient levels found in soils receiving manure are evidence of

17   manure applications in excess of agronomic rates.

18   73.    Washington Department of Agriculture inspection reports from November

19   22, 2005 documented elevated phosphorus levels in soils receiving Cow Palace

20   Dairy manure, indicating that the Dairy had applied manure in excess of agronomic

THIRD AMENDED COMPLAINT                                                  20

1    rates.  The report also cautioned the Dairy to "watch crop uptake rates" for nitrate,

2    indicating that there were also elevated nitrate levels in fields receiving the Dairy's

3    manure.

4    74.    Washington Department of Agriculture inspection reports from July 3, 2007

5    have documented elevated nitrogen and phosphorus levels in soils receiving Cow

6    Palace Dairy manure, indicating that the Dairy has applied manure in excess of

7    agronomic rates.

8    75.    Washington Department of Agriculture inspection reports from January 19,

9    2011 have documented elevated phosphorus levels in soils receiving Cow Palace

10   Dairy's manure, indicating that the Dairy has applied manure in excess of

11   agronomic rates.

12   76.    Upon information and belief, Washington Department of Agriculture

13   inspection reports from 2012 have documented elevated nitrate levels in soils

14   receiving Cow Palace Dairy's manure, indicating that the Dairy has applied

15   manure in excess of agronomic rates.

16   77.    Upon information and belief, the elevated nutrients found in Cow Palace

17   Dairy's fields are evidence of applications of manure in excess of agronomic rates.

18   78.    According to Washington Department of Ecology records, Cow Palace

19   Dairy was applying manure to a field on the NW corner of N Arms Road and

20   Knowles Road on or about January 2, 2013.  At the time, the field to which Cow

THIRD AMENDED COMPLAINT                                                    21

1    Palace Dairy was applying manure was frozen and/or snow covered.  According to

2    an unidentified eyewitness of the application, manure had been applied in such

3    quantities so as to create a "lake" of ponded manure.

4    79.    According to Washington Department of Ecology records, inspectors did not

5    visit Cow Palace Dairy until nearly one month later, on February 3, 2013.  At that

6    time, Cow Palace Dairy was still applying manure to fields that were frozen and/or

7    snow covered.

8    80.    According to records obtained from the Washington Department of

9    Agriculture, on or about April 9, 2009, Greg Schuler, a former dairy inspector,

10    filed a complaint alleging that Cow Palace Dairy was applying manure through a

11    "big gun" to "Field #4A" in such quantities that the ponding of manure occurred.

12    Field #4A is between 26-65 acres in size.  The ponded area was approximately 10-

13    20 feet wide and at least 12 inches deep.

14    81.    According to a Washington Department of Agriculture Inspection Report

15    from January 5, 2006, Cow Palace Dairy had been applying manure to "fields 1

16    and 2," in such quantities that there was ponding in a low spot of a field adjacent to

17    the Dairy.  The Report indicates that the ponding and size of application caused

18    runoff from the fields to occur.

19    82.    Upon information and belief, Cow Palace Dairy's DNMP prohibits

20    applications on frozen and/or snow covered fields.

THIRD AMENDED COMPLAINT                                                    22

83.    Applications of manure to frozen and/or snow covered fields creates pathways for manure to be discharged to surface and/or groundwater.

84.    Applications of manure to frozen and/or snow covered fields are not agronomic.

85.    Upon information and belief, Cow Palace Dairy's DNMP prohibits applications when there is a potential for ponding to occur.

86.    Applications of manure which cause ponding to occur create pathways for manure to be discharged to surface and/or groundwater.

87.    Applications of manure which cause ponding to occur are not agronomic.

88.    Applications of manure waste above agronomic rates cause manure nutrients, including but not limited to nitrates, to leach through soil and into groundwater.

89.    Once nitrates enter the vadose zone, the area below the soil surface from the end of the vegetative root zone to the beginning of a groundwater table, they migrate down to the nearest groundwater.  Other Contaminants, depending upon their responsive characteristics in soil, may also migrate down to the nearest groundwater.

90.     Once nitrates and Other Contaminants enter the water table, they migrate away from the Cow Palace Dairy and into the wells of nearby residents or into

nearby surface waters depending upon the depth and flow direction of the initial receiving groundwater.

91.     The contaminated shallow groundwater that likely discharges to surface waters include discharges into the Roza-Sunnyside Board of Joint Control Drains 26.6, 27.2 and 28.0 and the Sunnyside Canal.  The Joint Drains converge and discharge into the Granger Drain, which in turn then discharges to the Yakima River.  The Sunnyside Canal discharges into the Yakima River.  These waters are used by members of CARE and CFS and the general public for multiple purposes, including but not limited to recreation, human consumption, irrigation, and sustenance.

92.     Upon information and belief, the over-application of liquid manure above agronomic rates has been ongoing since the date Cow Palace Dairy was brought into operation and has been continuous for at least the past five years.

93.     Defendants know or should know that applications of manure above agronomic rates – that is, applications above that which the current or planned crop can effectively utilize – will cause manure nutrients, including but not limited to nitrate and phosphorus, along with nutrients that comprise some of the Other Contaminants, to pass through soils before they can be utilized by the planned or active crop and into groundwater.  This renders the manure incapable of serving its intended purpose as a fertilizer.  The presence of Other Contaminants that are not

THIRD AMENDED COMPLAINT                                                                          24

1    plant nutrients also indicate that discarded manure is the source of the groundwater

2    contaminants.

3    94.    Defendants know or should know that applications of manure to frozen

4    and/or snow covered fields or applications of manure which result in ponding will

5    cause manure nutrients, including but not limited to nitrate, phosphorus, and Other

6    Contaminants to pass through soils before they can be utilized by the planned or

7    active crop and into groundwater.  This renders the manure incapable of serving its

8    intended purpose as a fertilizer.

9    95.    Manure that has been over-applied on fields and permitted to leach, leak, or

10   otherwise discharge into groundwater is a "discarded material" from an

11   "agricultural operation," and is therefore a "solid waste" under Section 1004(27) of

12   RCRA, 42 U.S.C. § 6903(27).

13   96.    Manure that has been applied to frozen and/or snow covered fields, or

14   manure that has been applied in such a manner that ponding occurs, causes manure

15   to leach, leak, or otherwise discharge into groundwater.  This renders the manure a

16   "discarded material" from an "agricultural operation," and is therefore a "solid

17   waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

18   97.    Washington State regulators have proposed that soil samples containing

19   greater than 45 parts per million (ppm) nitrate constitute "excessive" levels of

20   nitrate within soils.

THIRD AMENDED COMPLAINT                                                    25

98.     The 45 ppm proposal used in drafting the 2006 Washington General CAFO National Pollution Discharge Elimination System ("NPDES") Permit was the result of political machinations between the dairy and cattle industry and Washington regulators, including the Washington Departments of Ecology and Agriculture.

99.     The 45 ppm soil number is not scientifically based to be protective of human health or the environment.  Soil samples containing less than 45 ppm nitrate may still allow nitrates to leach through soils and into groundwater at levels above the 10 mg/l federal Maximum Contaminant Level or "MCL."  A concentration of 45 ppm nitrate in the upper two feet of soil would amount to 360 pounds of available nitrogen per acre.  This amount of nitrogen is far in excess of the most demanding crop needs.

100.    Accurately measuring quantities of nitrate in soil that can cause groundwater contamination requires more than simply measuring the amount of nitrate in soil at certain levels below the surface.  Other factors, including but not limited to, moisture content, irrigation practices, and amount of nitrate contained in the soil solution must also be accounted for.  Soil sample results (from below the root zone) that have greater than 10 mg/l nitrate contained in the soil solution are excessive and will likely cause groundwater contamination, which correspond to the metric of the MCL for nitrates, which is also 10 mg/l.

THIRD AMENDED COMPLAINT                                                    26

101.   Defendants' improper manure application practices at Cow Palace Dairy have caused irreparable injury to the environment, contaminating soils and groundwater with excessively high levels of nitrates and other pollutants.

### *Contamination of Groundwater in Excess of MCLs*

102.   The practices mentioned in paragraphs 39-94 are causing or contributing to groundwater contamination beyond the federal MCL for nitrates.

103.   The EPA has determined that nitrates pose an acute health concern at certain levels of exposure.  Nitrates contained in drinking water are colorless and odorless. Ingestion of nitrates, converted to nitrite in the body, interferes with the oxygen carrying capacity of blood, potentially resulting in cyanosis and, at higher levels, asphyxia.

104.   High levels of nitrate in water can also cause a blood disorder in infants known as methemoglobinemia ("blue baby syndrome") that can be fatal if left untreated.

105.   Methemoglobinemia is a blood disorder in which an abnormal amount of methemoglobin -- a form of hemoglobin -- is produced.  Hemoglobin is the molecule in red blood cells that distributes oxygen to the body. Methemoglobin cannot release oxygen.  In methemoglobinemia, the hemoglobin is unable to release oxygen effectively to body tissues.

106.    High nitrate levels may also affect pregnant women and adults with hereditary cytochrome b5 reductase deficiency.

107.    In addition, nitrate and nitrite ingestion in humans has been linked to goitrogenic (anti-thyroid) actions on the thyroid gland (similar to perchlorate), fatigue and reduced cognitive functioning due to chronic hypoxia, and maternal reproductive complications including spontaneous abortion.

108.    Ingestion of nitrates in excess of the MCL is also suspected of causing various forms of cancer in the general exposed population, including a variety of carcinogenic outcomes deriving from N-nitrosamines formed via gastric nitrate conversion in the presence of amines, and compromises the health of immuno-compromised individuals and the elderly.

109.    The MCLs are health-based standards that specify contaminants known to have an adverse effect on human health at levels beyond the parameters set forth by regulations.

110.    The EPA has established that the MCL for nitrate in groundwater is 10 milligrams per liter (mg/l) or 10 parts per million (ppm).  Samples taken by the EPA as part of its study indicate elevated levels of nitrate, potassium, magnesium, calcium, sodium, chloride, sulfate, barium, zinc, and industry-standard bovine pharmaceuticals in nearby residential wells downgradient from the "Dairy Cluster," which includes Cow Palace Dairy.

111.    The October 17, 2012 notice of intent to sue Cow Palace LLC, attached

hereto as Attachment 1 and incorporated herein by reference, cited to the EPA

study, which shows the specific location of the wells and other areas that were

sampled at the Dairy Cluster sampling area, including areas on and near Cow

Palace Dairy, as well as a summary of the results obtained for nitrate.

112.    The July 3, 2013 protective supplemental notice of intent to sue, attached

hereto as Attachment 2 and incorporated herein by reference, also cited to the EPA

study.  That study showed where wells in the Dairy Cluster area were

contaminated with nitrates and Other Contaminants originating from Cow Palace

Dairy and its manure, including phosphorus, trace and inorganic elements, a

variety of veterinary pharmaceuticals, hormones, steroids, and organic compounds.

113.    The April 17, 2014 notice of intent to sue to The Dolsen Companies and

Three D Properties, LLC, attached hereto as Attachment 3 and incorporated herein

by reference, also cited to the EPA study.  The April 17 notice letter referenced,

*inter alia*, sections of the study showing wells and other sampling locations on and

near Cow Palace Dairy, and the sampling results for levels of nitrate and Other

Contaminants found in wells and Cow Palace Dairy's manure.

114.    Observed levels of nitrate in seven wells located downgradient of the Dairy

Cluster, which includes Cow Palace Dairy (identified as WW-11 through WW-17),

are all in excess of the 10 mg/l MCL and are as follows: Wells WW-11 through

WW-17 yielded results of 23 mg/l, 46.7 mg/l, 44 mg/l, 43.4 mg/l, 30.2 mg/l, 23.4 mg/l, and 22.7 mg/l, respectively.  *See* T. 20 in "Relation Between Nitrate in Water Wells and Potential Sources in the Lower Yakima Valley, Washington," EPA-910-R-12-003 (September 27, 2012).

115.   The results exceed the MCL for nitrate, and in one instance by nearly 5 times.  *See* 40 C.F.R. Part 141 and Appendix I.  The results were also substantially higher than the nitrate results obtained from WW-06, the sampled well located upgradient of Cow Palace Dairy, which had a reported value of 0.73 mg/l nitrate.  These samples were taken between February and April, 2010.

116.   EPA took additional groundwater samples on property adjacent to Cow Palace Dairy, both upgradient and downgradient, in December 2012.  The results of that sampling revealed that wells located downgradient of Cow Palace Dairy had observed nitrate levels many times greater than the MCL.  For instance, downgradient well DC-03 had a nitrate level of 190 mg/l, which is 19 times greater than the MCL.  Results of 26 mg/l, 32 mg/l, and 26 mg/l nitrate were also observed in monitoring wells DC-04, DC-05, and DC-14, respectively, all of which exceed the MCL for nitrate.   EPA's December, 2012 sampling information is hereby incorporated herein, and is attached hereto as Attachment 4.

117.   Upon information and belief, Plaintiffs assert that Cow Palace Dairy refused entry to EPA to conduct sampling on the Dairy's property during the fall of 2012 and winter of 2012-13.

118.   On or about March 31, 2010, EPA sent Cow Palace Dairy a letter requesting access to the facility to collect soil and other environmental samples on the Dairy's property.  The letter also requested Cow Palace Dairy to respond to a questionnaire about the Dairy's practices and management.  Upon information and belief, Cow Palace Dairy refused access to EPA and did not respond to the questionnaire.

119.   Upon information and belief, the highest levels of nitrates generally occur in the shallow alluvial aquifer.  Plaintiffs' members and other residents have installed domestic wells for drinking water that intersect or utilize this shallow aquifer.

120.   Defendants' storage and application of manure has caused nitrate contamination of these residential wells, forcing Plaintiffs' members and other residents to either consume unsafe drinking water or to obtain alternative sources of drinking water.

121.   Defendants' manure storage and application practices at Cow Palace Dairy, described in the preceding paragraphs, have caused irreparable injury to the environment, contaminating groundwater with excessively high levels of nitrates and Other Contaminants.

## CLAIMS FOR RELIEF

## COUNT I
### RCRA Imminent and Substantial Endangerment

122.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs of this Complaint.

123.   Since at least February 1, 2008, Defendants have been discarding and or disposing of manure, and pharmaceutical by-products in the manure, at Cow Palace Dairy, which wastes are "solid wastes" under section 1004 of RCRA, 42 U.S.C. § 6903(27), because the manure is, either when over-applied or leaked through holding areas, a discarded solid, liquid, and/or semisolid material resulting from an agricultural operation.

124.   Defendants are the past and present owners or operators of all or portions of the Cow Palace Dairy--including storage or disposal facilities and/or land owned or previously owned by Defendants that Cow Palace Dairy utilizes for manure storage and disposal.  As indicated above, manure is stored and disposed of on land owned or previously owned by Defendants and utilized by Cow Palace Dairy, and in massive earthen pits and other holding structures at the Cow Palace Dairy.  As a result, Defendants contribute to the past or present handling, storage, and disposal of a solid waste.  RCRA, 42 U.S.C. § 6972(a)(1)(B).

125.   Defendants are past and present generators of manure and other by-product wastes, which manure is "handled" and "transported" by the Defendants, as well as

disposed of on land owned or leased or utilized by the Defendants.  As a result, Defendants contribute to the past or present handling, transportation, or disposal of a solid waste.  RCRA, 42 U.S.C. § 6972(a)(1)(B).

126.   Defendants' handling, transportation, storage, and disposal of manure may present an imminent and substantial endangerment to public health and/or the environment.

127.   Specifically, as alleged above, ground and surface water contamination levels on Defendants' land, and down-gradient and downstream from Defendants' land and facilities, have contamination levels that exceed the maximum safe consumption limits established under state and federal law, establishing a case of imminent and substantial endangerment to public health and/or the environment.

128.   The National Primary Drinking Water Standards ("NPDWS") are established under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f, *et seq*.  The NPDWS are health-based standards that specify contaminants known to have an adverse effect on the health of persons at levels beyond the parameters set forth in the regulations. 42 U.S.C. § 300f(1)(B).

129.   The Washington Water Quality standards were promulgated to protect groundwater and human health pursuant to the Washington Water Pollution Control Act, RCW 90.48.

THIRD AMENDED COMPLAINT                                                    33

130.    Promulgated pursuant to this statute, WAC 173-200-040(2)(a)

provides: Groundwater concentrations shall not exceed the criteria listed in Table

1, except as described in WAC 173-200-050 (3)(b).  The ground-water protection

standard for nitrate is the same as the federal MCL of 10 mg/l.

131.    40 C.F.R. § 257.3-4(a) prohibits a facility or practice from contaminating an

underground drinking water source.  "Contamination" occurs when a facility or

practice introduces a toxic substance that causes the concentration of that substance

in groundwater to exceed certain parameters listed in Appendix I to 40 C.F.R. §

257.3-4(a).

132.    The past and continuing practices of Defendants at the Cow Palace Dairy

have contaminated and continue to contaminate groundwater and surface water to

levels that exceed the maximum limits for safety established under state and

federal law.  These practices present an imminent and substantial endangerment to

the environment and/or public health.  Specifically, Cow Palace Dairy is polluting

groundwater to the extent that it is hazardous to health and the environment and the

shallow contaminated groundwater feeds nearby surface waters including, but not

limited to, Roza-Sunnyside Board of Joint Control Drains 26.6, 27.2 and 28.0, the

Sunnyside Canal, and the Granger Drain, which discharges into the Yakima River.

133.    Pursuant to RCRA Section 7002, Defendants may be subject to an injunction

under RCRA ordering them to cease and abate any past or present handling,

storage, treatment, and/or transportation of any solid waste or hazardous waste at Cow Palace Dairy that may present an imminent and substantial endangerment to public health and/or the environment.

134.    Plaintiffs' interests are harmed and will continue to be harmed by this imminent and substantial endangerment and by Defendants' failure to abate the endangerment unless the Court grants the relief sought herein.

## COUNT II
## RCRA Illegal Open Dumping

135.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs of this Complaint.

136.    Cow Palace Dairy constitutes an "open dump" under RCRA Section 1004(14).  42 U.S.C. § 6903(14).

137.    Defendants' solid waste disposal practices cause groundwater concentration levels of nitrates and other pollutants to exceed the limits set forth in Appendix I to 40 C.F.R. Part 257, which constitutes illegal open dumping, and is considered to pose a reasonable probability of causing adverse effects to health and the environment.

138.    Defendants store and dispose of manure at Cow Palace Dairy, including on land owned or previously owned by Defendants that Defendants allow Cow Palace Dairy to utilize for such storage and disposal.  The manure constitutes an

agricultural waste and a "solid waste" under section 1004 of RCRA because it is over applied and/or improperly stored, and therefore constitutes a "discarded material" under the statute.  42 U.S.C. § 6903(27).

139.    Groundwater monitoring data indicates that the disposal of solid wastes at the Cow Palace Dairy, including the fields Cow Palace Dairy uses to apply manure, are causing the contamination of groundwater to exceed the limits set forth in Appendix I to 40 C.F.R. Part 257.  Concentrations of nitrate, identified herein, have repeatedly exceeded the maximum contaminant levels, as documented by the EPA study.  This practice constitutes illegal open dumping.

140.    Groundwater monitoring data, including as documented by the EPA study, also indicates that the disposal of solid wastes at the Cow Palace Dairy, including the fields Cow Palace Dairy uses to apply manure, are causing Other Contaminants to contaminate groundwater.  This practice is also indicative of illegal open dumping.

141.    Solid waste disposal practices prohibit the contamination of any surface water source in violation of NPDES requirements or water quality standards.  40 C.F.R. § 257.3-3(a).  Cow Palace Dairy is operating without a NPDES permit.

142.    Pursuant to Section 7002, 42 U.S.C. § 6972, Defendants may be subject to an injunction under RCRA ordering them to cease open dumping at Cow Palace

1  Dairy and remediate the environmental contamination they have caused and/or

2  contributed to, including widespread soil and groundwater contamination. *Id*.

3  143.  Plaintiffs' interests are harmed and will continue to be harmed by

4  Defendants' open dumping unless the Court grants the relief sought herein.

5  **RELIEF REQUESTED**

6  WHEREFORE, Plaintiffs CARE and CFS respectfully request that the Court enter

7  a judgment:

8  A.    Declaring that Defendants' contribution to the past and/or present

9  generation, handling, storage, treatment, transportation, and/or disposal of solid

10  waste presents, or may present, an imminent and substantial endangerment to

11  public health or to the environment.

12  B.    Declaring that Defendants' storage and disposal of manure and its

13  incorporated by-products constitutes disposal and illegal open dumping.

14  C.    Issuing a compliance order that requires Defendants to cease and desist from

15  storing manure on any portion of Defendants' land that the Defendants has not first

16  lined adequately with synthetic liners to prevent seepage of pollutants into surface

17  water or groundwater that may, whether by flow or diffusion, transmit such

18  pollutants outside Defendants' property boundaries.

19  D.    Issuing a compliance order that requires Defendants to capture, adequately

20  treat, and sequester as necessary all surface water or groundwater on or within their

THIRD AMENDED COMPLAINT                                                      37

land, except surface water that flows as the direct result of snowmelt or a precipitation event, so that discharges of such water do not cause or contribute to violation of any applicable water quality standards in any water resource that receives such discharge.

E.    Issuing temporary and/or permanent injunctive relief against Defendants, ordering Defendants to cease all activities constituting the imminent and substantial endangerment to the public health and environment, and to cease all activities constituting illegal open dumping.

F.    Issuing temporary and/or permanent injunctive relief against Defendants, ordering Defendants to design and implement a program which evaluates the actual amount of manure necessary to provide a specific crop with its anticipated nutrient needs, and to have sufficient land available, as documented in an approved Nutrient Management Plan, to handle the amount of manure produced by Defendants.

G.    Issuing temporary and/or permanent injunctive relief against Defendants, ordering Defendants to design and implement a regular soil sampling protocol, such protocol to require sampling at one-foot intervals down to at least a four-foot depth, in order to prevent the ongoing migration of nitrate (and other pollutants including Other Contaminants) to the vadose zone and groundwater.  Such soil

sampling protocol must include soil moisture concentrations to be able to convert the soil nitrate data to concentration in the soil solution.

H.    Issuing temporary and/or permanent injunctive relief against Defendants, ordering Defendants to design and implement a groundwater monitoring program designed to detect the transport of dairy manure nutrients and Other Contaminants into groundwater.

I.    Issuing temporary and/or permanent injunctive relief against Defendants, ordering Defendants to supply clean, safe drinking water to residents located within at least three (3) miles of Cow Palace Dairy who rely upon well water for consumption.

J.    Issuing temporary and/or permanent injunctive relief against Defendants, ordering Defendants to sample all surface waters running through or adjacent to Defendants' property to determine whether discharges from the Defendants' operations are impacting surface water.

K.    Ordering Defendants to take all such actions as may be necessary to eliminate any present and future endangerment and open dumping practices, including but not limited to:

(a) funding an independent, comprehensive, scientific study to determine the precise nature and extent of the endangerment and harm caused by open dumping, including a detailed examination of the fate and transport of solid

waste from the facility to the waters and soils of the surrounding area, and from the water and soils to biological receptors;

(b) funding an independent, comprehensive, scientific study, based on the results of the study described in subparagraph (a) above, of appropriate, effective, environmentally-sound means to eliminate the endangerment and harm caused by open dumping;

(c) developing and implementing an appropriate and effective remediation plan, based on the studies described in subparagraphs (a) and (b) above, which will remediate the soil and groundwater contamination caused by or contributed to by Defendants' past and present manure handling, storage, and application practices at Cow Palace Dairy;

(d) developing and implementing manure disposal and storage techniques in accordance to the scientific studies described in subparagraphs (a) and (b) above;

(e) providing Plaintiffs with complete copies of records from the past twenty years concerning Defendants' soil sampling, manure sampling, groundwater sampling, lagoon construction and sampling, manure applications, third-party manure transfers, and composting operations; and

(f) providing Plaintiffs with complete copies of all future records created by Defendants concerning Defendants' soil sampling, manure sampling,

groundwater sampling, lagoon construction and sampling, manure

applications, third-party manure transfers, and composting operations.

L.    Ordering Defendants to pay Plaintiffs' reasonable attorneys' fees, expert

witness fees, and costs incurred in prosecuting this action pursuant to 42 U.S.C. §

6972(e) and 28 U.S.C. § 2412(d); and

M.    Ordering such other relief as the Court may deem just and proper, including

pursuant to 42 U.S.C. § 6972(a)(1).


Dated: October 6, 2014.

        Respectfully Submitted,

s/ Brad J. Moore                          s/ Charles M. Tebbutt
BRAD J. MOORE, WSBA #21802                CHARLES M. TEBBUTT, *pro hac vice*
Stritmatter Kessler Whelan                DANIEL C. SNYDER, *pro hac vice*
200 Second Ave. W.                        Law Offices of Charles M. Tebbutt, P.C.
Seattle, WA  98119                        941 Lawrence St.
Tel. 206.448.1777                         Eugene, OR 97401
E-mail: Brad@stritmatter.com              Tel. 541.344.3505
                                          E-mails: charlie.tebbuttlaw@gmail.com
*Counsel for Plaintiffs*                    dan.tebbuttlaw@gmail.com

                                          *Counsel for Plaintiffs*


s/ Elisabeth A. Holmes                    s/ Jessica L. Culpepper
ELISABETH A. HOLMES,                      JESSICA L. CULPEPPER, *pro hac vice*
*pro hac vice*                              Public Justice
GEORGE KIMBRELL, Washington               1825 K Street NW, Ste. 200
State Bar No. 36050                       Washington, DC 20006
Center for Food Safety, 2nd Floor         Tel. 202.797.8600
303 Sacramento Street                     E-mail: jculpepper@publicjustice.net
San Francisco, CA 94111

THIRD AMENDED COMPLAINT                                                    41

Tel. 415.826.2770                    *Counsel for Plaintiffs*
E-mails:
eholmes@centerforfoodsafety.org
gkimbrell@centerforfoodsafety.org

*Counsel for Plaintiff Center for Food Safety*


s/ Toby James Marshall
TOBY JAMES MARSHALL
BETH E TERRELL
Terrell Marshall Daudt & Willie PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
206-816-6603
Emails:
bterrell@tmdwlaw.com
tmarshall@tmdwlaw.com

*Counsel for Plaintiffs*

1

CERTIFICATE OF SERVICE

2

    I hereby certify that on October 6, 2014, I presented the foregoing document
to the Clerk of the Court for filing and uploading to the CM/ECF system, which

3

will send notification of such filing to the following:

4

     Debora K. Kristensen           dkk@givenspursley.com
     Brendan V. Monahan           bvm@stokeslaw.com

5

     Jeffrey C. Fereday              jefffereday@givenspursley.com
     Mathew L. Harrington          MLH@stokeslaw.com

6

     Olivia E. Gonzalez             Olivia.Gonzalez@stokeslaw.com
     Preston N. Carter              prestoncarter@givenspursley.com

7

     Sean A. Russel                sean.russel@stokeslaw.com

8

9

10

11

                                 s/ Sarah A. Matsumoto

12

                                   Sarah A. Matsumoto
                                   Law Offices of Charles M. Tebbutt, P.C.

13

14

15

16

17

18

19

20