# — EXHIBIT  5 —

In The Matter Of:

# CARE

vs.

# Cow Palace

# Deposition of

# James Maul

# October 31, 2014



**Central Court Reporting**
800.442.DEPO
Support@centralcourtreporting.com
www.centralcourtreporting.com

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT OF WASHINGTON

 3

 4    COMMUNITY ASSOCIATION FOR         )
      RESTORATION OF THE ENVIRONMENT,   )
 5    INC., a Washington Non-Profit     )
      Corporation,                      )   NO. CV-13-3016 TOR
 6                                      )
               and                      )
 7                                      )
      CENTER FOR FOOD SAFETY, INC., a   )
 8    Washington, D.C. Non-Profit       )
      Corporation,                      )
 9                                      )
                    Plaintiffs,         )
10                                      )
               vs.                      )
11                                      )
      COW PALACE, LLC, a Washington     )
12    Limited Liability Company, THE    )
      DOLSEN COMPANIES, a Washington    )
13    Corporation, and THREE D          )
      PROPERTIES, LLC, a Washington     )
14    Limited Liability Company,        )
                                        )
15                  Defendants.         )

16

17

18        DEPOSITION UPON ORAL EXAMINATION OF JAMES MAUL

19

20                    October 31, 2014
                         8:35 a.m.
21           936 North 34th Street, Suite 300
                    Seattle, Washington
22

23        TAKEN AT THE INSTANCE OF THE PLAINTIFFS

24
      REPORTED BY:
25    PHYLLIS CRAVER LYKKEN, RPR, CCR NO. 2423
```

CERTIFIED COPY

DECLARATION OF CHARLES M. TEBBUTT - 311

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 2

1  APPEARANCES:
2    FOR THE PLAINTIFFS:
3      MESSRS. CHARLES M. TEBBUTT and  DAN SNYDER
         Law Offices of Charles M. Tebbutt
4      Attorneys at Law
       941 Lawrence Street
5      Eugene, OR  97401
       541.344.3505    541.344.3516 FAX
6      charlie.tebbuttlaw@gmail.com
7    FOR THE DEFENDANTS COW PALACE AND DOLSEN COMPANIES:
8      MR. PRESTON N. CARTER
       Givens Pursley
9      Attorneys at Law
       601 West Bannock
10     P.O. Box 2720
       Boise, ID  83701
11     208.388.1200    208.388.1300 FAX
       prestoncarter@givenspursley.com
12
         and
13
       MS. KRISTA L. NELSON
14     Stokes Lawrence
       Attorneys at Law
15     1420 Fifth Avenue, Suite 3000
       Seattle, WA  98101
16     206.626.6000    206.464.1496 FAX
       krista.nelson@stokeslaw.com
17
     FOR THE DEFENDANT THREE D:
18
       MR. RALPH H. PALUMBO
19     Summit Law Group
       Attorneys at Law
20     315 Fifth Avenue, Suite 1000
       Seattle, WA  98104-2682
21     206.676.7000    206.676.7001 FAX
       ralphp@summitlaw.com
22
     ALSO PRESENT:
23
       MR. BILL DOLSEN
24     MR. ADAM DOLSEN
25

Page 3

## I N D E X

1
2  CARE, et al. vs. COW PALACE, et al.
   NO. CV-13-3016 TOR
3  October 31, 2014
4
5
6
          T E S T I M O N Y
7
8  JAMES MAUL                              PAGE NO.
9    Examination by Mr. Tebbutt            4 - 139
10
11
12
13
14
          E X H I B I T S
15
     (Exhibits 1 - 345 were marked in previous
16    depositions.)
17  Exhibit No. 346, Expert Report of James J. Maul,    7
     LHG
18
   Exhibit No. 347, Rebuttal Expert Report of James     7
19   J. Maul, LHG
20  Exhibit No. 348, Laboratory Analysis Reports       68
21  Exhibit No. 349, EPA Report                        83
22
23
24
25

Page 4

1         BE IT REMEMBERED that on Friday, October
2    31, 2014, at 8:35 a.m., at 936 North 34th Street,
3    Suite 300, Seattle, Washington, the deposition of
4    JAMES MAUL was taken before Phyllis Craver Lykken,
5    Certified Court Reporter.  The following
6    proceedings took place:
7
8         JAMES MAUL,  being first duly sworn to tell
9                       the truth, the whole truth and
10                      nothing but the truth,
11                      testified as follows:
12
13                    EXAMINATION
14  BY MR. TEBBUTT:
15  Q. Mr. Maul, would you please state your full name and
16     address for the record, please.
17  A. James J. Maul, 400 East Mill Plain Boulevard,
18     Vancouver, Washington, 98665.  I go by Jim.
19  Q. Mr. Maul, looking at your resume, I'm assuming you've
20     been deposed before?
21  A. Yes, sir, I have.
22  Q. How many times?
23  A. I'm not sure of the exact number, but I'd say in my
24     career it's probably been five, six times.
25  Q. How many times have you testified at trial?

Page 5

1  A. I've testified at trial in one trial.
2  Q. In federal or state court?
3  A. It was, I believe it was, I don't think it was state
4     court, it was like I think -- I'm trying to think of
5     the correct term.
6  Q. Is it administrative proceeding?
7  A. Yes.  Or civil proceeding.  Excuse me.  Yeah.  So it
8     would have been -- what's the word for one level down
9     from state?  Local?
10  Q. District court?
11  A. A district court.
12  Q. State district court?
13  A. Yeah.
14  Q. Or circuit court, something along those lines?
15  A. Yeah.  Yeah.
16  Q. In Washington?
17  A. Oregon.
18  Q. Just to go over a couple of ground rules, human nature
19     is that we sometimes anticipate questions and want to
20     give answers before the question is posed.  I would ask
21     that you wait until my question is finished before you
22     give any kind of an answer.  All right?
23  A. Sure.
24  Q. We'll need to give an audible answer, yeses and nos.
25     Nods of the head don't work; yeses and nos are the best

DECLARATION OF CHARLES M. TEBBUTT - 312

http://www.ynslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                James Maul 10/31/2014

Page 6

1   or, you know, if it's a narrative answer, by all means.
2       If you don't understand my question, please tell
3   me, otherwise I will assume you understand my question.
4   Okay.
5   A. Yes.
6   Q. You'll hear, it's highly likely, more likely than not
7     from a reasonable degree of scientific certainty, that
8     your counsel will impose some objections today.  Those
9     objections, however, unless you're instructed not to
10    answer, you still must answer the question.  Do you
11    understand that?
12  A. Yes.
13           (MESSRS. BILL AND ADAM DOLSEN
14            ENTERED THE ROOM.)
15  Q. And you know that this deposition has a number of uses.
16    It can be used at trial, for instance, if you're
17    unavailable.  Do you know that it can be used as
18    testimony of yours if potentially you're unavailable at
19    trial?
20  A. Okay.
21  Q. And it can also be used in a number of ways.  For
22    instance, if you were to testify at trial to something
23    that's outside the scope of your expert report and you
24    opine differently at trial than what you opined in one
25    of your expert reports, it can used to limit your

Page 7

1   testimony at trial.  Do you understand that?
2   A. Yes.
3   Q. And do you also understand that it can be used to, if
4     you give a different answer at trial, it can be used to
5     show that you gave different answers at different
6     times, both under oath.  Do you understand that?
7   A. Yes.
8       MR. CARTER:  Counsel, if it's all right, before we
9     get started, Mr. Maul inadvertently left off a
10    publication that was made within the last ten years
11    from his resume in his report, so he's willing and
12    able to say what that publication is at this time.
13  Q. All right.  What is the publication?
14  A. It was Integrated Brown Field Planting.  It was
15    published in May of 2010 in the Oregon Insider, a
16    publication in Oregon.
17  Q. Didn't have anything to do with nitrate contamination,
18    did it?
19  A. No.
20  Q. Is there anything else that you left out of your report
21    that we should know about this morning?
22  A. Not that I'm aware of.
23      MR. TEBBUTT:  Off the record for a second.
24          (PLAINTIFF EXHIBIT NOS. 346 & 347 WERE
25           MARKED FOR IDENTIFICATION.)

Page 8

1   Q. Mr. Maul, have you ever done an expert report in a
2     federal case like you did for this particular case?
3   A. No.
4   Q. I'm going to go hand you what's been marked as Exhibits
5     346 and 347 in this case and ask you first is 346 a
6     complete copy of your initial expert report in this
7     matter?
8   A. Yes.
9   Q. And 346 is a complete copy of your initial expert
10    report?
11  A. I believe it is.
12  Q. Okay.  By the way, I forgot to tell you, for the
13    record, I'm Charlie Tebbutt.  I represent CARE and The
14    Center For Food Safety in this case against Cow Palace
15    and against Henry Bosma Dairy and DeRuyter Dairy.  Do
16    you understand that?
17  A. I understand that.
18  Q. Okay.  We've never met before, have we?
19  A. No.
20  Q. Exhibit 347, is that a complete copy of the rebuttal
21    report you provided in this case?
22  A. Yes.
23  Q. Just keep those nearby and we'll be referring to them
24    every now and again.  In fact, I'm going to start off
25    by asking you about some of your projects that you've

Page 9

1   worked on over time.
2       You said you did a Clatsop Plains 208 groundwater
3   study.  What's a 208 study?
4   A. It was a federally funded program to study aquifers
5     that were considered to be sensitive to potential
6     impacts from septic systems as a result of anticipated
7     development.
8   Q. So to that Section 208 of the Clean Water Act,
9     area-wide planning?
10  A. Yeah, I believe that's what it was related to.
11  Q. And so did you work on behalf of the federal government
12    in that, in the Clatsop Plains case?
13  A. I was working for a private consulting company, Sweet,
14    Edwards & Associates and they were under contract to
15    another engineering company, I believe it was R.W.
16    Beck, I'm not positive, and we were subcontracted to do
17    the groundwater investigation portion of the study.
18  Q. So essentially you worked for the developer, the
19    proposed developer in that case?
20  A. Well, it was a federally funded program, so we were --
21    actually, I believe the money was administered through
22    Clatsop County in that case, if I remember right.  I
23    think it was administered through a local governmental
24    agency that then they, they contracted and paid to --
25    paid for the activities associated with the study.

DECLARATION OF CHARLES M. TEBBUTT - 313

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                          James Maul 10/31/2014

Page 10

1  Q. So you essentially ended up, you worked for Clatsop
2     County, then?
3  A. Yes, yes.
4  Q. Okay.  And you said you evaluated hydrogeologic
5     conditions and the impact from nitrate loading
6     associated with anticipated development to shallow
7     groundwater.  How big a development were we talking
8     about here, what kind of development?
9  A. Well, it wasn't a single development, it was -- the
10    focus and nature of the study was to look at an area of
11    the Clatsop dune aquifer.  It was roughly from, if
12    you're -- I don't know if you're familiar with that
13    area or not.  Gearhart, north of Gearhart almost to
14    Warrenton.  And let's see...
15 Q. Let me stop you.
16 A. It was a fairly large area and --
17 Q. That's what I was going to try to get at, is what kind
18    of an area.  Do you know how many square miles?
19 A. No, I don't.  But it was probably an area that was ten
20    miles long between Highway 101 and the ocean.
21 Q. Ten miles long.  About how many miles wide, do you
22    know, approximately?
23 A. A couple miles wide, maybe, yeah.
24 Q. So 20, 30, 40 square miles, something like that?
25 A. It was a fairly large area, yeah.

Page 11

1  Q. How much development was proposed for that area, how
2     many people were you looking at in your modeling to
3     project what the nitrogen loading might be?
4  A. I don't know.
5  Q. Hundreds, thousands?
6  A. There were going to be -- I think, I believe that there
7     were, it was in anticipation of a number of homes being
8     developed on the dune, subdivisions.  I don't know the
9     numbers.
10 Q. Did you develop a model along with that about what the
11    nitrogen loading might be to the dunal aquifer?
12 A. There was a model developed, I didn't develop it.
13 Q. That wasn't what your firm was asked to do?
14 A. That wasn't, no.
15 Q. Hang on, wait until I ask my question.
16 A. Sorry.
17 Q. It's human nature to have these kinds of discussions,
18    but for the court reporter's purposes we have to go
19    slowly.
20 A. I understand.
21 Q. Please don't talk over one another because the court
22    reporter can only get one of our statements down at a
23    time.  So refrain, please, from interjecting something
24    until I'm done and I've asked you a question.  Okay?
25 A. Fair enough.

Page 12

1  Q. Thanks.  I'll remind you of that probably throughout,
2     because I know we all fall back from that sometimes.
3        I see you have done at least two other of these
4     208 types of area-wide planing studies; is that fair to
5     say?
6  A. Yes.
7  Q. Are those the only -- the Florence project in Oregon
8     and the Deschutes Basin project in Oregon, are those
9     the only two other 208 studies that you have done or
10    participated in?
11 A. Yes.
12 Q. And those all dealt with evaluating impacts from
13    nitrogen loading, correct, or potential impacts from
14    nitrogen loading?
15 A. Yes.  Relative to septic tanks, yes.
16 Q. What I would really like to just get to rather than
17    spending a lot of time beating around the bush is
18    whether you've done, you've calculated what the
19    nitrogen loadings are in any of these cases, any of
20    these potential cases, these three cases.
21    MR. CARTER:  Object -- you clarified it.  My
22    objection was confusing.  But.
23 Q. Could you repeat the question, please?
24 Q. Yeah.  Have you done any calculations of what the
25    nitrogen loadings are in any of the 208 studies we're

Page 13

1     talking about right now?
2  A. No.
3  Q. So how do you evaluate the impact from nitrogen loading
4     without knowing what the loading is?
5  A. I was evaluating the hydrogeology as it related to that
6     component of the study.
7  Q. So were nitrogen loading modeling calculations given to
8     you to determine whether they would impact groundwater?
9  A. No.  We -- I was collecting data that would be used in
10    other modeling efforts and calculations to evaluate
11    nitrogen loading to the groundwater.  I didn't do the
12    calculations.
13 Q. So isn't it, then, a misstatement that you evaluated
14    the impact from nitrogen loadings in these three cases?
15 A. That may not be precise.
16 Q. Well, that's why I would like to get to.  Precision is
17    a lot of what we're talking about --
18 A. Is part of the project.
19 Q. Hang on a second.  Precision is a lot of what we're
20    talking about here today, so I want to be precise with
21    what you're saying you've done.
22       You did not in fact evaluate the nitrogen loadings
23    to the aquifers in either of these three 208 studies,
24    correct?
25 A. I didn't do those calculations.

DECLARATION OF CHARLES M. TEBBUTT - 314

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 14

1   Q. So then the statements in your resume are incorrect,
2      are they not?
3          MR. CARTER: I'll object, counsel. What page are
4      you looking at? It might be helpful for Mr. Maul to
5      review them.
6   Q. Feel free to take a look. This is his qualifications
7      and expert disclosures attachment to his report.
8          MR. CARTER: What page?
9          MR. TEBBUTT: Starting on the first page under
10     project examples.
11         MR. CARTER: Which example are we talking about?
12         MR. TEBBUTT: Clatsop Plains 208 or Florence,
13     Oregon Dunes 208 and Deschutes Basin 208.
14         MR. CARTER: I'll object. That misstates what's
15     stated on the resume. The resume on the Florence,
16     Oregon, 208 says Mr. Maul evaluated hydrogeologic
17     conditions and evaluated the impact of nitrogen
18     loading.
19  Q. (By Mr. Tebbutt) Exactly. My question is, you didn't
20     evaluate the impact from nitrogen loading, did you, in
21     the Florence case?
22  A. I didn't do the calculations evaluating the impact.
23  Q. Someone else did?
24  A. From nitrogen loading. Yes, there was another person
25     that took data that I participated in collecting as a

Page 15

1      part of that study and used that to evaluate the impact
2      of nitrogen loading to that aquifer.
3   Q. I'll try to get right to the point here. The Deschutes
4      Basin 208 study and the Clatsop 208 study you did not
5      evaluate the impact from nitrogen loading in either of
6      those two cases, either, did you?
7          MR. PALUMBO: Objection. Asked and answered.
8   Q. If you want to say no, we can move on. Or that's
9      correct that you didn't, then we can move on.
10         MR. PALUMBO: Counsel, let the witness answer the
11     question.
12         MR. TEBBUTT: You just said asked and answered and
13     I'm trying to find out what the answer was.
14         MR. PALUMBO: I state my objection, you permit the
15     witness to answer, and then you can ask another
16     question.
17         MR. TEBBUTT: This is my deposition and I'll
18     handle it the way I'd like, Mr. Palumbo.
19         MR. PALUMBO: I'll continue to object the way I
20     like.
21  A. I was part of a study that evaluated the impacts from
22     nitrogen loading to the aquifer in all three of these
23     situations. I didn't perform the calculations, but I
24     helped develop the information that went in to the
25     study and the results.

Page 16

1   Q. All right. My question again is you did not evaluate
2      the impact from nitrogen loading in either -- any of
3      these three cases, did you?
4          MR. PALUMBO: Same objection. Asked and answered.
5          MR. CARTER: Asked and answered.
6   A. I didn't do the calculations that went in to
7      determining the loading to the -- of nitrogen to the
8      aquifer.
9   Q. Not only did you not do the calculations, you did not
10     evaluate the impact of those calculations, did you?
11         MR. PALUMBO: Same objection. Asked and answered.
12         MR. CARTER: Same objection.
13  A. Maybe I don't understand what you mean by evaluated.
14  Q. That's what I'm trying to get at, because that's what
15     you say. You say you evaluated the impact from
16     nitrogen loading and I asked you what were the impacts
17     and you said I don't know, I didn't do those
18     evaluations.
19         MR. PALUMBO: Objection. Mischaracterizes the
20     witness's testimony.
21  Q. Isn't that a fair statement?
22  A. I didn't do the calculations that went into calculating
23     the impacts from nitrogen loading.
24  Q. I've heard you say that now a few times.
25  A. Uh-huh.

Page 17

1   Q. That's not answering my question. You didn't evaluate
2      the impacts from the nitrogen loading in any of those
3      three cases, someone else did that, correct?
4          MR. PALUMBO: Same objection.
5          MR. CARTER: Same objection.
6   A. I think I'm beginning to understand your question a
7      little bit better, counselor.
8          I did perform evaluations of the potential for
9      nitrogen loading relative to some of the predicted
10     impacts. For example, evaluating the hydrogeology and
11     where groundwater would discharge and the hydro-
12     geologic characteristics of the dunes was part of the
13     evaluation.
14         So I didn't do the calculations of the nitrogen
15     loading, but I was part of a project team and I did
16     perform evaluations that went into addressing the
17     potential impacts of the loading.
18  Q. Right. So in your work you looked at hydrogeologic
19     conditions and potential pathways of contaminant
20     transfer; is that a fair statement?
21  A. Yes.
22  Q. But you didn't apply the nitrogen loading potential to
23     the transport mechanisms themselves; is that a fair
24     statement?
25  A. Could you repeat that? I'm sorry.

DECLARATION OF CHARLES M. TEBBUTT - 315

http://www.youtube.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                      James Maul 10/31/2014

Page 18

1  Q. I'll rephrase it.
2  A. I'm not sure I understand.
3  Q. You looked at the general hydrogeologic conditions,
4     correct?
5  A. I was part of the data collection and developing the
6     interpretation of that data --
7  Q. Okay.
8  A. -- relative to the hydrogeologic conditions.  For
9     example, relative to the Clatsop Plains.
10 Q. What type of date it did you collect?
11 A. Groundwater monitoring data, hydrology data, soils
12    data, prepared drilling logs, collected samples of
13    effluent from septic tanks, septic systems, helped
14    tabulate.
15 Q. In that particular area?
16 A. Tabulated data.  Yes.
17 Q. Okay.  And so the, you put in monitoring wells in the
18    area?
19 A. Yes.
20 Q. Okay.  And as part of the work that you did, was there
21    a nitrogen loading estimate for the development in
22    these three projects?
23 A. Yes.
24 Q. Okay.  Did you apply those nitrogen loading estimates
25    to your hydrogeologic work that you did and make a

Page 19

1     determination whether the nitrogen loadings could
2     impact the aquifers in any of these three studies?
3  A. I don't believe that I did that.
4  Q. Isn't it fair to say, then, that you didn't evaluate
5     the impact from nitrogen loading in these three cases?
6        MR. CARTER:  Objection.  That's been asked and
7     answered.
8  A. I'm not, I'm not sure that I can give you a precise
9     answer to that, because I was part of a project team
10    that performed -- that looked at a number of different
11    parameters and provided input and analysis, including
12    report preparation.  So I, I can't say that I wasn't
13    part of the team that evaluated that.
14 Q. You were part of the team, but you're not the one who
15    did the evaluations, correct?
16 A. I wasn't the lead on the evaluations.
17 Q. We'll move on.
18       Now, keeping an eye on your attachment again, the
19    Agripac study that you did in Lane County, Washington;
20    is that correct?
21 A. No, that would be Lane County, Oregon.
22 Q. Okay.  So that's incorrect as well.  So it's Lane
23    County, Oregon, not Lane County, Washington?
24 A. I'm sorry.  Yeah, that is incorrect.
25 Q. Okay.  In the Agripac situation, did you determine what

Page 20

1     the potential nitrogen loading in the vegetable
2     processing operations were on groundwater?
3  A. No.
4  Q. You weren't asked to do that?
5  A. No.
6  Q. So you just developed -- when you say you developed
7     baseline data for nitrates, that was prior to the
8     Agripac 200-acre land application facility being put in
9     place or was it after the 200-acre land application
10    facility had been in place?
11 A. Prior to.
12 Q. So your job was just to determine what the nitrate
13    levels were in the groundwater under that area for
14    baseline purposes?
15 A. That and the hydrogeologic characteristics of the area.
16 Q. Your Clark County, Washington, project involved a
17    dairy, correct?
18 A. Yes.
19 Q. And a spill of what, manure?
20 A. Yes.
21 Q. How big was the spill, do you know?
22 A. It was pretty substantial in size, it ran into a stream
23    and probably impacted roughly three miles along the
24    reach of the stream downstream from where the discharge
25    occurred.

Page 21

1  Q. Did you do evaluations of the nutrient loadings to the
2     stream?
3  A. No.
4  Q. What did you do?
5  A. Developed a response plan for cleaning up as much of
6     the manure near the source area as possible, and
7     collected samples to evaluate for residual impacts
8     associated with the manure spill.
9  Q. Who did you work for in that case?
10 A. The dairy farmer.
11 Q. How big was the dairy?
12 A. 200 cows.
13 Q. What year was this?
14 A. I believe it was, it was around, I don't know the
15    exact --
16 Q. Approximately?
17 A. -- date.  Early 2000, I believe; might have been late
18    '90s.
19 Q. And so the volume of manure that you dealt with, was it
20    thousands of gallons, tens of thousands of gallons, do
21    you know what order of magnitude it was?
22 A. I don't recall the exact amount, I would guess it was
23    over, over a thousand gallons.
24 Q. Under 10,000?  Just wondering orders of magnitude?
25 A. Yeah, I'm thinking that's probably the range.  Yeah.

DECLARATION OF CHARLES M. TEBBUTT - 316

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 22

1  Q. Okay. And is that your only experience with dairy
2     farms in your professional experience?
3  A. Yes.
4  Q. Have you visited Cow Palace?
5  A. Yes.
6  Q. When?
7  A. It was this summer.
8  Q. How long were you there?
9  A. Probably a couple hours.
10 Q. Tell me about your, what did you do when you were
11    there?
12 A. Toured the facility.
13 Q. How did you tour it, by car, by foot, by?
14 A. By car, truck.
15 Q. Who were you there with?
16 A. Attorneys from Givens Pursley, Adam was on the tour.
17 Q. You're pointing to Adam Dolsen at the end of the table?
18 A. Yes, yes.
19 Q. Okay.
20 A. The dairy operations manager, I don't remember his
21    name.
22 Q. Jeff Boivin?
23 A. Might have been. I don't remember his name. My
24    colleague Tom Mullin, works for Maul, Foster & Alongi;
25    Matt Harrington, another attorney; another gentleman,

Page 23

1     and I don't remember his name, but he was an employee
2     of the Cow Palace. That's it.
3  Q. When you say attorneys from Givens Pursley, do you know
4     who they were?
5  A. Yes, it was Preston and --
6  Q. The gentleman sitting to your left?
7        MR. CARTER: Out of the office again.
8  A. And Jeff Fereday.
9  Q. Okay. Have you ever done any work for Givens Pursley
10    before this case?
11 A. No.
12 Q. Have you ever done any work for Stokes Lawrence before
13    this case?
14 A. No.
15 Q. Mr. Mullin, when did you -- you said Mr. Mullin is in
16    your employ now?
17 A. Yes.
18 Q. How long has he been in your employ?
19 A. I don't know the exact date of his joining MFA.
20 Q. I'm not asking for an exact date, but approximately
21    when?
22 A. Just a year, a little over a year.
23 Q. Okay. And he came from where?
24 A. From Arcadis.
25 Q. Did you personally hire Mr. Mullin?

Page 24

1  A. I was involved in his hiring him. I didn't personally
2     hire him.
3  Q. Had you known Mr. Mullin before you hired him?
4  A. No.
5  Q. Did he, did you ask him why he was leaving Arcadis?
6  A. We talked about it when we were having discussions
7     about him joining MFA.
8  Q. And what did he tell you?
9  A. He said he felt like Arcadis had gotten -- had grown to
10    the point where the office that Tom was in and just in
11    the Spokane area was sort of being -- did not really
12    fit with the Arcadis business model because of its
13    size; that Arcadis was targeting larger projects and
14    that he was looking for a smaller firm that he could go
15    to work for and feel like he was more engaged in
16    projects that fit, I guess fit better with -- a better
17    fit with the firm, would be a way to, a fair way to
18    describe it. And he felt like MFA offered that,
19    offered him that kind of opportunity and culture.
20 Q. Does he still work on the east side of Washington for
21    you?
22 A. Yes. Excuse me. He is actually based in Coeur
23    d'Alene. And works in both Washington and Idaho.
24 Q. So you have an office in Coeur d'Alene?
25 A. We are opening an office in Coeur d'Alene. We have an

Page 25

1     office in Kellogg right now and Tom works out of his
2     house in Coeur d'Alene until currently.
3  Q. Do you have other offices besides your office in
4     Seattle and the one in Kellogg?
5  A. Yes.
6  Q. Where else?
7  A. Bellingham.
8  Q. How many people are in that office?
9  A. There is about seven people in that office. Seattle,
10    four or five people. Vancouver, Washington, we have
11    about 15, 17 people there. And then in Portland,
12    Oregon.
13 Q. Did you consult with Mr. Mullen at all in preparing
14    your expert reports in this case?
15 A. Yes.
16 Q. What type of information did you acquire from Mr.
17    Mullen in preparing your report?
18 A. He assisted me in the review of the EPA report and he
19    also described some of the work that he had performed
20    when he was with Arcadis relative to the dairy AOC.
21 Q. Did Mr. Mullen present with you any data with respect
22    to his time when he worked for Arcadis?
23 A. He's helped me with locating some of the well logs for
24    some of the wells that are referenced in the EPA
25    report, and also directed me to some of the monitoring

                    Central Court Reporting    800.442.3376

DECLARATION OF CHARLES M. TEBBUTT - 317

http://www.ynslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                James Maul 10/31/2014

Page 26

1    well logs that were installed by Arcadis that Mr.
2    Mullen was also the -- had a role in logging some of
3    those wells and so he's describing a description of
4    some of the materials that he encountered in the
5    subsurface, and the geology and conditions in the area.
6    Q. Did Mr. Mullen bring any files with him from Arcadis
7       with respect to Cow Palace or Bosma or DeRuyter
8       facilities when he came to work for you?
9    A. Not that I'm aware of.
10   Q. Who else has assisted you in preparing your reports in
11      this case?
12   A. Erik Naylor is the other person who provided me with
13      assistance on the project.
14   Q. Who is Mr. Naylor?
15   A. He's a project chemist that works for MFA,
16      environmental scientist/project chemist.
17   Q. And what assistance did he provide?
18   A. He primarily reviewed the analytical data and the
19      Quality Assurance Project Plan and data quality
20      objectives and some of the validation that went into
21      the data and provided me with some input, and I
22      discussed with him the interpretation of the data.
23   Q. Okay.  So you're not a chemist yourself, correct?
24   A. That's correct.
25   Q. You relied on Mr. Naylor for the chemistry critique of

Page 27

1    the EPA report?
2    A. Yes.
3    Q. Mr. Maul, I want to ask you with respect to your
4       initial report in this case, what documents did you
5       have in front of you to make your determinations?  And
6       the reason I ask is I don't see a list of anything, any
7       documents that you relied on other than the references
8       that you make on the second to the last page.  No, I
9       won't go there.  Yeah, the references -- no.  I don't
10      even see any references.  You don't have any references
11      in your initial report, do you?
12   A. No.
13   Q. Is that unusual to do a 14-page report and not have a
14      single reference in it, scientific reference?
15   A. I was asked to review the EPA report and that's what I
16      did.
17   Q. Yeah, but when you do reviews, don't you usually cite
18      to other scientific literature for propositions that
19      you were putting forth?
20   A. That's a possibility.
21   Q. Isn't that kind of a usual scientific practice?
22   A. Not necessarily.
23   Q. No?  So just your --
24   A. In this case I relied on my experience.
25   Q. So your experience is the only reference that you have

Page 28

1    for your critique of the EPA report?
2    A. Yes.  I did, I did -- I briefly scanned the comments
3       that were prepared by Arcadis, but I didn't go into
4       reviewing them in any detail.
5    Q. The comments prepared by Arcadis critiquing the EPA
6       report?
7    A. Yes.  During the public comment period and then also
8       comments prepared by Mr. Turner and --
9    Q. Who is Mr. Turner?
10   A. There was a -- it was another set of comments that were
11      prepared by -- I forget what his first name is.  I
12      don't have it with me.
13   Q. Was it Stuart Turner?
14   A. Stuart Turner, yes, that's right.
15   Q. Was it Stuart?  Do you know Stuart Turner?
16   A. No, I don't know Stuart Turner.
17   Q. From Yakima?
18   A. Yeah.
19   Q. Did you rely at all on Mr. Turner's comments in
20      critiquing the EPA report?
21   A. There was one comment that he made regarding the
22      historical irrigation practices that I, I referenced in
23      terms of a possible source of groundwater contamination
24      other than the dairies.
25   Q. So you relied on his representation of the history?

Page 29

1         MR. CARTER:  Misstates prior testimony.
2    Q. Is that a fair statement?  You relied on his
3       representation of what the historical agricultural
4       practices were in that area, Mr. Turner's
5       representation?
6    A. I confirmed what I had heard anecdotally, yes.
7    Q. So what did you hear anecdotally about the history of
8       agricultural practices in that area?
9    A. It was just a reference to the flood irrigation
10      activities that had occurred, real common practice, my
11      understanding, in the Valley.
12   Q. Who did you hear that from?
13   A. I believe it was discussed during our tour of the Cow
14      Palace Dairy as we were talking about the historical
15      activities on the -- in the area.
16   Q. So who told you that?
17   A. Then -- I don't recall exactly who was, who made that
18      reference.  But then I followed up and discussed it
19      with Tom Mullen, and Tom was aware of it as well.
20   Q. Okay.  And was your confirmation of the anecdotal
21      discussions of the history of agricultural practices
22      confirmed by your review of Stuart Turner's comments?
23   A. It was supported by Stuart Turner's comments.
24   Q. So is that your scientific basis for the history of the
25      agricultural practices in the area, Mr. Turner's

DECLARATION OF CHARLES M. TEBBUTT - 318

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                    James Maul 10/31/2014

Page 30

1    comments?
2    A. After preparing my up initial report, I also reviewed a
3        document that is referenced in my rebuttal report that
4        also documents the history of flood irrigation in the
5        Yakima Valley and the historical practices.
6    Q. Take a look at Exhibit 347, your rebuttal report, and
7        tell me what it is you relied on for making that
8        determination.
9    A. That would be Zuroske, 2009.
10   Q. Okay.  Do you have any citation or data or information
11       to show whether there was flood irrigation practices at
12       or around the Cow Palace facility land?
13   A. I don't have specific documentation of that.
14   Q. None whatsoever?
15   A. None.
16   Q. So then you're speculating that flood irrigation
17       happened right at and around the Cow Palace facility;
18       is that correct?
19   A. No.
20           MR. CARTER:  Object.  That misstates prior
21       testimony.
22   Q. When you said no, you weren't speculating?
23   A. I'm sorry.  Could you repeat the question?
24   Q. Yeah.  So you're speculating, then, that some type of
25       flood irrigation happened at and around the Cow Palace

Page 31

1        facility?
2    A. No.
3    Q. What are you doing, then?
4    A. I am simply pointing out that it is a gap in EPA's
5        evaluation, because it could have occurred in that
6        area.
7    Q. A volcano could have erupted there, too, right?
8           MR. CARTER:  I'll object, that's not a question.
9    A. Volcano --
10   Q. Anything could have happened there, right?
11   A. A volcano --
12   Q. Let me strike that.
13   A. Okay.
14   Q. You have no data, no direct data to show that flood
15       irrigation happened at the Cow Palace property prior to
16       Cow Palace's operations, do you?
17   A. I wasn't asked to evaluate that.
18   Q. That's not my question.  You don't have any data, do
19       you?
20   A. No.
21   Q. So what I would like to do right now is for you to tell
22       me the complete list of documents that you reviewed in
23       putting together your initial expert report.
24   A. My initial expert report?
25   Q. Yes.

Page 32

1    A. I reviewed, I relied -- I reviewed the EPA report.
2    Q. That's it?
3    A. That was what I focused my review on.
4    Q. Nothing else?
5    A. Other than what I had previously told you that I looked
6        at just very briefly before starting my review of the
7        EPA report.
8    Q. Tell me again what you looked at very briefly before
9        you did your evaluation?
10   A. Comments that were prepared by Arcadis, and then the
11       comments that were prepared by Stuart Turner.  But I
12       did not refer to them subsequently during my review of
13       the report.
14   Q. Yeah, I noticed they're not referred to.  That's it,
15       that's the complete universe of documents that you
16       looked at?
17   A. Yes.
18   Q. With respect to your rebuttal report, what documents
19       did you review in putting together your rebuttal
20       report?
21   A. They're listed.  I should note that the Schuman
22       reference is a mistake, that I did not review that in
23       preparing my rebuttal report.  Again, I looked at the
24       Arcadis reports that are referenced, the Coeur d'Alene
25       monitoring report for the third quarter.  My focus was

Page 33

1        to look at maps that had their monitoring well
2        locations on them so that I could then correlate those
3        to the well logs that were in the report and get a
4        sense of the methodology and the stratigraphy in those
5        areas.
6    Q. So you didn't look at those at all before doing your
7        initial report and critiquing the EPA evaluations of
8        the lithology in the area?
9    A. No, I didn't.  So the three Arcadis reports listed, I
10       looked at the Quality Assurance Project Plan that was
11       prepared by EPA.
12   Q. For your rebuttal report, but not for the original
13       expert report?
14   A. I didn't look at it for the original expert report.
15   Q. As a scientist, isn't that the kind of thing you would
16       want to review before critiquing a scientific study?
17   A. I was, again, I was looking, I was asked to review what
18       was in the EPA report, and that's what I did.
19   Q. And isn't the quality assurance plan an important part
20       of that report?
21   A. Yes, it does form the basis of the report.  It's
22       referenced and discussed in Appendix E and then, like I
23       said, I had assistance from Mr. Naylor and Erik had
24       reviewed the Quality Assurance Project Plan.
25   Q. But you hadn't?

DECLARATION OF CHARLES M. TEBBUTT - 319

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 34

1   A. I hadn't.
2   Q. And I looked at the Zuroske report.
3       MR. CARTER:  To clarify, that's with reference to
4   your rebuttal, not your initial.
5   A. That's correct.  Yes.
6   Q. That's what we're asking about right now is the
7   rebuttal.
8   A. Yeah.
9   Q. So this is the complete universe of documents that
10  you've reviewed about Cow Palace?
11  A. That's correct.
12  Q. Handing you what's been marked as Exhibit 324 in this
13  case, the EPA report in this case without all of the
14  appendices, did you review --
15      MR. CARTER:  Counsel, I'd object to the
16  introduction of that without the appendices.  The
17  appendices are referenced frequently within Mr. Maul's
18  report.
19      MR. TEBBUTT:  Sorry, it's already been introduced,
20  it's already Exhibit 324.
21      MR. CARTER:  In the interest of completeness, as
22  counsel have e-mailed previously, we've brought a clean
23  copy of the report that includes all of the appendices.
24      MR. TEBBUTT:  Okay.  You can do what you want for
25  it, but for right now we're going to go with

Page 35

1   Exhibit 324.
2   A. Excuse me, could you show me what this is, please?
3   Q. (By Mr. Tebbutt)  The EPA report.
4   A. This is the EPA report?
5   Q. Yeah, from 2013.  Updated 2013 report.
6   A. Okay.
7   Q. The references on pages 84 through 90 of Exhibit 324.
8   Did you review any of those references in critiquing
9   the EPA report?
10  A. No.
11  Q. And so EPA, the EPA report has six pages of references
12  backing up their particular report; you saw that?
13      MR. CARTER:  I'll object, that misstates the
14  document.
15  A. I saw the pages of references.
16  Q. Yeah.  Six pages?
17  A. Uh-huh.
18  Q. And you have no references for your critique, correct?
19      MR. CARTER:  Objection, misstates prior testimony.
20  A. I --
21  Q. There is none in your expert report, are there?
22  A. That's correct.  That's correct.
23  Q. So just to be clear, in your critique of, of your
24  rebuttal report on Dr. Shaw and Dr. Erickson, you
25  didn't look at any of the boring logs for the Cow

Page 36

1   Palace facility, right?
2       MR. CARTER:  I'll object.  That's ambiguous.  What
3   boring logs are you referring to?
4   Q. You didn't look at any boring logs in doing your
5   rebuttal report of Dr. Shaw or Dr. Erickson, correct?
6   A. No.  I said that I did.
7   Q. Oh.  You did?
8   A. Yeah.
9   Q. Which ones did you look at?
10  A. I looked at the boring logs.  I looked at boring logs
11  that were contained in the Arcadis report.
12  Q. Okay.
13  A. For the monitoring wells.
14  Q. Handing you what's been marked as Exhibit 332, are
15  those some of the boring logs that you reviewed?  Have
16  you seen those before?
17  A. No, no.
18  Q. Okay.  So you didn't look at those.  I'm going to hand
19  you what's been marked as Exhibit 333, and ask you,
20  there is four, a couple pages of color maps.  Did you
21  review any of those maps from any of the Arcadis
22  reports in doing your rebuttal report for Dr. Shaw or
23  Dr. Erickson -- or Mr. Erickson.  Excuse me.
24  A. I looked at a potentiometric surface map.  I don't
25  recall whether -- actually, I think I did.  Actually, I

Page 37

1   looked at the third and fourth quarter potentiometric
2   surface maps.
3   Q. Basically what we call contour maps?
4   A. They're called ground or potentiometric contour maps.
5   Q. Okay.  But you didn't do that before critiquing the EPA
6   study, correct?
7   A. That is correct.
8       MR. CARTER:  That misstates prior testimony.
9   Q. I don't think so.  We've got the answer, we're good to
10  go.
11      MR. CARTER:  Trying to keep the distinction
12  between the initial report and the rebuttal report.
13  Q. Sir, don't the contour maps provided -- there are two
14  contour maps, one for the third quarter 2013, Figure
15  15, and Figure 15 in the fourth quarter of 2013 Arcadis
16  report that are shown in Exhibit 333 -- don't those
17  confirm the statements made in the EPA report about
18  groundwater flow direction?
19      MR. CARTER:  I'll object, lack of foundation.
20  A. The EPA report did not contain groundwater contours.
21  Q. I understand that.  But don't these contour maps
22  confirm the findings in the EPA report about the
23  groundwater flow direction at and around the Cow Palace
24  property?
25      MR. CARTER:  I'll object again.  Lack of

Case 2:13-cv-03016-TOR   Document 205-2   Filed 11/17/14

CARE vs. Cow Palace                                          James Maul 10/31/2014

Page 38

1   foundation.
2   A. I think that there is a general similarity to the
3   conclusions drawn in the EPA report in that it, it
4   stated generally that groundwater flows from the
5   southeast -- or excuse me, from the northeast away from
6   the Rattlesnake Hills to the southwest.
7       The contours in the Arcadis report provide a
8   significant amount of additional precision.
9   Q. All right. They do confirm the EPA's conclusions in
10  their report --
11      MR. CARTER: Objection. Asked and answered.
12  Q. Let me finish my question, please.
13      (Continuing) -- about the groundwater directional
14  flow at and around Cow Palace, don't they?
15      MR. CARTER: Objection. Asked and answered.
16  A. I think that they are consistent with the EPA; I think
17  confirm is too strong a word.
18  Q. Consistent, we'll take consistent for today's purposes.
19  Did you ever look at the groundwater monitoring
20  results for the dairy wells?
21      MR. CARTER: Objection. That's vague and
22  ambiguous.
23  Q. For Cow Palace that Arcadis has located as part of the
24  OAC?
25  A. No.

Page 39

1   Q. Never?
2   A. No.
3   Q. Still today you haven't looked at them?
4   A. No.
5   Q. All right. As part of Exhibit 333, introduced
6   yesterday, they're summaries of the well results
7   collected by Arcadis as part of the AOC.
8   A. Uh-huh.
9   Q. Do you see those?
10  A. Uh-huh.
11  Q. I'd like you to take a look at YVD-10. Do you see
12  YVD-10?
13  A. Not yet. There it is.
14  Q. All right.
15      MR. CARTER: Counsel, can I have a moment to
16  review this document, please?
17      MR. TEBBUTT: By all means.
18      MR. CARTER: I'll object to the extent that these
19  tabulated results were -- what purports to be tabulated
20  results don't contain Bates numbers and haven't, to our
21  knowledge, been previously produced.
22      MR. TEBBUTT: Well, they were produced yesterday
23  and introduced while your counsel was sitting here.
24  Your objection is noted for the record and we'll move
25  through and ask some questions about this. If you

Page 40

1   would hand it back to the witness, please.
2       MR. CARTER: Counsel, are you representing that
3   these are summaries of the reports compiled under the
4   OAC?
5       MR. TEBBUTT: Yes.
6       MR. CARTER: Okay. All right.
7   Q. (By Mr. Tebbutt) If you'll turn to YVD-10, sir.
8   A. On the table?
9   Q. Yes. On the table.
10  A. Okay.
11  Q. Do you see those numbers for nitrates, ranging from
12  September 2013 at 95 parts per million nitrate?
13  A. Uh-huh, yes.
14  Q. And there are three other values for the succeeding
15  quarters, do you see those, the succeeding quarter of
16  December, 2013, 86.9 milligrams per liter nitrate?
17  A. Yes.
18      MR. CARTER: Counsel, I'll object. Are you
19  representing that each subsequent line represents a
20  different quarter?
21      MR. TEBBUTT: It's right there in the summaries.
22      MR. CARTER: Where?
23      MR. TEBBUTT: Take a look at it, the date, under
24  date, see where it says date?
25      MR. CARTER: I see. Thanks.

Page 41

1   Q. (By Mr. Tebbutt) You see those four values there, they
2   range from a low of 77.6 up to the 95 that we just
3   discussed for nitrates. Do you see those?
4   A. Yes.
5   Q. And then let's take a look at the -- compare that to
6   the first page of Exhibit 333, the map, the contour
7   map. First page --
8   A. I'm sorry.
9   Q. We can use multiple places if we want.
10  A. Okay.
11  Q. See where YVD-10 is?
12  A. Yes.
13  Q. And that's directly south of the Cow Palace facility,
14  do you see that this -- I'll represent to you this is
15  the Cow Palace facility.
16  A. Yes.
17  Q. Okay. Let's just keep that map right there and let's
18  look at YVD-15. Do you see that, on the same page, as
19  part of Exhibit 333?
20  A. Yes.
21  Q. And you see the nitrate levels for YVD-15 ranging from
22  a low of 47.4 up to 88.1 milligrams per liter of
23  nitrate?
24  A. Yes.
25  Q. And those are for those successive four quarters which

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 42

1    have been made available to the plaintiffs.  You can
2    see the dates in that summary?
3    A. Uh-huh.
4    Q. YVD-15.
5    A. Yes.
6    Q. You see YVD-15 on the map?
7    A. I do.
8    Q. And that's just further south of YVD-10, correct?
9    A. Yes.
10   Q. Now, let's take a look on the next page, one of the
11   pages of Exhibit 333, I believe it's the last page of
12   Exhibit 333.  You see the entry for DC-04?
13   A. Yes.
14   Q. And you see the nitrate results for DC-04 ranging from
15   26 parts per million nitrate up to 37.3?
16   A. Yes.
17   Q. Did you see those.  Okay.  And you see where DC-04 is
18   on the map, the first page of Exhibit 333?
19   A. I haven't looked DC-04.  I guess is that -- it's right
20   there.
21   Q. All right.  That is at the southern end of the Cow
22   Palace property?
23   A. I don't see the boundary of the Cow Palace property
24   identified on the figure.
25   Q. Okay.  See the black lines, the heavy black lines

Page 43

1    around that purport to encompass an area on
2    Exhibit 333?
3    A. Yes.
4    Q. And looking at the legend for Figure 15 of Exhibit 333,
5    you see the legend where it says the approximate
6    boundary of the dairy facilities with that black line?
7    A. Yes.
8    Q. Okay.  And I'll represent to you that -- well, let's
9    see.  The red area, you see the red lines kind of in
10   the middle of Exhibit 333?
11   A. Yes.
12   Q. Those are the Cow Palace property lines.  Do you see
13   that it didn't say that specifically, but I'll
14   represent to you that within that red area is the
15   ownership of the Cow Palace property.  Do you see that?
16   A. I see the red lines, yes.
17   Q. I'm going to ask you, then, just to acknowledge DC-03
18   as we go back to the chart and see DC-03, just off to
19   the southwest of the edge of the Cow Palace property.
20   A. Yes.
21   Q. Okay.  Let's take a look at DC-03D to begin with.  Do
22   you see the nitrate levels for DC-03D ranging from 38.9
23   to 46.4 micrograms per liter in the nitrate column
24   here?
25   A. Yeah.  I'm just confirming that that's the nitrate

Page 44

1    column.  It appears to be.  And what was the the,
2    question about the range again?
3    Q. Just that you see them.  That it confirms that the
4    range is from 38.9 to 46.4?
5    A. Yes.
6    Q. Okay.  Let's turn the page back once to DC-03.  Do you
7    see the nitrate levels for DC-03 ranging from a low of
8    166 up to 34 milligrams per liter of nitrate; do you
9    see those?
10   A. Yes, I do.
11   Q. And you've never seen those before today; is that
12   correct?
13   A. That's correct.
14   Q. Have you ever looked at the groundwater hydrographs
15   prepared by Arcadis for the, I'm going to call them the
16   cluster dairies?  Are you familiar with the term
17   cluster dairies?
18   A. Yes, I am.
19   Q. You know what I'm talking about.  I'm talking about the
20   Cow Palace Dairy, the Bosma Dairies and the DeRuyter
21   Dairies that are defendants in this case that you're
22   working for the dairies on.  Do you understand that?
23   A. Yes.
24   Q. Have you ever seen the hydrographs that have been
25   prepared by Arcadis?

Page 45

1    A. For the cluster dairies?
2    Q. Yes.
3    A. No.
4    Q. Handing you what's been marked as Exhibit 334 from
5    yesterday's deposition.
6          MR. CARTER:  Counsel, I'd like to take a minute to
7    look at that.
8    Q. Actually, two days ago, Mr. Melvin's deposition.
9          MR. CARTER:  Counsel, you are representing that
10   these are excerpts from which Arcadis report?
11         MR. TEBBUTT:  They're identified on each page.
12         MR. CARTER:  I don't see the name of the report
13   that they come from.
14         MR. TEBBUTT:  Well, they came from you, they were
15   provided, as you can see, there's Bates numbers on each
16   page, they came from you guys.
17         MR. CARTER:  Right.  And do you know --
18         MR. TEBBUTT:  What are you objecting to?
19         MR. CARTER:  I'm asking you what the -- what
20   Arcadis report these are taken from.
21         MR. TEBBUTT:  I can't tell you right at the
22   moment.  But they're your documents.
23         MR. CARTER:  I understand.
24   Q. (By Mr. Tebbutt)  Mr. Mullen, I see you standing up, do
25   you need to take a break?

DECLARATION OF CHARLES M. TEBBUTT - 322

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 46

1  A. No, I just want to stretch.
2  Q. That's fine.  By the way, if you need to take a break,
3     please let me know, we'll accommodate that.  The only
4     thing is you can't take a break while a question is
5     pending.  Fair?
6        MR. CARTER:  Let's plan on taking a break in 10 or
7     15 minutes, I'll let you determine when you want that
8     to be.  But we've been at it over an hour now.
9  Q. Okay.  The hydrographic data you now see in front of
10    you, take a look at each page and just kind of
11    familiarize yourself with each one of the various
12    wells.  Have you had a chance to review those?
13 A. I've looked at them.  Yes.
14 Q. Okay.  Tell me, sir, in your words, are those, is that
15    the kind of data that you would look at as a
16    hydrogeologist to determine what the rate of recharge
17    would be for groundwater in an area if you were doing a
18    hydrogeologic investigation?
19       MR. CARTER:  Objection.  Lack of foundation.  It
20    also exceeds the scope of the opinions that have been
21    rendered in this case.
22 A. Yeah, I wouldn't be able to answer that without
23    understanding what the objectives of the data were and
24    the representations that were trying to be made.
25 Q. Okay.  But this is, in your field of expertise, this is

Page 47

1     the kind of information that is the kind of data
2     collection that would be important in making a
3     determination or a conclusion or an opinion about the
4     rate of recharge in a certain area, is this one type of
5     information you would look at?
6        MR. CARTER:  Objection.  Lack of foundation.
7  A. That, yeah, that would be -- I'm not sure exactly how
8     this would necessarily relate to an evaluation of
9     recharge.
10 Q. Okay.  Or perhaps --
11 A. What I see here is I see water level data.
12 Q. Yeah.
13 A. And I see it also on the graph, then, barometric
14    pressure.
15 Q. Right.  And these are for just a period of about three
16    months, right, from October to, well, even November,
17    only a period of about a month, right?
18 A. A little over a month.
19 Q. Yeah.  And so as an expert in hydrogeology that you
20    purport to be, looking at groundwater fluctuations over
21    a short period of time would be the kind of information
22    you would look at to determine whether surficial
23    impacts are happening to groundwater on a short-term or
24    a longer-term basis; is that fair enough?
25       MR. CARTER:  I'll object.  Lack of foundation and

Page 48

1     exceeds the opinions that have been expressed in the
2     reports and Mr. Maul has been asked to opine upon.
3  A. I'm sorry.  Could you repeat the question?  I'm not
4     sure I understood.
5  Q. This kind of information, hydrographic information and
6     groundwater fluctuations, that's one kind of data you
7     would collect to determine how quickly groundwater is
8     being impacted by surficial activities.  Fair enough?
9        MR. CARTER:  I'll object.  Same objections.  Asked
10    and answered.
11       MR. TEBBUTT:  He didn't answer it.  I'm rephrasing
12    the question.
13       MR. CARTER:  I believe he did two iterations ago.
14 A. I'm sorry.  Would you just -- back and forth here.
15 Q. Yeah.  I know it can get confusing.
16 A. I want to answer your question.
17 Q. I understand that's part of a lawyer's job is to try to
18    confuse the witness.  I understand.
19 A. Okay.
20 Q. That's not what I'm trying to do here.
21       MR. TEBBUTT:  Phyllis, can read back the last
22    question?
23       (THE REPORTER READ BACK THE PREVIOUS
24       QUESTION.)
25 A. I don't believe that short-term fluctuations of

Page 49

1     groundwater levels are necessarily indicative of
2     potential surface impacts.
3  Q. Right.  But it's one piece of information that you
4     would look at to help make that determination, wouldn't
5     you?
6        MR. CARTER:  Objection.  Same objections as
7     before.
8  A. It's, it would be part of characterizing the aquifer --
9     or determining aquifer characteristics.
10 Q. And wouldn't this help with determining the speed and
11    the time of groundwater recharge?
12       MR. CARTER:  Objection.  Lack of foundation,
13    exceeds the opinions that have been expressed in this
14    case.
15 A. And I'm just seeing this information for the first
16    time, and that's a pretty complicated question, so I
17    don't think that I can just spin off an opinion
18    regarding that without more extensive evaluation.
19 Q. Okay.  Would temperature data in the groundwater be the
20    kind of information that you would look at in
21    evaluating how long recharge or impacts from surficial
22    activity might influence groundwater levels, or
23    groundwater?
24       MR. CARTER:  Objection.  Lack of foundation and
25    exceeds the opinions that have been rendered.

DECLARATION OF CHARLES M. TEBBUTT - 323

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                      James Maul 10/31/2014

Page 50

1  A. I think there were a couple of different questions or
2     parameters involved in that question as well, so if I
3     could --
4  Q. Let's break it down.  Break it down into what you
5     think --
6  A. Could you read the question back to me, please.
7            (THE REPORTER READ BACK THE PREVIOUS
8            QUESTION.)
9  A. So the temperature data could be -- excuse me --
10    temperature data could be useful in evaluating
11    potential mechanisms for groundwater recharge and the
12    potential for impacts from surface activities.
13 Q. Right.  And that temperature information could also
14    help make determinations of how much time you might
15    think it takes for surficial activities to influence
16    groundwater, correct?  Is that a fair statement?
17       MR. CARTER:  Same objections.  Lack of foundation,
18    exceeds the scope of opinions that have been rendered.
19 A. And again, without looking, looking at that in the
20    context of a number of different inputs, it could be
21    one input to answering that question, and I don't have
22    enough information and it would take some time to
23    understand how that fit in with that type of
24    evaluation.
25 Q. Sure.  As a scientist, you want to look at as many

Page 51

1     pieces of the puzzle as possible, right?
2  A. Yeah, you would need to have a good problem statement
3     and conceptual model.
4  Q. Right.  And the hydrographic information we just looked
5     at would be one piece of the puzzle?
6  A. It could be.
7  Q. And the soil boring logs that we looked at would be
8     another piece of the puzzle?
9  A. Uh-huh, yes.
10 Q. And the groundwater monitoring results would be another
11    piece of the puzzle?
12 A. Yes.
13 Q. And contour maps would be another piece of the puzzle?
14 A. Relevant, yes.
15       MR. CARTER:  I'll object.  It's ambiguous as to
16    what the puzzle is.
17 Q. And the nitrogen isotope testing performed by EPA would
18    be another type of information that you would look at
19    in filling out that puzzle is?
20       MR. CARTER:  Objection.  That's ambiguous as to
21    what the question -- the overarching question is, the
22    puzzle, so to speak.
23 Q. You understand my question, don't you?
24 A. Could you re-ask me the question?
25 Q. Sure.  I mean the big puzzle is, right, we have a

Page 52

1     problem, right?  At least a hypothetical, a conceptual
2     problem, a conceptual model.  And in order to fill out
3     that conceptual model, we want to look at as much data
4     as possible, right?
5        MR. CARTER:  Objection.  What model are you
6     speaking about?
7  Q. Conceptually scientifically.
8        MR. CARTER:  Objection.  It's ambiguous what model
9     you are trying to speak about.  Are you trying to speak
10    of Cow Palace as a causation or are you trying to speak
11    about the EPA reports' conclusions which are the
12    subject of this deposition.
13       MR. TEBBUTT:  This is a general question at this
14    point.
15       MR. CARTER:  I understand.  I'm seeking
16    clarification of the question because it's ambiguous.
17 Q. I'll ask you the question, do you think it's ambiguous?
18 A. A little bit.  I don't understand quite where we're
19    going to.
20 Q. The big picture, the 30,000-foot picture, as a
21    scientist, when you see -- you're asked to evaluate a
22    potential problem, let's use Cow Palace as the example,
23    you're looking to determine whether Cow Palace is a
24    source of contamination of nitrate to groundwater.
25    There are a lot of different pieces that you would want

Page 53

1     to look at, right?  So you want to start with a
2     conceptual model at some point.  Right?  You have some
3     information, and from that you distill that to a
4     conceptual model.  Fair enough?
5        MR. CARTER:  Objection.  Lack of foundation and
6     goes beyond the opinions that have been expressed in
7     this case.
8  A. I wasn't asked to evaluate whether Cow Palace was a
9     source of groundwater contamination for purposes of the
10    report that I prepared.
11 Q. Not for your rebuttal report?
12 A. Nor for my rebuttal report.
13 Q. Yet you offer numerous opinions about why Dr. Shaw and
14    Mr. Erickson don't have enough data to support their
15    opinions, don't you, in your rebuttal report?
16       MR. CARTER:  Objection.  That misstates the
17    rebuttal report.
18 Q. Don't you?  Don't you critique Dr. Shaw's and Mr.
19    Erickson's conclusions?
20 A. I critiqued their conclusions, that's correct.
21 Q. And you said they didn't have enough data, among other
22    things, among other critiques?
23 A. I said that EPA -- I -- what I did was when I looked at
24    their reports, I looked specifically at their reliance
25    upon the EPA report.  I think that was pretty clear in

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 54

1    my rebuttal report.
2    Q. That's all you, all your critique is --
3    A. That was --
4    Q. Just a second, let me ask my question.
5    A. I'm sorry.
6    Q. So your critique of Dr. Shaw's and Mr. Erickson's
7       reports are only with respect to their reliance on the
8       EPA report?
9    A. Primarily.
10   Q. What else besides that? You say primarily.
11   A. Primarily.
12   Q. Right. What else is your critique based on?
13   A. There was, I believe, one or two references to other
14      information. You would have to -- I would have look at
15      my report.
16   Q. Yeah, we'll get to that.
17   A. Uh-huh.
18   Q. Again, we were just about to talk about groundwater
19      temperature information. Groundwater temperature
20      information could help determine how -- a piece of the
21      puzzle, again -- how fast surficial activities might be
22      impacting groundwater; would be fair to say?
23         MR. CARTER: Same objection. Lack of foundation,
24      exceeds the opinions.
25

Page 55

1    A. Could you read the question back to me again, please?
2         (THE REPORTER READ BACK THE PREVIOUS
3               QUESTION.)
4    A. What, what are you referring to by surface activities?
5       I'm, I'm still not quite sure I really understand the
6       question.
7    Q. Well, recharge from irrigation practices, irrigation
8       canals, those sorts of things. Surficial activities
9       being water at the surface impacting groundwater.
10   A. Could that be reflected in temperature variations?
11   Q. Yes.
12   A. Is that the question?
13   Q. Yes.
14   A. Yeah.
15   Q. Handing you what's been marked as Exhibit 335 in this
16      case during the Melvin deposition, this is a summary of
17      the temperature fluctuations from all of the Arcadis
18      reports and we will, just to anticipate your objection,
19      represent that these are an accurate summary of the
20      Arcadis data and they were not objected to by your
21      co-counsel two days ago.
22         MR. CARTER: Okay. I'm still going to object, not
23      Bates numbered, hasn't been produced, and it's your
24      representation that these data are accurate.
25   Q. Correct.

Page 56

1         MR. CARTER: With that.
2    Q. Correct. So let's take a look, we talked earlier about
3       DC-03, and DC-03 had nitrates as high as, I believe,
4       200 and -- let's get this accurate, since we're being
5       careful about this thing -- as high as 234 parts per
6       million nitrate. We have over a 11-degree centigrade
7       swing in the period of three months. Do you see that?
8    A. From September to December?
9    Q. Yep.
10   A. An 11.04 difference in temperature.
11   Q. Right. Degrees C?
12   A. Uh-huh.
13   Q. That's a large difference of temperature for
14      groundwater, isn't it, in a short period of time?
15         MR. CARTER: Objection. Lack of foundation and
16      exceeds the opinions that have been expressed.
17   A. I don't have any basis or point of reference to say
18      that it's to evaluate the magnitude of that swing. I
19      can see that it, assuming that these are accurate, that
20      there is an 11.04 degree difference between September
21      and December.
22   Q. And so what other data points are, or information do
23      you need to help determine whether these large swings
24      in temperature are a result of influences, relatively
25      fast influences from surficial activities?

Page 57

1         MR. CARTER: Same objections.
2    Q. What depth to water, for instance, would be helpful for
3       DC-03 to help make that determination of influences?
4         MR. CARTER: Same objections.
5    A. There's a number of factors that could come in to play
6       relative to what is the, what is causing the difference
7       in temperature.
8    Q. What factors?
9    A. It could be depth of water could be a factor, it could
10      be the difference in the hydrogeologic relationship --
11      hydraulic relationship between different water-bearing
12      zones, it could be the source of the recharge.
13   Q. Uh-huh. You've said in your rebuttal report that there
14      is no evidence of saturated conditions in the vadose
15      zones between the dairy facilities and the groundwater
16      tables. Is that a fair assessment of what you said in
17      your sum of your rebuttal to Dr. Shaw, Dr. Shaw's
18      report?
19         MR. CARTER: I'll object. Where are you referring
20      to?
21   Q. Is that a fair assessment, Mr. Maul?
22         MR. CARTER: Same objection. Where are you
23      referring to?
24   Q. I understand that's your objection. I'm asking Mr.
25      Maul if he understands right now without looking at his

DECLARATION OF CHARLES M. TEBBUTT - 325

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                          James Maul 10/31/2014

Page 58

1   report.

2       MR. CARTER: I'm repeating the same objection.

3  Q. That's fine. Do you understand my question? Can you

4    answer it, please?

5  A. Regarding evidence of perched groundwater in the vadose

6    zone? I had seen no evidence of perched groundwater in

7    the vadose zone.

8  Q. You also rebuttaled Dr. Shaw by saying that there was,

9    I believe you said it would take many years or decades

10   for incident precipitation or irrigation and any

11   accompanying nitrate to reach groundwater if it ever

12   does at all. And that's page 16 of your rebuttal

13   report.

14  A. I'm sorry, they're all page 16, we had a mistake in the

15   printing.

16  Q. Oh. Okay.

17      MR. CARTER: I'll object.

18  A. So maybe you could --

19  Q. I'll point you to it.

20  A. Direct me.

21  Q. It's in reference to -- or in response to No. 20. I

22   believe it's No. 20, referring to the Shaw report,

23   paragraph 20.

24  A. Uh-huh. Uh-huh. Right here.

25  Q. Yeah.

Page 59

1      MR. CARTER: I'll object. After reading this, it

2   confirms the objection that that misstates Mr. Maul's

3   statement in his report.

4      MR. TEBBUTT: I disagree with you.

5  Q. You said it can conceivably take many years or decades

6    for incident precipitation or irrigation and any

7    accompanying nitrate to reach groundwater if it ever

8    does at all, correct?

9  A. Yes.

10  Q. And that was in response to Dr. Shaw saying nitrate

11   readily leaches through the unsaturated zone of soil,

12   correct?

13  A. Yes.

14  Q. And is the temperature data that you just looked at --

15   let's take a look back at Exhibit 333 for a second.

16   Depth to water at DC-03, 85 feet, correct?

17  A. Yes.

18  Q. Would you expect an 11-degree C temperature variation

19   in three months if it took many years or decades for

20   influences from irrigation or precipitation practices

21   to reach groundwater, would you expect that kind of

22   temperature fluctuation so fast?

23      MR. CARTER: Objection. Lack of foundation, goes

24   beyond the opinions that were expressed.

25  A. I --

Page 60

1  Q. It's right -- just a second. Before you answer, it's

2    exactly what he's saying in No. 20.

3      MR. CARTER: He says conceivably. He has not

4   reviewed any of this data and for you to try to make

5   him come to an opinion based on your excerpts from

6   various reports we don't have complete copies of, it's

7   inappropriate and it goes beyond what was referenced in

8   this document.

9      MR. TEBBUTT: You have complete copies of them

10   because these come from the Arcadis reports.

11     MR. CARTER: You haven't presented Mr. Maul with

12   those and he previously testified that he hasn't

13   reviewed them.

14     MR. TEBBUTT: Phyllis, would you read back my

15   earlier question, please.

16      (THE REPORTER READ BACK THE QUESTION

17      ON PAGE 59, LINES 18-22.)

18     MR. PALUMBO: Counsel, if Mr. Maul is comfortable

19   with this, then I have no objection, but I find you

20   standing over the witness to be offensive and

21   inappropriate.

22     MR. TEBBUTT: I'm not trying -- I don't believe it

23   is at all.

24  Q. (By Mr. Tebbutt) Do you find it to be offensive or

25   inappropriate, Mr. Maul?

Page 61

1  A. I'm fine.

2      MR. PALUMBO: He looks like he can defend himself,

3   but I think it's inappropriate conduct by an attorney.

4      MR. TEBBUTT: Mr. Maul said he's fine. Thank you,

5   Mr. Palumbo.

6      (THE REPORTER READ BACK THE QUESTION

7      QUESTION.)

8  A. I'm going to start my answer to that question by saying

9   that I, I stand by the statement in my rebuttal report

10   that Mr. Shaw presented no data in drawing his

11   conclusions, and that there are other potential

12   explanations that are absent and not accounted for.

13   And with regard --

14  Q. I was trying to figure out what you mean by potential

15   explanations of --

16     MR. CARTER: Counsel, it goes both ways. He's not

17   going to interpret your questions, you can't interrupt

18   his answer. Mr. Maul, finish your answer.

19  Q. Go ahead.

20  A. And that as I previously stated, there could be a

21   number of variables that would account for a

22   temperature fluctuation, not just one circumstance or

23   event.

24  Q. What other --

25  A. And based upon those variables and the complexity of

DECLARATION OF CHARLES M. TEBBUTT - 326

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                James Maul 10/31/2014

Page 62

1  that type of issue, I don't believe that I can offer an
2  opinion regarding the variation in the temperature that
3  you're showing me.
4  Q. Okay. What other potential explanations can you have
5     for such wide variation swings?
6  A. Like I believe I stated in my earlier answer, there
7     could be changes in hydrology that happen seasonally
8     that can affect recharge relationships between
9     different geologic units. It could be a difference
10    associated with an irrigation canal and leakage from an
11    irrigation canal. There could be a number of different
12    circumstances.
13 Q. How about a lagoon pond?
14    MR. CARTER: Objection. Lack of foundation and
15    exceeds the opinions that have been expressed.
16 Q. Is that a conceivable explanation for fluctuations in
17    the temperatures?
18 A. As I've said, there could be a number of different
19    circumstances that would come into play that would need
20    to be evaluated.
21 Q. Okay. You've been to the Cow Palace facility, you've
22    been -- have you been to the Bosma facility?
23 A. Yes.
24 Q. And have you been to the DeRuyter facility?
25 A. Yes.

Page 63

1  Q. And were you at each of those facilities on the same
2     day in August?
3  A. Yes.
4  Q. So all three --
5  A. I believe it was in August. I --
6  Q. All three facilities in one day?
7  A. Yes.
8  Q. Did you drive over in the morning and leave in the
9     evening?
10 A. Yes.
11 Q. So you spent a total of one day. Do you know how many
12    total hours you spent on all three sites?
13 A. I would say it was four hours.
14 Q. For all three?
15 A. Yes.
16 Q. So a little over an hour at each facility?
17 A. Give or take.
18 Q. Fair enough?
19 A. Fair enough.
20 Q. Okay.
21 A. Might have been a little longer than that, but --
22 Q. And you've seen the, the irrigation canals, the Roza
23    and Sunnyside Irrigation Canals?
24 A. Uh-huh, yes.
25 Q. And you saw -- did you see all of the lagoons at the

Page 64

1  facilities?
2  A. I can't say with certainty that I saw them all. I
3     think we might have not toured one area of the lagoons,
4     but I saw lagoons at all three of the facilities.
5  Q. Okay. You might not have toured all of the lagoons at
6     the Cow Palace facility?
7  A. I saw all of the lagoons at the Cow Palace facility.
8  Q. And you've seen fields where irrigation practices occur
9     at those facilities?
10 A. Yes.
11 Q. Did you go north of the Cow Palace facilities north
12    above the Roza Canal and look at any of the
13    agricultural fields or other activities north of the
14    Roza Canal and north of the dairies?
15 A. I don't recall whether we did or not.
16 Q. So based on your tour of the facilities sometime, you
17    believe it was August, what would be the likely
18    influences to groundwater temperature fluctuations that
19    you saw?
20    MR. CARTER: Objection. Lack of foundation,
21    exceeds the opinions that have been expressed. And I
22    continue to object to attempting to have Mr. Maul draw
23    new conclusions based on limited data that was
24    presented solely today and solely picked by plaintiffs'
25    counsel.

Page 65

1  Q. Go ahead and answer my question, please.
2  A. Like I said, I have not been asked to evaluate that and
3     it's not something that, just sitting here for the
4     first time seeing this data, that I can offer you a
5     scientific opinion about.
6  Q. What I'm asking you is what surficial -- you discuss a
7     couple of different potential influences to groundwater
8     that you would need to know.
9  A. Three, I believe.
10 Q. And what were those three again?
11 A. One would be the potential interaction of other
12    geologic formations seasonally; the potential that
13    there could be changes in the Roza Canal; the third
14    could be the potential for seasonal recharge.
15 Q. Seasonal recharge from what, irrigation practices?
16 A. Precipitation.
17 Q. Okay. What about seasonal recharge from irrigation
18    practices, is that another conceivable influence?
19    MR. CARTER: Same objections as before.
20 A. It's a conceivable influence. I mean it's one that
21    could be considered in terms of several.
22 Q. Right. And lagoons built into earthen soil, would that
23    be another conceivable influence?
24 A. Could be a factor, sorry.
25    MR. CARTER: Same objections.

DECLARATION OF CHARLES M. TEBBUTT - 327

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 66

1   Q. It could be a factor, was that your answer?
2   A. It could be a factor.
3       MR. CARTER:  Counsel, I'm going to ask for that
4   break, if that's all right.
5       MR. TEBBUTT:  Sure.
6       MR. CARTER:  Thanks.
7       (A SHORT RECESS WAS HAD.)
8       MR. TEBBUTT:  Mr. Carter, are there no other
9   recording devices other than our court reporter here?
10      MR. CARTER:  Not that I know of.
11  Q. (By Mr. Tebbutt)  Mr. Maul, you have some familiarity
12  with septic systems; is that right, and nitrate impacts
13  from septic systems?
14  A. Some.
15  Q. How many septic systems have you evaluated in your
16  career?
17  A. Oh, I would say between 10 and 30.
18  Q. Okay.  And do you know what the highest concentration
19  of nitrates possible is from a residential septic
20  system?
21  A. No.
22  Q. Have you ever looked at any literature or done any
23  studies to determine what the possible nitrate loading
24  is from a residential septic system?
25  A. Early in my career I did some evaluation of siting of

Page 67

1   septic tanks and the potential impact for groundwater
2   impacts, but it's been -- that's been a while ago, and
3   I don't recall just exactly what the specifics or the
4   outcome was.
5   Q. Do you have any idea whether a septic system is capable
6   of having nitrate contamination, or the presence of
7   nitrates in excess of 80 parts per million in the raw
8   septic sludge itself at a residential home?
9   A. I don't know.
10  Q. Did you look at any of the water quality results from
11  the canals in forming your opinion about whether the
12  canals are a potential source of nitrogen contamination
13  to the groundwater?
14      MR. CARTER:  Object on foundation.
15  A. I didn't form an opinion about the canals and their
16  potential to be a source of contamination, that was
17  outside of the scope of my review.
18  Q. In critiquing the EPA report you said that the
19  irrigation canals could be a significant source of
20  nitrogen to the recharge of the groundwater, didn't
21  you?
22      MR. CARTER:  Objection.  Misstates testimony.
23  Counsel, if you would indicate where you're referring
24  to, we could clear up what was said and what wasn't.
25  Q. You did say that in your report, didn't you?

Page 68

1   A. Could you read the question back to me, please?
2       (THE REPORTER READ BACK THE QUESTION
3       QUESTION.)
4   A. Consistent with my earlier testimony, I said that there
5   could be -- which what I said, there could be a number
6   of different inputs that should be looked at, I was
7   pointing out in my critique of the EPA report that
8   would have been something, one of those components to
9   address, and that the canals could be a significant
10  source of nitrates because of the runoff from cropland
11  that they receive.
12      (PLAINTIFF EXHIBIT NO. 348 WAS
13      MARKED FOR IDENTIFICATION.)
14      MR. CARTER:  Counsel, I'll object to these.  I
15  don't see any Bates numbers and I don't know that these
16  have been produced to us and --
17      MR. TEBBUTT:  You're right that this particular
18  set doesn't have Bates numbers, but I will represent to
19  you that these have been produced to you as part of
20  ongoing discovery in this case from the October site
21  visit, the Rule 34 site visit.
22      MR. CARTER:  Okay.
23  Q. (By Mr. Tebbutt)  Handing you what's been marked as
24  Exhibit 348 in this case, if you'll look at the first
25  page of 348, Mr. Maul, you can see the nomenclature

Page 69

1   used for these samples.  Do you see the descriptions
2   there?
3   A. Can you show me what you're referring to?
4   Q. Yeah, I'm actually going to be referring to only two
5   things, LB-SS Canal SW.
6   A. Uh-huh.
7   Q. And CPR Canal SW.  I'll be referring to those two
8   things.  And I will represent to you, just to speed the
9   process up, that the first one, LB-SS Canal is just
10  below Liberty Bosma Dairy in the Sunnyside Canal.
11  That's what SS stands for.
12      MR. CARTER:  I'll object to that.  Especially
13  ambiguity as to just below.
14  Q. Okay.  And just for fun, we'll take a look at
15  exhibit --
16  A. I'm --
17  Q. Do you see the first one here?
18  A. This first one?
19  Q. Yeah.  We'll talk about that one first.
20  A. All right.  Thank you.
21  Q. And I'll show you again Exhibit 333, just so you get a
22  picture of approximately where the sample was taken?
23  A. Okay.  Uh-huh.
24  Q. In Exhibit 333 I'll just point out to you that this is
25  the Liberty Dairy, this is the Bosma Dairy that are

DECLARATION OF CHARLES M. TEBBUTT - 328

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 70

1    really -- he'll make an objection on this --
2    essentially the same entity.  This is the Bosma Dairy,
3    as we call it in this case, the Bosma defendant.  All
4    of this property in this area here and then going down
5    to what is right about VYD-17, that's about the
6    southern end of the Bosma property?
7    A.  Uh-huh.
8    Q.  So for purposes of this question, please assume that.
9    A.  Uh-huh.
10   Q.  And there is a turn in the Sunnyside Canal that comes
11   to, I guess, it looks like the northernmost point on
12   Exhibit 333, Figure 15.  The sample from the Sunnyside
13   Canal was taken at approximately where I'm pointing my
14   pen, at that northernmost point.  Do you see that?
15   A.  Yes.
16   Q.  Okay.
17       MR. CARTER:  I'll object again based on
18   foundation.  I don't see any lats and longs or other
19   GPS or other information indicating where these are.
20       MR. TEBBUTT:  I'm just asking him to accept my
21   representation for purposes of this discussion.
22       MR. CARTER:  Understood.  I'll object as to
23   incomplete hypothetical.
24   Q.  On page 4 of 32 of Exhibit 348, please turn to that.
25   Yep, 432.  You see these are the analytical results for

Page 71

1    the canal that we just discussed.  That's what I
2    represent to you.  These are the analytical results for
3    that point of sampling.
4        Do you see where under nutrients it discusses what
5    the nitrogen concentrations are in the canal?
6    A.  Yes.
7    Q.  And so that's in October of 2013 with water.  I'll
8    represent to you that there was significant water still
9    in the Sunnyside Canal at that point.  Okay?
10       MR. CARTER:  Object.  Ambiguous as to significant.
11   Incomplete hypothetical.
12   Q.  Sure.  The canal had not been emptied for the year.  So
13   that's at the end of a full irrigation season.
14       MR. CARTER:  Same objections.
15   Q.  And in your report you talk about and you testified
16   just a little while ago that you were concerned about
17   potential agricultural impacts to the irrigation canal,
18   right?
19       MR. CARTER:  Objection.  Misstates prior
20   testimony.
21   Q.  That's a fair paraphrase of your earlier testimony,
22   isn't it?
23       MR. CARTER:  Objection.  He never said he was
24   concerned about anything.
25   Q.  That it was conceivable.  It was conceivable that the

Page 72

1    canals could have significant concentrations of
2    nitrogen that could impact groundwater, correct?
3    That's a fair paraphrase?
4    A.  It's conceivable that they could have nitrogen impacts
5    and could also be a source of recharge for groundwater.
6    Q.  Right.  So my question is, page 4 of 32 of Exhibit 348
7    essentially provides data that shows that there is very
8    little nitrogen in the canal, correct?
9        MR. CARTER:  Objection.  Lack of foundation.  Goes
10   beyond the opinions that have been expressed.  And
11   there is a lack of foundation as to the underlying
12   document itself, which appears to be a single sample.
13   Q.  There's virtually no nitrogen there, right?
14   A.  The concentrations are low and it doesn't represent a
15   complete data set, though, in terms of characterizing
16   the potential impacts for nitrogen.  One sample.
17   Q.  What else would you need?
18   A.  One sample is not adequate to characterize what the
19   potential impacts could be.  You need more data over
20   time.
21   Q.  Fair enough.
22   A.  Under the, the representative of the sort of range of
23   activities that would occur along the canal.
24   Q.  Sure.  Do you have any data to support your position
25   that there would be large nitrogen, potential nitrogen

Page 73

1    loadings from those irrigation canals?
2        MR. CARTER:  Objection.  Misstates testimony.
3    A.  There was a reference in my rebuttal report of the
4    Zuroske report where she presents nitrogen data from
5    the canals that indicates that there -- the
6    concentrations were based upon what she reported would
7    typically be higher than this.
8    Q.  In the Sunnyside Irrigation Canal or the Roza Canal or
9    in the irrigation return flow ditches?
10   A.  In the Granger district, I don't recall whether it was
11   specific to the canals or not.
12   Q.  In the Granger Drain itself --
13   A.  But it was relative, relative to the canals in the
14   Granger district.
15   Q.  But it wasn't about the canals themselves.  Wasn't it
16   about the irrigation return flow ditches that had high
17   nitrogen in them?
18   A.  The subject of the study was the impact of the
19   irrigation return on the Yakima River and evaluating
20   ways to reduce that, but --
21   Q.  Exactly.  So go ahead.
22   A.  I believe --
23   Q.  Sorry.  I interrupted you.
24   A.  I believe the data that I looked at, again, I don't
25   have it with me and I don't recall specifically whether

DECLARATION OF CHARLES M. TEBBUTT - 329

http://www.ynslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                James Maul 10/31/2014

Page 74

1  it was for the canals or not.  I know I saw data.  I
2  thought it was for the canals that were higher than
3  this, and it could indicate that there was variability
4  in that data.
5        But again, I didn't -- the purpose of my review of
6  the EPA report was not to assess the water quality of
7  the canals.
8  Q. Right.  And you just mentioned that the Zuroske study
9  was primarily focused on the irrigation return flow
10 ditches in the area and the high nitrogen in those,
11 correct?
12       MR. CARTER:  Objection.  Misstates prior
13 testimony.
14 A. That wasn't -- I don't know whether that was actually
15 what I said or not.  What I understand was is it was
16 looking at water quality in the canals and the
17 potential that that, those canals, could impact the
18 Yakima River, was my understanding, yeah.
19 Q. Right.  And the irrigation return flow ditches and how
20 they impacted the Granger Drain, right?
21       MR. CARTER:  Objection.  Misstates prior
22 testimony.  Go ahead.
23 A. My understanding, and again, I just looked at the data
24 very briefly, was that the -- it was the water,
25 representative of the water quality in the canals.

Page 75

1  Q. In --
2  A. My point is, is that it is, as we discussed before, a
3  potential input that could impact groundwater quality
4  and was not addressed in the EPA study.
5  Q. Right.  So I'll ask you again, page 4 of 32,
6  Exhibit 348, do the nitrogen levels that you see in the
7  Sunnyside Canal cause you any concern that these levels
8  could impact groundwater in the area, just these
9  levels, this one data point?
10       MR. CARTER:  Objection.  Lack of foundation and it
11 exceeds the opinions that have been expressed.
12 A. I can't say that these data are representative of the
13 conditions in the canal.
14 Q. That's not what I'm asking.  I'm saying based on this
15 one data point, the nitrogen levels on this particular
16 day, would you be concerned that the nitrogen levels on
17 this day could impact groundwater?
18       MR. CARTER:  Objection.  In addition to the prior
19 ones, this has been asked and answered.
20 A. Could you read the question back to me, please?
21       (THE REPORTER READ BACK THE QUESTION
22       QUESTION.)
23 A. The nitrogen levels in this data are relatively low.
24 Q. The nitrogen is virtually non-existent in that data
25 set, right?

Page 76

1  A. It's detected.  There is nitrogen, so it would depend
2  upon the volume of water.  It could be a contributor to
3  nitrogen loading, but the concentrations in the sample
4  are low.
5  Q. Most all of them -- well, nitrogen ammonia is
6  non-detect, total Kjeldahl nitrogen, which is probably
7  the best indicator of nitrogen loading; would you
8  agree?
9        MR. CARTER:  Objection.  Lack of foundation.
10 Q. Of the analytes.
11       MR. CARTER:  Counsel --
12       MR. TEBBUTT:  Wait a minute.  I'm asking the
13 question.
14       MR. CARTER:  I'm going to object.  Lack of
15 foundation, exceeds the opinions that have been
16 expressed.
17 Q. So total Kjeldahl nitrogen of these analytes would be
18 the best indicator of the potential total nitrogen
19 loading; would you agree with that?
20 A. I can't offer an opinion about that.  I can acknowledge
21 that it's ND.  It's not detected.
22 Q. You're not a geochemist, right?
23 A. No, I'm not.
24 Q. Yet you're -- okay.  Fair enough.
25       Let's take a look at page 7 of 32, Exhibit 348.

Page 77

1  This, I will represent to you, is a sample taken on the
2  same date, one year ago yesterday, at the Roza Canal
3  just on the northern edge of the Cow Palace facility.
4  All nitrogen analytes came in at non-detect in the Roza
5  Canal, correct?
6  A. That's accurate, yes.
7  Q. And the Roza Canal is just north of the Cow Palace
8  property; would you agree with that?
9  A. Yes.
10 Q. And so there would be essentially no nitrogen loading
11 from the Roza Canal based on this data set, correct?
12       MR. CARTER:  Objection.  Lack of foundation.
13 Q. To the groundwater?
14       MR. CARTER:  Lack of foundation, exceeds the
15 opinions in the report.  Again, you've interrupted my
16 objection.  I don't appreciate that.  You can ask
17 another question after the objection.
18       MR. TEBBUTT:  Pardon me, counsel.
19 A. The nitrogen is ND when this sample was taken, and I
20 can't say that it's representative of conditions in the
21 canal year-round, but at the time the sample, the time
22 the sample was taken, it was ND.
23 Q. Right.  So if the levels were close to this year-round,
24 that would refute your position that the irrigation
25 canals are a potential significant source of nitrogen

DECLARATION OF CHARLES M. TEBBUTT - 330

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 78

1    loading to the groundwater, correct?
2         MR. CARTER:  Objection.  Misstates testimony,
3    calls for speculation, and again, goes beyond the
4    opinions that have been expressed.
5    A. My opinion was -- excuse me, was that it was not
6    addressed by EPA in its report, and that was a gap in
7    their analysis.
8    Q. This fills in that gap, though, doesn't it?
9         MR. CARTER:  Objection.  Objection.  Argumentive,
10   and again foundation and it goes beyond the scope of
11   the opinions that have been expressed.  I think Mr.
12   Maul's made that abundantly clear.
13        MR. TEBBUTT:  He just said that it could
14   influence, it's a conceivable influence.  How could you
15   say it's outside of the scope, Mr. Carter?
16        MR. CARTER:  As Mr. Maul just explained, it was a
17   data gap EPA failed to consider.  That's the scope of
18   his opinion.
19        MR. TEBBUTT:  He also tried to rebut Dr. Shaw
20   about Dr. Shaw not having any data.  This is some data,
21   isn't it?
22        MR. CARTER:  He did not make that conclusion as to
23   this particular conclusion regarding the irrigation
24   canals.  I think it's clear from his report.  And I'll
25   just note that this deposition is supposed to be about

Page 79

1    the opinions that Mr. Maul has expressed and it instead
2    has degraded into an opportunity for counsel to try and
3    have Mr. Maul come to the opinions based on select
4    documents that have been picked out by plaintiffs'
5    counsel.
6         MR. TEBBUTT:  Well, I completely disagree with
7    you.  You're just trying to frame it in a way that's
8    most favorable to you, but I completely disagree with
9    you, Mr. Carter, and your representations.
10        MR. CARTER:  That's fair enough.
11   A. I didn't see Dr. Shaw discussing this data in his
12   report.
13   Q. (By Mr. Tebbutt)  Take a look at page 3 of your expert
14   report, please.  Exhibit 346.
15   A. Have we finished with this?
16   Q. Yes.  You talk about, at the bottom of the page, you
17   say EPA skipped a step of developing a fact-based
18   conceptual model.  Have you seen Arcadis's conceptual
19   site model?
20   A. I don't believe I have.  I should add that was not part
21   of the scope of my --
22   Q. What was the scope of your work, just to --
23   A. Again, reviewing the EPA report.
24   Q. The first part?
25   A. Sorry?

Page 80

1    Q. Right.  The first part was just the EPA report?
2    A. Uh-huh.
3    Q. And the second part, let's get back to that.  If I
4    recall your earlier testimony, you said that your
5    rebuttal report was to critique the Lawrence -- correct
6    me if I'm mischaracterizing, please -- the Lawrence,
7    Shaw, and Erickson reports based on their reliance on
8    the EPA report.  So that -- you said primarily?
9    A. Yes.
10   Q. Is that fair?
11   A. Yeah.
12   Q. What else are you critiquing in the Lawrence, Shaw, or
13   Erickson reports other than their reliance on the EPA
14   report?
15   A. I made reference to information from some of the
16   Arcadis documents as well, and that's where I referred
17   to monitoring well, boring logs, and the site location
18   maps and the potentiometric surface maps that I looked
19   at.
20   Q. Just those documents that are listed in your rebuttal
21   report?
22   A. Yes.
23   Q. Going back to Exhibit 346, your expert report --
24   A. Uh-huh.
25   Q. -- at the bottom of the page you have five potential

Page 81

1    sources of contamination that scientifically valid CSM
2    should include.  That spills over to a sixth on page 4,
3    correct?
4         MR. CARTER:  I'll object.  I think that misstates
5    what this list is.
6    Q. Does that misstate what your list is?
7    A. What I say is a scientifically valid CSM relates
8    potential sources of contamination to, and then the
9    five or six bullets are listed.
10   Q. Right.  So for primary sources of contamination, now
11   that you've seen Cow Palace, you've been there, what
12   would be the primary sources of contamination for a CSM
13   based on the site?
14   A. Well, I was --
15        MR. CARTER:  Objection.  Lack of foundation and
16   exceeds the opinions that have been expressed.
17   A. I prepared this comment in relationship to my review of
18   the EPA report and was not asked to evaluate the
19   potential impacts from the Cow Palace.
20   Q. I understand that.  But what I'm saying is, now that
21   you've seen, the facility, and you've reviewed
22   some of the information, what are some of the primary
23   sources of contamination that you would put into a CSM?
24        MR. CARTER:  Again, objection.  Lack of foundation
25   and it misstates his testimony.  His testimony is it's

DECLARATION OF CHARLES M. TEBBUTT - 331

http://www.ymilaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                           James Maul 10/31/2014

Page 82

1  clear that the EPA reports lacks the CSM.
2      MR. TEBBUTT: You know, I'm objecting to your
3  narrative discussion. You can object and say what, you
4  know, a proper objection. But narrative objections are
5  not appropriate.
6      MR. CARTER: Okay. Objection misstates page 3 of
7  his expert report.
8  Q. (By Mr. Tebbutt) Okay. Fair enough. So what I'm
9  asking you is, what are the primary sources of
10 contamination around the Cow Palace facility that EPA
11 should have put in its report?
12     MR. CARTER: This has been asked and answered.
13 A. And I was commenting on the conceptual model that EPA
14 included in its report and was not developing an
15 opinion about contaminant sources or potential
16 contamination from the Cow Palace.
17 Q. Okay. Didn't they discuss the primary sources of
18 contamination being the dairies? Yes or no.
19 A. We can -- shall we get the conceptual site model out
20 that EPA did?
21 Q. Sure. Why don't you find it.
22 A. I think that might be, that might be helpful. Is this
23 okay? I was asked to bring this.
24 Q. That's fine. I don't have any problem with that. For
25 the record, though, the witness is looking at his own

Page 83

1  version of the EPA report, and I'm fine with that.
2      MR. CARTER: What I'm planning to do, we can do it
3  now or later, is to introduce this as an exhibit, the
4  entire copy of the report with the exhibits and
5  figures. We can do it now or later, whichever you
6  prefer.
7      MR. TEBBUTT: Do you want to introduce this
8  particular binder as the exhibit?
9      MR. CARTER: I want to produce the complete report
10 including the figures and the exhibits.
11     MR. TEBBUTT: I'm asking, do you want to introduce
12 that physical piece?
13     MR. CARTER: Yes. Yes.
14     MR. TEBBUTT: Okay. By all means.
15     (PLAINTIFFS' EXHIBIT NO. 349 WAS
16     MARKED FOR IDENTIFICATION.)
17 Q. (By Mr. Tebbutt) That means you can't take that back
18 to Vancouver with you. Lighten your load.
19 A. That will be good. Okay.
20 Q. Okay. Go to the EPA conceptual site models.
21 A. Figure 1.
22 Q. Did you say Figure 1?
23 A. Yes.
24 Q. Okay. So tell me what's missing from the EPA
25 conceptual site model.

Page 84

1  A. My problem with this figure, and again, this was
2  reflected, I believe, in my report, is that it shows
3  potential sources of contamination associated with
4  the -- all of the potential sources that they have
5  identified for the Phase 3 report as complete exposure
6  pathways and having led to impacts of the aquifer and
7  water wells.
8      And my concern with that is that that had not been
9  investigated in this report to the degree necessary to
10 make -- to draw the conclusions that there were any
11 specific activity was a source or there were specific
12 exposure pathways.
13 Q. Okay. What else would have needed to be done?
14 A. Well, I think, I was simply commenting that there are
15 acceptable methods of preparing a conceptual site model
16 that aren't biased and lead the reader directly to the
17 conclusion that there are impacts when these impacts
18 haven't been established.
19 Q. What would you have done to create a conceptual site
20 model different than EPA's? If you're saying EPA's was
21 wrong, what would be the right way to do it?
22 A. I would have shown where there was uncertainty and
23 where additional assessment was necessary and used that
24 to guide future assessment and data-gathering
25 activities.

Page 85

1  Q. So what other assessment would you have identified as
2  necessary?
3  A. One of the deficiencies that I identify in the EPA
4  report is the lack of characterization of the
5  unsaturated zone in the area.
6  Q. How would you go about characterizing that unsaturated
7  zone?
8  A. Through borings, investigations, monitoring wells,
9  drilling.
10 Q. Isn't that exactly what happened?
11 A. The ground -- I haven't reviewed those. Review of that
12 documentation relative to that work was outside of the
13 scope that I performed. I know that there has been
14 monitoring wells installed out there and there's
15 groundwater monitoring going on, but I haven't reviewed
16 the work plans or documents leading up to that.
17 Q. Do you know whether EPA reviewed existing well boring
18 logs in creating its -- before creating its conceptual
19 model?
20 A. They did not, that I am aware of.
21 Q. Review any well boring logs for the area?
22 A. They didn't discuss the characteristics of the
23 unsaturated zone.
24 Q. But you don't know whether they reviewed any well
25 boring logs before creating a conceptual model; is that

http://www.ym.law.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                          James Maul 10/31/2014

Page 86

1    what you're stating today?
2    A. I'm stating that I did not see any kind of a discussion
3       in the report to indicate that they had that would
4       accurately reflect, that I've seen, in terms of the
5       unsaturated zone, thickness and characteristics.
6    Q. The conceptual model isn't the entities, right? It's
7       just the conceptual model to assess what data has been
8       collected and then to use that as a basis for figuring
9       out what data needs to be collected moving forward; is
10      that a fair assessment?
11   A. To guide the investigation.
12   Q. Is that correct? To guide the investigation, in your
13      terms?
14   A. And data-gathering activities.
15   Q. Doesn't this conceptual model have a number of
16      potential release mechanisms in it?
17   A. Yes, it does.
18   Q. Okay. Does it have transport mechanisms?
19   A. I would not say that they're well articulated.
20   Q. But it has some. What transport mechanisms are
21      identified?
22   A. I really can't tell, from this figure. It's kind of
23      cartoonish, in a way. It suggests that there are
24      releases that go directly to various receptors with no
25      real assessment of mechanisms or whether or not there

Page 87

1    is data to indicate that there is a complete or any
2    exposure pathway.
3    Q. Aren't the exposure pathways the wells that would be
4       drilled into potentially contaminated groundwater?
5    A. A well could be an exposure pathway.
6    Q. And the receptors would be the people who drink from
7       that?
8    A. That's correct.
9    Q. You then talk about, on page 4 of your report, The
10      exposure pathways classified as complete, potentially
11      complete, or not complete. What do you mean by that?
12   A. Whether or not there is data to indicate that those
13      exposure pathways are complete, potentially complete,
14      or not complete.
15   Q. Right. But what do you mean by that? You say -- your
16      next sentence says: The CSM in the report presents all
17      pathways as complete without any data to support such a
18      conclusion.
19   A. For example, the -- I'm sorry.
20   Q. Go ahead.
21   A. The irrigated cropland leaching fertilizer is shown as
22      being directly related to contaminated drinking water
23      wells.
24   Q. What would you -- what would you do differently than
25      what EPA did?

Page 88

1    A. I think it would be valid to accurately present
2       uncertainties relative to and prior to drawing any
3       conclusions, and I don't think that the EPA report was
4       really very -- either thorough or transparent in
5       identifying what the uncertainties relative to their
6       conclusions were.
7    Q. The certainties are that there are significant nitrogen
8       loadings in the area around the cluster dairies, right?
9       You would agree that there are certainly significant
10      nitrogen loadings from the dairies themselves, right?
11          MR. CARTER: Objection. Compound, and misstates
12      the EPA report.
13   Q. You agree with that, don't you?
14   A. No.
15   Q. You don't think that the dairies are a significant
16      source of nitrogen loading to the soils?
17   A. I don't, I --
18          MR. CARTER: Objection. Lack of foundation and
19      exceeds the opinions that have been expressed.
20   A. Again, I don't know whether they are. There is
21      widespread contamination throughout the Yakima Valley
22      associated a number of different sources. For example,
23      the EPA report purported to evaluate the impacts from
24      not just the dairy cluster, but from irrigated
25      croplands and septic tanks. And the concentrations of

Page 89

1    the nitrates in the wells that they selected for
2    monitoring were basically similar, which suggests that
3    there are fairly widespread impacts, which I think has
4    been acknowledged within the Yakima Valley.
5       The well in the EPA study with the highest
6    nitrogen concentration wasn't associated with any
7    specific impact.
8    Q. What's the source of the highest nitrogen loading
9       around the cluster dairies?
10          MR. CARTER: Objection. Lack of foundation. Goes
11      beyond the opinions that have been expressed.
12          THE WITNESS: Could you read the question back
13      again, please?
14          (THE REPORTER READ BACK THE QUESTION
15          QUESTION.)
16   A. I don't know the answer to that. I, again, I was asked
17      to review the EPA report and I don't think that you
18      could, from that report, draw such a conclusion.
19   Q. You don't think EPA did an assessment of how many
20      residences there were around the area, how much
21      irrigated cropland there was around the area, and how
22      many dairies and animal units there were in the area?
23          MR. CARTER: Objection. Calls for speculation.
24   A. They might have. That doesn't necessarily mean that --
25      explain what the mechanism for the contamination might

DECLARATION OF CHARLES M. TEBBUTT - 333

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 90

1    be.
2    Q. So it's the mechanism that you're, that you're taking
3       issue with EPA about?
4         MR. CARTER: Objection. Misstates testimony.
5    A. I'm saying that there are multiple potential scenarios
6       for contamination that's seen in the wells that were
7       tested by EPA.
8    Q. And so you think some of the other potential
9       contamination conceivably could be other septic systems
10      or other irrigated cropland?
11        MR. CARTER: Objection.
12   A. That's not what I'm saying.
13   Q. What are you saying, then?
14   A. What was the question?
15   Q. What are you saying?
16   A. About what?
17   Q. This conceptual model. You're saying "that's not what
18      I'm saying," so I'm asking, what are you saying?
19   A. Again --
20   Q. About the nitrogen.
21   A. Okay.
22   Q. Let me back up. I'm trying to figure out what you
23      think the nitrogen sources are in the area for the
24      conceptual model. And you've critiqued EPA's report by
25      saying that they didn't assess the -- are you saying

Page 91

1       that EPA didn't assess the possible sources of nitrogen
2       loading?
3    A. I'm saying that they didn't assess all of them, that it
4       seemed like the report concluded without adequate
5       consideration of other potential sources that existing
6       activities at this time are the source of elevated
7       nitrogen concentration in the wells. And I'm just
8       saying that their report doesn't support that
9       conclusion.
10   Q. Well, I guess --
11   A. And that they have not -- they -- and that their
12      evaluation was incomplete.
13   Q. And that's what I'm trying to get at, is why is it
14      incomplete? What part of their investigation is
15      incomplete? Is it just the transport mechanism?
16   A. For example, they didn't look at the historical
17      activities that could have impacted groundwater in the,
18      you know, the long history of agricultural activities
19      in the Valley.
20   Q. How would they have done that?
21   A. Get historical information, evaluating the nature of
22      the activities, historical data. There is a number of
23      different ways that that could be, could be done. It
24      would take time for me to actually put together a valid
25      scope of work to do that, but it did not appear that

Page 92

1    EPA did it.
2    Q. How long would it take you to put together a valid
3       historical scope of work?
4    A. That would take --
5         MR. CARTER: Calls for speculation.
6    Q. It doesn't call for speculation. You can give us an
7       answer, Mr. Maul. How long would it take you?
8    A. To put together a scope of work for the historical
9       evaluation?
10   Q. Yeah.
11   A. A period of months.
12   Q. What would you do to gather that evidence? What
13      evidence would you seek to gather?
14        MR. CARTER: Calls for speculation. Same
15      objection.
16   Q. Question pending.
17   A. I want to give you an accurate answer. Again, it would
18      be -- there is a number of different types of
19      information that you could potentially look at that I
20      don't necessarily have the ability to come up with off
21      the top of my head that would allow you to evaluate
22      what is a complex situation here.
23        I'm saying that EPA did not appear to really
24      consider the potential impacts from historical
25      practices to the aquifer.

Page 93

1    Q. So you haven't done any kind of loading assessment
2       about how much nitrogen 11,000 animal units provides at
3       the Cow Palace facility, right?
4    A. That wasn't in the scope of what I was asked to
5       evaluate.
6         THE WITNESS: Can I take a break?
7         MR. TEBBUTT: Yes.
8         (A SHORT RECESS WAS HAD.)
9    Q. (By Mr. Tebbutt) Is your report, Exhibit 346, in front
10      of you, Mr. Maul?
11   A. Yes.
12   Q. Would you turn to page 6, please. The third bullet on
13      page 6 you talk about overland transport of
14      contaminants in storm water. Why is that of concern to
15      you?
16        MR. CARTER: Objection. Misstates the testimony.
17   A. Again, it goes to the question of the scope and
18      adequacy of EPA's evaluation and their exclusion of a
19      potential of the mechanisms that could result in
20      groundwater contamination, particularly if there was
21      runoff into, for example, the canals and the canals
22      leaked and could potentially impact groundwater.
23   Q. Runoff from what?
24   A. Agricultural practices, fields.
25   Q. And the dairies would be one of those agricultural

DECLARATION OF CHARLES M. TEBBUTT - 334

http://www.ynslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                              James Maul 10/31/2014

Page 94

1    practices, right?
2        MR. CARTER: Objection. Calls for speculation,
3    lack of foundation.
4  Q. Really? Does that call for speculation that the
5    dairies are a source of potential storm water runoff?
6  A. There could be runoff from any number of facilities,
7    and to the extent that there are dairies, there could
8    be runoff from dairies.
9  Q. And at the bottom of page 6, going on out, EPA used
10   some so-called tracer evaluations of the pharmaceutical
11   compounds found in the dairy manure, in the dairy
12   lagoons, and in the dairy groundwater, correct?
13 A. There -- hang on. I want to make sure I understand the
14   question.
15       THE WITNESS: Could you read that back to me?
16           (THE REPORTER READ BACK THE QUESTION
17           QUESTION.)
18 A. There was inconsistent correlation with the tracers
19   that EPA used. Some were found in different mediums
20   and not others.
21 Q. Right. But they were found in -- one of your critiques
22   was the inconsistent, the sometimes so-called
23   upgradient wells had some of the compounds present,
24   correct, so you were saying that EPA's conclusions that
25   the dairies were a source of the pharmaceuticals was

Page 95

1    incorrect based on that observation of yours?
2        MR. CARTER: Objection. Misstates testimony.
3  A. I didn't believe that the EPA was able to accurately
4    correlate the detections of the compounds.
5  Q. But you don't take issue that the compounds were found
6    on the facilities; is that correct?
7  A. The data is what the data is. If there were certain, a
8    number of -- a variety of different compounds detected
9    in the various samples; notwithstanding there were a
10   number of quality control issues associated with those
11   samples.
12 Q. Right. I recognize that you indicated that some of the
13   groundwater levels of pharmaceuticals were near the
14   detection limit, therefore potentially putting their
15   detection at issue, correct?
16 A. I didn't actually make that notation, EPA did in their
17   data validation. I just reported what they validated
18   and reported.
19 Q. You just pointed that out. But some of them were not
20   in question, some of the findings. You did not say
21   that all of the findings of pharmaceuticals in the
22   groundwater were suspect, correct?
23 A. What did I say?
24       THE WITNESS: Could you read that back to me
25   again?

Page 96

1           (THE REPORTER READ BACK THE QUESTION
2           QUESTION.)
3  A. Yeah, I don't believe all of the data was flagged as
4    estimated or that there were QC problems with all of
5    the data.
6  Q. Let's go to page 8 of your report. You state, among
7    other things, that EPA made overly-conservative
8    assumptions and broad estimates including number of
9    animals. Let's start there. What overestimates of
10   number of animals did EPA assume in its study?
11 A. I'm sorry, first bullet?
12 Q. Yes. Under dairies.
13 A. Okay. I'm just saying that in a number of cases EPA
14   said that they were, that they didn't have specific
15   information regarding the assumptions that they were
16   making.
17 Q. Are you saying that they improperly assumed the number
18   of animals? Isn't that what your report says?
19 A. They noted where they were making assumptions and they
20   lacked specific information.
21 Q. Right. So they had a range of numbers, correct?
22 A. Yes. Yes.
23 Q. And were you, did you read the part of the EPA report
24   where they said that the dairies didn't allow them onto
25   their facilities to look at the facilities?

Page 97

1  A. I did.
2  Q. So are you saying that EPA overestimated the number of
3    animals present?
4  A. Let me check the -- let me go back to the report and
5    see what EPA said. I thought there was a specific
6    example there, but I can't find it, that there was a
7    number of just, an estimate that EPA employs in terms
8    of the waste generated by the dairies, and that was
9    just the point that I was trying to make.
10 Q. So do you have any references or scientific citations
11   to refute the numbers that EPA used in its report?
12 A. My biggest concern, in looking at this, these
13   statements, was the, again, the apparent lack of
14   evidence that indicated that the surface conditions led
15   to impacts of groundwater.
16 Q. Right. It doesn't answer my question.
17       MR. TEBBUTT: Would you read back my question,
18   please?
19           (THE REPORTER READ BACK THE QUESTION
20           QUESTION.)
21 A. I don't.
22 Q. Page 10 of your report talks about septic systems.
23   Says septic systems were not evaluated as rigorously as
24   were the dairy operations during the study, indicating
25   inconsistent methodologies. Do you know how many

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 98

1    septic systems there are around the Cow Palace
2    facility?
3         MR. CARTER: Objection. Foundation.
4    A. I don't.
5    Q. Page 11 of your report, the first bullet, you say that
6       nitrate concentrations in wells downgradient of septic
7       systems were found to be equal to or greater than
8       nitrate concentrations in comparables with down-
9       gradient of dairy operations or irrigated cropland.
10   A. I'm sorry, which page?
11   Q. The first bullet on the top of page 11.
12   A. Oh.
13        MR. CARTER: Next page, Jim.
14   A. Oh. There is my problem. Okay.
15   Q. Do you have that in front of you, Mr. Maul?
16   A. Yes, I do.
17   Q. Aren't those septic systems also downgradient of the
18      dairies sources that you're referring to?
19   A. My understanding of the EPA's methodology of selecting
20      septic tanks for analysis were they were non-associated
21      dairies, they were other sources of potential sources
22      of contaminants.
23   Q. Let me ask you this question: Do you know where the
24      septic systems were in relation to other dairies that
25      EPA looked at?

Page 99

1    A. And that was one of the problems that I had with the
2       EPA report, was that when you started getting into
3       looking at the septic systems or the, the locations, I
4       didn't feel like their mapping was really as rigorous
5       as it had been perhaps for the dairy operations, and
6       you just weren't able, again, that's one of my
7       criticisms, you just weren't able to make that
8       correlation.
9    Q. You, I believe, made some statements about the nitrogen
10      isotope testing that EPA, and that -- let's see if I
11      get that right. I'm trying to recall whether that was
12      in your rebuttal report. Strike that.
13        Do you recall whether you discussed at all
14      nitrogen isotope tests that were taken and whether they
15      were indicative of animal waste?
16   A. I recall that the EPA report did not distinguish
17      between human and other animal waste with the isotope
18      analysis. I believe they commented on that.
19   Q. Do you know whether the isotopic testing can
20      distinguish between human and animal waste by itself?
21        MR. CARTER: Objection. Lack of foundation.
22   A. I don't, no.
23   Q. Have you read any of the expert reports in these cases?
24   A. Yes. I read Dr. Lawrence's, Dr. Shaw's, and the
25      Erickson report.

Page 100

1    Q. Is that it?
2    A. Yeah.
3    Q. What facts or assumptions were presented to you to help
4       you do your expert report? And when I say facts or
5       assumptions presented to you, I'm talking about counsel
6       for the defendants or the defendants themselves, other
7       than what we discussed earlier about your conversations
8       with Adam Dolsen and other Cow Palace employees and
9       counsel.
10        MR. CARTER: I'll instruct the witness not to
11      answer as to any privileged communications between
12      attorneys and you not go beyond identifying just facts
13      or just assumptions for you to rely upon.
14   A. Could you repeat the question for me, again, please?
15   Q. I'll rephrase it.
16   A. Okay.
17   Q. What facts or assumptions were you given to assist in
18      your work in this case for Cow Palace?
19   A. I was provided with the instructions to review the EPA
20      report and evaluate the methods used in the report and
21      the conclusions that it came to. I don't recall any
22      other instructions or methods that I was instructed to
23      use.
24   Q. You weren't asked to assume any facts or models or
25      assumptions -- I guess that's redundant. You weren't

Page 101

1    asked to assume any facts or models?
2    A. No, I don't believe so. If I understand your question
3       correctly.
4    Q. So your rebuttal report, which we have determined is
5       all inaccurately paginated as page 16, correct?
6    A. It appears to be that way.
7    Q. All right. So what I will try to do is discuss the
8       name, the person whose report you were intending to
9       rebut and whatever paragraphs, to the extent possible,
10      that we're referencing.
11   The Lawrence report -- you're not a public health
12   expert, are you?
13   A. No.
14   Q. And just so everyone knows and Preston knows this, too,
15      Dr. Lawrence, we have already established through his
16      deposition last week, is not opining whether or not Cow
17      Palace is the cause of the contamination around Cow
18      Palace, just that nitrates present a public health
19      threat.
20        MR. TEBBUTT: Fair stipulation, from what you
21      understand with your co-counsel?
22        MR. CARTER: That's consistent with what I
23      understand, yes. Fair enough.
24   Q. Okay. So with that understanding, your rebuttal of
25      Dr. Lawrence really is irrelevant, isn't it?

DECLARATION OF CHARLES M. TEBBUTT - 336

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 102

1    MR. CARTER: Objection. Calls for a legal
2  conclusion.
3    MR. TEBBUTT: If counsel will stipulate that it's
4  irrelevant, then I won't ask any questions about this.
5    MR. CARTER: No, I'm not going to stipulate that
6  it's irrelevant.
7    MR. TEBBUTT: Okay. I'll have to ask some
8  questions about it.
9    MR. CARTER: It's your day.
10 A. Is there a question I'm supposed to answer?
11 Q. (By Mr. Tebbutt) Let rephrase it. Your criticisms or
12   critiques of Dr. Lawrence's report are all based on the
13   premise that Dr. Lawrence is saying that Cow Palace is
14   the cause of the contamination, correct?
15    MR. CARTER: Objection. Misstates testimony.
16 A. Yeah, I don't, I don't think that's the case. I just
17   was responding to what Dr. Lawrence said in my rebuttal
18   report.
19 Q. Show me where in any of your five pages of rebuttal of
20   Dr. Lawrence's report that you're rebutting something
21   that doesn't involve a causation of Cow Palace causing
22   groundwater contamination. Take your time. Do you
23   understand my question, first of all?
24 A. Well, since you're asking me if I understand your
25   question, I better, I feel like I should ask you to

Page 103

1    clarify it, if you think you need to.
2  Q. I don't think I need to. I'm asking you whether you
3    think I need to.
4  A. Okay.
5    THE WITNESS: Would you go ahead and read that
6  back to me?
7    (THE REPORTER READ BACK THE QUESTION
8    QUESTION.)
9  Q. That was somewhat unartful. Do you want me to rephrase
10   that?
11 A. I think it would be helpful. I want to make sure I'm
12   answering correctly.
13 Q. Is there anything in your five pages of rebuttal of
14   Dr. Lawrence's report that involves something other
15   than Dr. Lawrence saying that Cow Palace is the cause
16   of the groundwater contamination?
17 A. Yes.
18 Q. Where?
19 A. For example, Dr. Lawrence states in -- and this is in,
20   again, in his reference to the EPA report, in its
21   analysis of the cluster.
22 Q. Where are you looking?
23 A. I'm sorry. I'm on page --
24 Q. Page 16?
25 A. -- page 16.

Page 104

1  Q. We've established that.
2    MR. CARTER: We'll stipulate to that.
3  A. Item No. 22.
4  Q. Okay. At the bottom, starting --
5  A. At the bottom, yeah. Lawrence, Dr. Lawrence's
6    statement is: In its analysis of the cluster dairies,
7    which includes Cow Palace, the EPA studies sampled
8    residential wells during Phases 2 and 3 of the study
9    for nitrates.
10    During Phrase 2 sampling, EPA sampled 331
11   residential wells between February 22nd and March 6,
12   2010. And they -- he goes on to summarize the number
13   of homes that had nitrates in excess of the MCL.
14    During Phase 3, EPA obtained samples from one
15   upgradient drinking water well and eight downgradient
16   residential drinking water wells.
17    Paraphrasing or summarizing, the eight down-
18   gradient drinking water sources had also been sampled
19   during Phase 2. As a result of the Phase 3 sampling,
20   EPA concluded that upgrade well MW06 is within back-
21   ground range and found some downgradient wells were
22   more than four times the MCL, indicating that the dairy
23   cluster, which includes Cow Palace, is a source of the
24   increased nitrogen levels in downgradient wells. So
25   he's referring to the dairy cluster in that statement.

Page 105

1  Q. Right. And so he's relying on the EPA determination,
2    which you're saying he shouldn't; is that correct?
3  A. I'm just saying that -- indicating that the dairy
4    cluster is a source of the increased nitrogen levels in
5    the downgradient wells. You're asking me a different
6    question, I think.
7  Q. I'm asking you --
8  A. Because I was answering an earlier question about
9    directly relating to the Cow Palace.
10 Q. Uh-huh.
11 A. And I was answering that and it relates to -- as it
12   relates to all of Dr. Lawrence's testimony. And that
13   was a statement by Dr. Lawrence that was beyond the Cow
14   Palace. So I just wanted to make sure that I was
15   answering your question.
16 Q. Okay. Fair enough. I appreciate that.
17    And I think you did identify a problem with Dr.
18   Lawrence's report here that he sort of misstated the 67
19   homes. It wasn't 20 percent of the 67 homes were
20   contaminated, but that 67 homes' water supplies were
21   contaminated, correct? You understood that to be the
22   correct interpretation of the EPA report, right?
23 A. That's what we read the EPA report to say.
24 Q. All right. Just to be clear, you're not opining here
25   that nitrates don't present a health risk, are you?

DECLARATION OF CHARLES M. TEBBUTT - 337

http://www.ymdlaw.net/fetip

Case 2:13-cv-03016-TOR   Document 205-2   Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 106

1  A. No.
2  Q. And you don't even know at what level they might
3     present a health risk, do you?
4  A. I don't know --
5  Q. Just a minute.  Whether it's at the MCL or below, you
6     don't know?
7  A. I'm not an expert on the health impacts associated with
8     nitrates.
9  Q. You're not taking issue with anything in Dr. Lawrence's
10    report about the fact that Cow Palace uses all of the
11    pharmaceuticals found in the groundwater, correct,
12    you're not saying --
13        MR. CARTER:  Objection.
14 Q. You're not saying they're the cause of the groundwater,
15    but that the dairies themselves use the chemicals that
16    are also found in the groundwater, you're not taking
17    issue with that, are you?
18        MR. CARTER:  Objection.  Misstates Dr. Lawrence's
19    testimony.
20        THE WITNESS:  Could you read the question back to
21    me, please?
22            (THE REPORTER READ BACK THE QUESTION
23             QUESTION.)
24 A. There were instances of chemical detections in the
25    dairy samples that are also found in groundwater.

Page 107

1  Q. Right.  But that Dr. Lawrence, you're not -- you're not
2     refuting Dr. Lawrence's findings that the dairies also
3     used those chemicals in their animals, right?
4         MR. CARTER:  Objection.  Misstates Dr. Lawrence's
5     testimony.
6  Q. Let me rephrase it.
7  A. Yeah.
8  Q. I believe one of your critiques of the EPA study was
9     that EPA didn't know for sure whether the dairies were
10    using all of those pharmaceuticals or not, right?
11 A. There was, there were gaps in the information that EPA
12    had.
13 Q. Right.  And Dr. Lawrence filled in those gaps.  But
14    you're not rebutting any of the factual statements that
15    Dr. Lawrence is making that the dairies actually do use
16    all of those chemicals, are you?
17        MR. CARTER:  Objection.  Misstates Dr. Lawrence's
18    testimony.  I can offer a little bit of narrative, if
19    you want me to.  I think we can clear up this dispute,
20    or not.
21        MR. TEBBUTT:  We can do it off the record, if you
22    want.
23        MR. CARTER:  Let's go off the record.
24            (AN OFF-THE-RECORD DISCUSSION WAS
25             HELD.)

Page 108

1  Q. (By Mr. Tebbutt)  You're not rebutting any of the
2     factual statements that Dr. Lawrence made about what
3     chemicals were used at Cow Palace, are you?
4  A. I'm -- my only rebuttal of Dr. Lawrence is the extent
5     to which he relies upon the EPA report and the extent
6     to which there are uncertainties upon that reliance.
7  Q. And so to the extent those issues have been cleared up
8     by further discovery, you're not disputing any of those
9     additional statements of fact made by Dr. Lawrence, are
10    you?
11 A. I'm not disputing statements of fact made by
12    Dr. Lawrence.
13 Q. Thank you.  I'll hand you what's been previously marked
14    as Exhibit 329 in this matter, the expert report of
15    Byron Shaw.  I'm going to ask you some questions about
16    it.  On page 16 -- sorry.  At the beginning of your
17    critique of the Shaw report --
18 A. Yes.
19 Q. -- the first paragraph, you say, among other things,
20    that Dr. Shaw ignores other sources of nitrates,
21    potential sources of nitrates, including sources that
22    are known to exist, e.g., septic systems.
23        MR. CARTER:  Objection.  That misstates the
24    testimony.
25 Q. Does Dr. Shaw ignore septic systems?

Page 109

1  A. I'm sorry?
2  Q. The first paragraph on the Shaw report.
3  A. Here?
4  Q. Yeah.  Right here.
5  A. Okay.  Okay.  For example, septic systems.
6  Q. Does he ignore septic systems?
7         MR. CARTER:  Objection.  That misstates the
8     testimony.  He can read this paragraph.
9         MR. TEBBUTT:  I'm asking him, does he ignore
10    septic systems.  That's a valid question.
11 A. I think to the extent that I think septic systems are a
12    potential source of nitrate contamination and it, it is
13    not receiving the attention that the dairies are.
14 Q. Right.  Do you think the septic systems deserve the
15    same amount of attention that the dairies do?
16 A. The contamination in EPA's study in domestic wells were
17    at levels comparable to the contamination wells that
18    are seen around not just of the dairies, but the
19    irrigated croplands, but they certainly don't receive
20    as much discussion or acknowledgment of that.
21 Q. How about, again, I think we've already established
22    that you don't know how many septic systems there are
23    around the Cow Palace property, right?
24 A. I'm sorry.
25 Q. There's --

DECLARATION OF CHARLES M. TEBBUTT - 338

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                    James Maul 10/31/2014

Page 110

1  A. I don't.
2  Q. Right.  So we don't have much to go on there, do we?
3     Without that knowledge in your mind, there is not much
4     we can talk about.
5  A. I wasn't -- I'm sorry.  I need to let you finish.
6  Q. I did finish.
7  A. Okay.  I don't -- the issue associated with my review
8     was not septic systems at the Cow Palace.  The issue
9     was EPA identified septic systems as one of three
10    potentially primary sources of groundwater
11    contamination and set about to assess that in their
12    report.  That's what I was asked to -- I was asked to
13    evaluate the EPA report, and that's what EPA evaluated.
14 Q. Right.  But here you're saying Shaw ignores the septic
15    systems, which is different than EPA ignoring septic
16    systems.  Would you agree?
17 A. No.  I'm talking about -- no.  I'm sorry.
18      MR. CARTER:  One minute.  Objection.  That
19    misstates the testimony.
20 A. I was discussing Shaw's reliance upon the EPA report.
21    He does not acknowledge the results of EPA's own
22    findings.
23 Q. Okay.  So you're only, then, critiquing Dr. Shaw's
24    failure to rely on EPA's own findings about residential
25    septic system contamination possibilities?

Page 111

1       MR. CARTER:  Objection.  Misstates testimony.
2  Q. I'm just trying to figure out what it is you're doing
3     here, because it's not clear to me.
4  A. What I say is he selectively assigned Cow Palace as the
5     primary course of nitrate in groundwater while ignoring
6     other sources, including sources that are known to
7     exist; for example, septic systems.
8  Q. Right.
9  A. He doesn't objectively evaluate the data that EPA
10    developed associated with septic systems.
11 Q. Okay.  So your critique then, again, is just as to what
12    EPA said in its report, not what Dr. Shaw is saying
13    from the data that he's reviewed?
14      THE WITNESS:  Could you read that back to me?
15      (THE REPORTER READ BACK THE QUESTION
16      QUESTION.)
17 A. I didn't see Dr. Shaw discussing all of the information
18    in the EPA report.  I saw him focusing selectively on
19    the data from the Cow Palace, but not objectively
20    contrasting that with data from other sources that EPA
21    identified.
22 Q. Right.  Once again, I'm just trying to figure out what
23    your frame of reference is for the critique.  And is
24    your frame of reference just the EPA report discussion
25    of residential septic systems?

Page 112

1  A. That's what I reviewed.  The EPA report.
2  Q. Right.  So that's it, in terms of your rebuttal of
3     Dr. Shaw, it's his reliance on the EPA report and
4     failure to account for what EPA said in its report?
5  A. Yes.  I think that's accurate.
6  Q. Okay.  Did you review the Phase 1 and 2 investigations
7     by EPA?
8  A. No.
9  Q. Again, you don't know how many people live in the Cow
10    Palace area, correct?
11 A. I don't.
12 Q. You don't know how many cows there are?
13 A. No.
14 Q. Let's take a look at paragraph 14, your critique of
15    paragraph 14 of the Shaw report.  You say Dr. Shaw
16    ignores the Roza Canal.  I have just shown you data
17    about the Roza Canal.  Is it still your position that
18    Dr. Shaw ignores the Roza Canal?
19 A. Dr. Shaw didn't say anything about the Roza Canal, that
20    I saw, in his report.
21 Q. Okay.
22 A. I didn't see it addressed.
23 Q. Okay.  The second sentence of your rebuttal talks about
24    agricultural fields north of Cow Palace.  Do you have
25    any data or knowledge about what happens at those

Page 113

1     agricultural fields north of Cow Palace?
2  A. That was out of the scope of my review.
3  Q. So your answer is no?
4  A. Only to the extent that I know that there are
5     agricultural fields north of the Cow Palace and that
6     there has been indications that -- by EPA that
7     agricultural fields are a potential source of
8     contamination.
9  Q. Right.  But you don't have any data to support that, do
10    you?
11 A. I don't have data for those fields, no.
12 Q. With respect to paragraph 15 of Dr. Shaw's report,
13    would you agree that nitrates in the soil column -- or
14    in the groundwater, pardon me, nitrates in groundwater
15    will continue to move until they are either three
16    things:  Denitrified, taken up by wells that are
17    established in the aquifer, or until they reach a
18    surface water body?
19      MR. CARTER:  Objection.  Foundation and it goes
20    beyond what's been, the opinions that have been
21    indicated.
22 A. Would you repeat the question for me, please?
23 Q. Yes.  Would you agree or disagree with the following
24    statement:  Nitrates in groundwater will continue to
25    move until they are either denitrified, taken up by

DECLARATION OF CHARLES M. TEBBUTT - 339

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                          James Maul 10/31/2014

Page 114

```
 1    wells that are placed in the aquifer, or until they
 2    reach a surface water body.
 3          MR. CARTER:  Same objections.
 4    A.  I would qualify that by saying that there are other
 5    possibilities, but nitrates are mobile in groundwater.
 6    Q.  What are the other possibilities?
 7    A.  There could be discharge into other water bodies.
 8    Q.  That was one of the things I said.  That was No. 3.
 9    A.  Or, well, subsurface water bodies.  I guess that's, I
10    guess nothing comes to mind, so that's accurate.
11    Q.  Those three are fair to say?
12          MR. CARTER:  Objection.  I repeat the QUESTION
13    objections based on lack of foundation and that it
14    exceeds the opinions that are expressed in his report,
15    which we have right in front of us.
16    Q.  You are a licensed hydrogeologist, right?
17    A.  Yes.
18    Q.  You're opining based upon your expertise as a
19    hydrogeologist?
20          MR. CARTER:  Objection.  There's no foundation.
21    And you certainly haven't laid a foundation regarding
22    the types of data that would be considered and would be
23    necessary to make these conclusions you're asking him
24    to draw and which he did not draw in his report.
25          MR. TEBBUTT:  Okay.  I think I got the answer I
```

Page 115

```
 1    was looking for, so I think we'll move on.
 2          MR. CARTER:  Counsel, you're fishing for opinions
 3    that weren't made in the report.
 4          MR. TEBBUTT:  Well, you know, Mr. Carter, Mr. Maul
 5    makes a lot of broad accusations in his report about
 6    denitrification, about lack of data, about information
 7    between the vadose zones.  So he's opened himself up
 8    for questioning in this area.  And I don't appreciate
 9    you're attempts to limit my questioning.
10          MR. CARTER:  Fair enough.  We'll continue to
11    object because this deposition, again, is supposed to
12    be based on the opinions Mr. Maul expressed, not trying
13    to make him come up with any opinions based on the data
14    you present him.
15          MR. TEBBUTT:  It's also based on discovery.
16    That's what we're here for.  We're not at trial, we're
17    not talking about admissibility, we're talking about
18    discovery.  These are fair questions.
19          MR. CARTER:  You're trying to make him come up
20    with a new opinion that he hasn't expressed.  He's not
21    your expert.  That's beyond the scope.
22          MR. TEBBUTT:  Disagree.  Let's move on.
23    Q.  (By Mr. Tebbutt)  Do you have any evidence to discount
24    the USGS finding that the shallower part of the aquifer
25    in the area ranging from 30 to 160 feet or so feet
```

Page 116

```
 1    below ground surface eventually reaches the Yakima
 2    River?
 3          MR. CARTER:  Objection.  Same objection.  Lack of
 4    foundation, goes beyond the opinions that Mr. Maul has
 5    been asked to express and does express.
 6    A.  I haven't reviewed the USGS information.
 7    Q.  At all?
 8    A.  At all.
 9    Q.  Okay.  Pardon me for doing this, but paragraph 16 on
10    page 16 of your report you state, among other things,
11    in the middle of your rebuttal, that Dr. Shaw does not
12    discuss nitrogen uptake by crops in reducing nitrogen
13    loading to groundwater.  I would like to show you --
14          MR. CARTER:  I believe he's got it.
15    Q.  You have Dr. Shaw's report?
16    A.  I do.
17    Q.  Which is Exhibit 329.  Would you turn to paragraph 25
18    of Dr. Shaw's report, please?
19    A.  Pardon me?  Paragraph 25?
20    Q.  25.
21    A.  Okay.
22    Q.  In that paragraph Dr. Shaw talks about crop uptake of
23    nitrogen, doesn't he?
24    A.  What was the question again?
25    Q.  Dr. Shaw talks about crop uptake of nitrogen, doesn't
```

Page 117

```
 1    he, in paragraph 25?
 2    A.  Yes.
 3    Q.  And in paragraphs 28 through 32 -- actually, it's 28
 4    through 39, doesn't he also talk about crop uptake of
 5    nitrogen?
 6    A.  Yes.
 7    Q.  Moving on to paragraph 18 of Dr. Shaw's report that you
 8    rebut, you say there is widespread evidence of legacy
 9    impacts of agricultural practices.  I think we already
10    discussed this, so I'm happy if you're content with the
11    asked and answered anticipated objection from counsel,
12    that the only information you have, are relying on
13    about your statement about widespread evidence of
14    legacy impacts is anecdotal discussions that you've
15    heard while you were at Cow Palace and Stu Turner's
16    comments.  That's all of the evidence you have for that
17    statement, correct?
18    A.  No, I wouldn't say that.
19    Q.  What are the other?
20    A.  There are the fact that there has been many, many years
21    of agricultural use and fertilizer application in the
22    Yakima Valley that in all likelihood has contributed to
23    groundwater impacts that are the subject of the EPA's
24    investigation.
25    Q.  What evidence do you have of that, other than what we
```

DECLARATION OF CHARLES M. TEBBUTT - 340

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                          James Maul 10/31/2014

Page 118

1  just discussed?
2  A. That's outside of what I've been asked to evaluate, so
3     I don't have specific information --
4  Q. So then --
5  A. -- that I can provide you.
6  Q. So then how do you make the statement that there's
7     widespread evidence of legacy impacts?
8  A. Well, there are impacts throughout the Yakima Valley to
9     groundwater that are not attributable to a specific
10    activity that exists today.
11 Q. What's the evidence of that?  Once again, we're in a
12    circular argument here, right?
13 A. Yeah.
14 Q. Where's your evidence?
15 A. I don't have evidence to present to you today.
16 Q. And you haven't reviewed any in coming up with your
17    rebuttal, right?
18 A. That's outside of the scope of my review.
19 Q. Right.  The point is, you don't have any evidence of
20    that, do you?
21 A. No.
22    MR. CARTER:  Objection.  That misstates the --
23 Q. Because it's outside of the scope of what you were
24    asked to do, you don't have any evidence of it?
25    MR. CARTER:  Counsel, I was in the middle of an

Page 119

1  objection.  I didn't know whether I was objecting to
2  the misstatement of your prior question or the
3  misstatement of his testimony.  But you just asked
4  whether there was any evidence and your prior question
5  was whether there was additional evidence.
6  Q. Any evidence other than Stu Turner and the anecdotal,
7     you have no other evidence, right?
8  A. Other than the acknowledgment of the historical
9     practices that have occurred in the Valley prior to --
10    or going back to the beginning of the last century.
11 Q. Referenced in the EPA report?
12 A. That's referenced in the -- that is referenced in the
13    EPA report.
14 Q. Okay.
15    MR. CARTER:  Counsel, I see we're at 12:05.  I
16    don't know whether you're planning on continuing after
17    lunch or I'm happy to take a break and continue maybe
18    for another half our or so or we can break and come
19    back.
20    MR. TEBBUTT:  I would suggest we try going about
21    another half an hour and see if we can wrap this up,
22    we're getting really close.
23    MR. CARTER:  Can we take five minutes?
24    MR. TEBBUTT:  Sure.
25    MR. CARTER:  Thank you.

Page 120

1     (A SHORT RECESS WAS HAD.)
2     MR. TEBBUTT:  Shall we go back on the record?
3  A. We're on page 16 again?
4  Q. (By Mr. Tebbutt)  Yeah.  I think we're still on page
5     16.  You know what I'd like to do, if I might, is take
6     that exhibit and handwrite in page numbers starting one
7     through the end.
8     MR. CARTER:  Sure, if you would like.
9  Q. Would we be okay with that?  Why don't we, to make life
10    easier.  I'll circle the number in the bottom right
11    corner.
12    MR. CARTER:  Okay.
13    MR. TEBBUTT:  For the record and with counsel's
14    approval, I circled, starting with the cover page, page
15    1 through page 14, each page of Mr. Maul's rebuttal
16    report, because the report erroneously had page 16 on
17    each of the pages.  I also note that the exhibit has
18    two copies of the same document in it, and with
19    permission from counsel, I will remove the second copy.
20    MR. CARTER:  I think that's a good idea.  Yep.
21 Q. (Mr. Mr. Tebbutt)  So now Exhibit 347 consists of
22    14 pages.
23    Okay.  Mr. Maul, paragraph 22 of Dr. Shaw's report
24    now found on the new starting on page 2 of your report,
25    as we just repaginated it, your rebuttal report,

Page 121

1  Exhibit 347 --
2  A. Page 2.
3  Q. Yes.  Starting on page 2, bottom of page 2 and
4     continuing on through page 3.
5     MR. CARTER:  I think it's page 8.  I think
6     paragraph 22 of Shaw's which is on page 8.
7  Q. Yes.  I'm sorry.  Thank you for the clarification.
8     Starting on page 8 of your report, Shaw's paragraph 22,
9     you say that Shaw's claim about denitrification is
10    unsupported by applicable soils data, among other
11    things.  That's just a rough piece.
12    Does in fact Dr. Shaw discuss denitrification at
13    paragraphs 24 -- well, I'm going to put out a list --
14    24, 33, 112, 152, 164, 168, 169, and 173 through 174?
15    And I can go back and do these paragraph by paragraph,
16    if that's helpful to you.  Would you like me to do it
17    that way?
18 A. I don't think it's helpful.  The point that I was
19    making there, and I found this to be really consistent
20    throughout the EPA report, that there is a discussion
21    about the shallow aquifer and the shallow groundwater
22    and it's really not acknowledged that the depth of
23    ground water in the area of the dairies is typically 80
24    to over 100 feet thick, and that the processes
25    associated with the unsaturated zone and, again, the

http://www.ymxlaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                        James Maul 10/31/2014

Page 122

1  transport of nitrogen to groundwater that can occur
2  within that unsaturated zone are significant. And I
3  think it's just -- I thought the EPA report was very
4  misleading in terms of its basically lack of any
5  acknowledgment of that fairly significant and likely
6  somewhat complex unsaturated thickness.
7       And I just saw -- I didn't see any acknowledgment
8  of that in Dr. Shaw's testimony. In fact, he
9  references unsaturated hydraulic conductivity to imply
10 that there is moderately high in the capacity to
11 transmit water, but the material under the -- in the
12 area of the dairies in the unsaturated zone is just
13 that, it's unsaturated. So it's not hydraulically,
14 there is no hydraulic head driving that water.
15 Q. Okay. So you just said that the aquifer is generally
16   80 to 190 feet?
17 A. No. 80 to over 100.
18 Q. Over 100?
19 A. Feet thick.
20 Q. Not 190, 100?
21 A. It's 80 to over 100 feet thick, yeah.
22 Q. In fact, looking at Exhibit 333, which you've looked at
23   before, for DC-04 the well depth is 51 feet; would you
24   agree, if that's an accurate summary?
25 A. Where is DC-04 at?

Page 123

1  Q. Right here at the top.
2  A. Where is it located on the map?
3  Q. Let's take a look. Right at the bottom of the Cow
4    Palace property.
5  A. Yeah, I hadn't seen that well log. I wasn't aware of
6    that. So that's one exception.
7  Q. Okay. So you don't know whether Dr. Shaw reviewed soil
8    boring logs in making his determination about the types
9    of soil that were available in the vadose zone above
10   the groundwater table?
11 A. He doesn't reference that.
12 Q. Do you know that these -- you know that these wells
13   were drilled by both EPA and the dairies, right?
14     MR. CARTER: Objection. Calls for speculation.
15 Q. The wells that are listed in Exhibit 333?
16 A. I know that the, YVD wells were drilled as a, as part
17   of the AOC. I'm not familiar with the history of the
18   DC wells.
19 Q. Okay. Those are referenced in the EPA report, aren't
20   they, in the March 2013 EPA report, the DC wells for
21   the EPA wells?
22 A. I don't believe so. I don't believe so.
23 Q. You don't believe they're referenced?
24 A. I don't believe they're referenced, the DC wells.
25 Q. Okay.

Page 124

1  A. I don't recall seeing them.
2  Q. Did you ever see the deep soil borings done by Arcadis
3    on the Cow Palace property that were referenced in
4    Dr. Melvin's report?
5  A. The deep wells on the Cow Palace?
6  Q. Deep soil samples.
7  A. Deep soil samples. No.
8  Q. Let me just show you. This is from, this is for ease
9    of quickness, it just so happens to ironically be page
10   16 of Dr. Melvin's rebuttal report.
11 A. That's convenient.
12 Q. Have you ever seen that table before?
13 A. No.
14 Q. That makes the questions a lot easier.
15     You state that the EPA report, again, on page 8 of
16   your report discussing Shaw's paragraph 22, the EPA
17   report did not present any argon gas analysis data.
18   Are you saying that the EPA report did not reference
19   the argon gas analysis or just that it didn't present
20   the data?
21 A. I just didn't see it.
22 Q. You're not disputing the EPA discussed argon gas in its
23   report?
24 A. I didn't see it.
25 Q. Take a look at pages 29 through 30 of the EPA report.

Page 125

1  Let's, for these purposes, let's use Exhibit 324.
2  That'll be easier. Take a look at pages 29 and 30.
3  A. Let me make sure I know what I said. What number were
4    we?
5  Q. Pages 29 and 30 of the EPA report.
6  A. Related to?
7  Q. Paragraph 22 of the Shaw report on page 8 of your
8    rebuttal report. Do you see the last sentence of your
9    critique?
10 A. Yeah, yeah. And I'm looking at pages 29 and 30. Oh.
11   Missed it.
12 Q. So your critique, then, is wrong, in that particular
13   spot?
14 A. Well, my --
15 Q. Correct?
16 A. Yes.
17 Q. Okay. Taking a look at paragraph 177 of Dr. Shaw's
18   report, which is on page 163 of Exhibit 329.
19 A. Okay.
20 Q. Do you have that in front of you?
21 A. I have to get organized. 177?
22 Q. Yeah. Paragraph 177, page 163.
23 A. Oh. I'm sorry.
24 Q. Dr. Shaw, you said you didn't see any data or
25   discussion about Dr. Shaw's reliance on the fact that

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                          James Maul 10/31/2014

Page 126

1    denitrification is unlikely to occur.  Doesn't this
2    par --
3    A. I'm sorry.  Go ahead.
4    Q. Yes.  Doesn't this paragraph actually provide some of
5    the data that Dr. Shaw relied on in discussing the
6    local lithology, soil types?  That does help form
7    Dr. Shaw's opinion?
8        MR. CARTER:  Objection.  Misstates the report.
9    Misstates the testimony in the report.
10   A. I did want to refer to that.  I don't believe that I
11   was making a -- I don't believe that I was making a
12   statement regarding Dr. Shaw's Item No. 16 that he did
13   not discuss denitrification in his report.  I was
14   relating that to his statement above.
15   Q. What statement above?
16   A. His statement No. 16.
17   Q. So your 22 comment is based -- refers back to your 16
18   comment?  That's why I'm confused.  I'm talking about
19   paragraph 22 on page 8, where you say --
20   A. Right.
21   Q. -- you say -- oh.  I see.  You're just refuting that
22   Shaw's report claims that denitrification was verified
23   by EPA.  You're not saying anything else generally
24   about denitrification in the area; you're not rebutting
25   Dr. Shaw's conclusion that denitrification is unlikely

Page 127

1    to occur?
2    A. I was just commenting as it relates to reliance on the
3    EPA report, and specifically, the full -- lack of
4    discussion about the full unsaturated thickness of the
5    subsurface of the Cow Palace.  And then I did miss the
6    discussion of the argon gas.
7    Q. Just to be clear, you're not taking issue with Dr.
8    Shaw's conclusion that denitrification is unlikely to
9    occur; is that correct?
10   A. I wasn't asked to opine with respect to denitrification
11   and the occurrence of denitrification.
12   Q. That's all I wanted to clarify.
13   A. Okay.  Okay.  Then, I'm sorry, I wanted to go back.  I
14   thought there was some clarification needed there.  So
15   you were -- we are on --
16   Q. On what?  Clarification on what issue?
17   A. Just the discussion with respect to my statement in No.
18   22 on denitrification.
19   Q. I think we're okay now.
20   A. I think we're okay.  I thought you had another
21   question, so I was trying to come back.
22   Q. Not at the moment.  Not at the moment.
23   A. Okay.  All right.
24   Q. Have you reviewed drilling logs for soil types?
25   A. I reviewed the drilling logs from the AOC monitoring

Page 128

1    wells and soil and the geology that was logged in those
2    wells.
3    Q. But again, you're not opining at all whether
4    denitrification is likely to occur.  You were not asked
5    to do that, correct?
6    A. That's outside of my scope, that's correct.
7    Q. Are you qualified to make such an opinion if you were
8    to look into that?
9    A. Probably, it's not within my area of expertise.
10   Q. Okay.  Page 9 of your rebuttal report, paragraph 178 of
11   the Shaw report, you're not saying that Shaw's claiming
12   that the Cow Palace flow goes through one percent of
13   the whole soil matrix, correct?
14   A. I'm just saying that I did not see site specific data
15   that he was relying upon.
16   Q. Right.  Was he in fact referring to scientific
17   literature when he made that statement?
18   A. Not site specific data.
19   Q. Correct.  He was referring to scientific literature,
20   not specifically about Cow Palace, correct?
21   A. Okay.
22   Q. Is that correct?
23   A. Let me see what he says.  He is referencing scientific
24   literature and then relating it back to the Cow Palace
25   in that statement.

Page 129

1    Q. In general terms, right?  He's just saying that's a
2    possibility?
3    A. But he says once he found the flow became -- talks
4    about.
5    Q. He's not saying --
6    A. This is largely due to preferential flow paths that
7    occur in most soils.  A general statement.  Such as
8    those found in and around Cow Palace Dairy.
9    Q. Do you disagree with the general statement that
10   preferential flow paths exist in soils?
11   A. What would be considered to be a preferential flow
12   path?
13   Q. I don't know the answer to that, I'm the lawyer.  What
14   do I know?
15   A. He goes on to state:  A combination of soil structure
16   properties and over --
17   Q. I'm just asking --
18   A. I'm going to finish answering that earlier question, if
19   that's okay.
20   Q. Okay.
21   A. -- and overlapping lenses of soils with different
22   porosities often results in rapid transport time from
23   soil surfaces to groundwater.  Again, I don't know what
24   supports that.  One study found that flow became more
25   preferential --

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR     Document 205-2     Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 130

1   Q. You don't have to read it out loud.  Just read it to
2      yourself.
3   A. Well, the reason I was reading it was because he then
4      goes on to state that:  Based on soil types found in
5      the vicinity of Cow Palace Dairy, I believe similar
6      flow patterns exist.  And he -- and that's what I said
7      earlier, is that he does reference a source, but then
8      he relates it back to the Cow Palace and he doesn't
9      provide a basis for his statement related to the Cow
10     Palace.
11  Q. That's not a -- the basis in paragraph 178 doesn't
12     provide his basis, you're saying?
13  A. He just says based on soil types found in the vicinity
14     of Cow Palace, and I don't know what he's basing that
15     statement on.
16  Q. Okay.  Again, page 9 of your rebuttal report, regarding
17     paragraph 179 of Shaw's report, do you have -- you
18     don't have any idea what other areas upgradient of Cow
19     Palace are irrigated, do you; you weren't tasked with
20     that, correct?
21  A. That's correct.
22  Q. We've already gone over the pharmaceutical issues, so I
23     won't beat that issue further.
24         With regard to on page 10, 188 of your rebuttal
25     report, referencing Shaw's 188, a similar question to

Page 131

1      what we were just discussing:  You have no data to show
2      that there are contributions from upgradient sources,
3      right?
4   A. I have no data on the upgradient properties.
5   Q. Again, because you weren't tasked with looking at that,
6      right?
7   A. That's correct.
8   Q. Similar question for page 11, referencing paragraph 190
9      of Dr. Shaw's report:  You don't have any data to show
10     that there are artesian conditions at Cow Palace or
11     around Cow Palace, correct?
12  A. That's correct.  And again, that wasn't something that
13     I was asked to evaluate.
14  Q. With regard to paragraphs 191 through 224 of Dr. Shaw's
15     report, you make a sort of blanket statement about
16     Dr. Shaw's report.  What basis do you have to rebut the
17     data that Dr. Shaw relied on?
18  A. Let me see what I said.  We're on page 11, 191 to 224?
19  Q. Yes.
20  A. I think this just goes to my earlier statement that the
21     -- and back to the EPA report, that they identified
22     three potential activities that could be major sources
23     of nitrate contamination.  And that I -- it seemed like
24     the report ignores other potential activities, both
25     historic, possibly current, that could also be sources

Page 132

1      of contamination and that aren't addressed.
2   Q. You haven't reviewed the references that Dr. Shaw uses
3      to come to his conclusions in his report, for the most
4      part, correct?
5   A. That's -- what references would we be discussing in
6      terms of 191 to 224?
7   Q. References start at 329 --
8         MR. CARTER:  That would be footnote 329?
9   Q. Uh-huh.  Uh-huh.  And go through 342.
10        You haven't reviewed those references, have you?
11  A. That would be correct.
12  Q. So aren't you essentially trying to disagree with
13     Dr. Shaw's conclusions without having the same volume
14     of information that Dr. Shaw has?
15  A. I didn't see this information discussed in his
16     statements.
17  Q. And if you'll also take a look at page 4 of Dr. Shaw's
18     report.
19  A. Page 4.
20  Q. Page 4.  Starting at paragraph 8, and that runs from
21     page 4 until page 7.  Those discuss the documents that
22     Dr. Shaw relied on in coming to his conclusions.  You
23     haven't reviewed much of any of that data, either, have
24     you?
25  A. With the exception of what I've already --

Page 133

1   Q. Right.
2   A. -- stipulated to.
3   Q. Right.  You haven't reviewed any of that other data.
4      We can go through each one, but I'd rather not spend
5      the time.
6   A. Yeah.
7   Q. You would agree with that?
8   A. Other than what I've already disclosed, I haven't
9      reviewed any of these other than what I've already
10     disclosed.
11  Q. Yeah.  With respect to Mr. Erickson's report -- do you
12     know Mr. Erickson, by the way?
13  A. I don't.
14  Q. I think we've hit this one pretty hard already because
15     this dealt with Dr. Shaw's report.  With respect to
16     your critique of paragraph 20 of Dr. Erickson's report,
17     you would agree that we've confirmed that you don't
18     have any data about upgradient fields from Cow Palace,
19     correct?
20  A. That is accurate.  The, my concern is that it seems to
21     be pretty dismissed as a potential source, and again, I
22     wasn't scoped with the -- or tasked to evaluate it, but
23     there are conclusions being drawn absent an evaluation
24     of a potential impact from the upstream, upgradient
25     sources.  And that was the point I was trying to make.



http://www.ycw-law.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

Page 134

1  Q. And similar to what we just talked about with Dr. Shaw,
2     starting on page 5 of Mr. Erickson's report, and
3     running to page 8 -- I'll hand you Exhibit 325, which
4     is Mr. Erickson's report -- he has three-plus pages of
5     documents that he's reviewed in coming to his opinions.
6     Same question I asked you with Dr. Shaw, other
7     than the documents that you have stipulated that you
8     reviewed, you haven't reviewed this other plethora of
9     data, correct?
10 A. I'm sorry, where did you say the reference is?
11 Q. Starting at page 5 --
12 A. Starting at page 5.
13 Q. -- and running through the end of page 8, the bottom of
14    paragraph -- excuse me, for the record, paragraph 12.
15 A. It looks like he -- go to the end on page 8.
16 Q. Uh-huh.
17 A. Other than what I've already stipulated to having
18    reviewed, I haven't reviewed the other documents that
19    Erickson references.
20 Q. Okay.  Paragraph 21 of Mr. Erickson's report, page 12
21    of your rebuttal, says:  Mr. Erickson's conclusions
22    regarding perched ground water beneath Cow Palace
23    relying on the Haak data are unfounded.
24 A. I'm sorry what paragraph number?
25 Q. Paragraph 21 on page 12 of your report.

Page 135

1  A. Okay.  Uh-huh.
2  Q. Do you believe that it is inappropriate to rely on data
3     that comes from similar soil types and elevations and
4     similarly constructed earthen lagoons for Mr. Erickson
5     to rely on some of the Haak data to extrapolate to the
6     Cow Palace situation?
7  A. What do you base your conclusion that there are similar
8     soil types that Haak has relates to Cow Palace's
9     subsurface?
10 Q. That's what Mr. Erickson relies on in his report in the
11    well boring logs.
12 A. I don't think you can make that extrapolation, I
13    believe the geology is likely to be different.
14    Actually, I think that's supported by the Arcadis
15    drilling logs.
16 Q. What's supported by the Arcadis drilling logs?
17 A. That the geology/lithology is different.  They didn't
18    see any perched water in those boring logs.
19 Q. Do you know that they used an air rotary drill in when
20    they did the logs at Arcadis?
21 A. Yes.
22 Q. You could miss perched water in some of those settings,
23    couldn't you, using an air rotary drill?
24 A. Not if you're careful.
25 Q. It's possible you could miss?

Page 136

1  A. If you're an experienced geologist using an air rotary
2     rig you would be looking for indications of perched
3     water and moisture content changes in material.
4  Q. They didn't drill below the lagoon, right through the
5     lagoons in any of the Cow Palace facilities, right?
6  A. Not that I'm aware of.
7  Q. They would be more likely to find perched water under a
8     large liquid manure source than you would in dry
9     conditions, wouldn't you?
10 A. Well, if there was a mechanism for water to be perched.
11    If there was perched water that would, again, it would
12    be important because that would impede the flow and
13    recharge to the aquifer.
14 Q. Right.  Then what you might get is some horizontal flow
15    until you hit another opening of a preferential
16    pathway, if you will, for that to go further down into
17    groundwater, right?
18 A. You could see migration in a perched system that would
19    be subject to the geology.
20 Q. Right.  So paragraph 23, of Mr. Erickson's report, Mr.
21    Erickson relies on more than just the EPA report in
22    making his conclusion in paragraph 23, doesn't he?
23 A. I come back to my earlier comments regarding the EPA
24    report and reliance on the EPA report is in discussing
25    shallow monitoring wells, that in general the ground

Page 137

1     water -- the uppermost groundwater is actually fairly
2     deep.  There's a fairly thick unsaturated zone.
3  Q. But my question is Mr. Erickson relies on more than
4     just the EPA report in coming to his conclusions in
5     paragraph 23, doesn't he?  And your critique is just of
6     the EPA report reliance, correct?
7  A. I don't know what reports he relies upon.  He says
8     other earlier studies.
9  Q. Right.  Your critique, though, just so you understand
10    my question, your critique is that you think that Mr.
11    Erickson should not have relied upon the EPA report.
12    You're not opining about anything else he relied upon,
13    correct?
14 A. My focus was on reliance on the EPA report, that's
15    correct.
16 Q. Exclusively?
17 A. Yes.
18 Q. For that paragraph?
19 A. Yes.
20 Q. Okay.  With respect to paragraph 25 of the Erickson
21    report, starting on the bottom of page 12 of your
22    report and going to the top of page 13, again, Mr.
23    Erickson has reviewed a lot more data than you have in
24    coming to his conclusions, correct?
25 A. I don't -- I can't necessarily relate what he's

DECLARATION OF CHARLES M. TEBBUTT - 345

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                    James Maul 10/31/2014

Page 138

1    reviewed in terms of his conclusion, but I do know
2    that it's erroneous to apply saturated hydraulic
3    conductivity to unsaturated soil conditions.
4  Q. Right.  But we don't know whether we have saturated
5    soil conditions under the lagoons at the Cow Palace
6    property, do we?
7  A. That's not what -- there is no indication that's
8    what he's talking about.  So I would be speculating if
9    I guessed.  I make specific reference to unsaturated
10    soils.  That's what my concern is about.
11  Q. So if Mr. Erickson was referring -- this is in his sort
12    of general statement section of his report, correct?
13  A. I don't know what you're looking at.
14  Q. Well, do you have Mr. Erickson's report in front of
15    you?
16  A. I do.
17  Q. So starting at page 9, scientific and factual
18    background, paragraph 17 through 31, are sort of
19    general statements and principles based upon his review
20    of a lot more data than you looked at, correct?
21  A. Well, these are very generalized statements --
22  Q. Right.
23  A. -- what I'm seeing.
24  Q. Right.
25  A. My, my evaluation of the EPA report.

Page 139

1  Q. Okay.  Based on all of the data that you've been
2    presented today for the first time, do you have any
3    opinion about whether it's more likely than not that
4    Cow Palace is contributing to the groundwater
5    contamination below its site?
6        MR. CARTER:  Objection.  Lack of foundation, goes
7    beyond the opinions that were expressed.
8  A. I haven't had an opportunity to evaluate the data.
9    That would actually take a little bit of time to do
10    that before I could form such an opinion.
11  Q. You don't think it's pretty obvious from looking at
12    what you've seen?
13  A. I, again, I haven't had a chance to digest and evaluate
14    the data and look at it in the context of the full
15    report, so I couldn't form an opinion.
16  Q. All right.  And the people that are paying you are
17    here, so you don't want to pass that opinion based on
18    what is fairly obvious information, correct?
19  A. That was a statement, not a question, right?
20        MR. CARTER:  Counsel -- correct.
21        MR. TEBBUTT:  We're done.  All right.
22        (DEPOSITION CONCLUDED AT 12:55 P.M.)
23        (SIGNATURE RESERVED.)
24
25

Page 140

1  CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE
   IN THE FOREGOING ORAL EXAMINATION TRANSCRIPT:
2
   (NOTE:  If no changes desired, please sign and date where
3  indicated below.)
4
5  PAGE      LINE           CORRECTION AND REASON
6
7
8
9
10
11
12
13
14
15
16
17
   I, JAMES MAUL, hereby declare under penalty of perjury
18  that I have read the foregoing deposition and that the
   testimony contained therein is a true and correct
19  transcript of my testimony, noting the corrections above.
20
          JAMES MAUL
21
          Date
22
23  See:  Wash. Reports 34A, Rule 30(e)
        USCA 28, Rule 30(e)
24  PLEASE RETURN TO:  Central Court Reporting,
   P.O. Box 8029, Yakima, WA  98908          PCL
25

Page 141

1           C E R T I F I C A T E
2  STATE OF WASHINGTON )
                        ) ss.
3  COUNTY OF YAKIMA    )
4
5      This is to certify that I, Phyllis Craver Lykken,
6  Certified Court Reporter in and for the State of
7  Washington, residing at Yakima, reported the within and
8  foregoing deposition; said deposition being taken before
9  me on the date herein set forth; that pursuant to RCW
10  5.28.010 the witness was first by me duly sworn; that
11  said examination was taken by me in shorthand and
12  thereafter under my supervision transcribed, and that
13  same is a full, true and correct record of the testimony
14  of said witness, including all questions, answers and
15  objections, if any, of counsel.
16      I further certify that I am not a relative or
17  employee or attorney or counsel of any of the parties,
18  nor am I financially interested in the outcome of the
19  cause.
20      IN WITNESS WHEREOF I have set my hand this
21  day of        , 2014
22
23          PHYLLIS CRAVER LYKKEN, RPR,
            CCR NO. 2423
24
25



DECLARATION OF CHARLES M. TEBBUTT - 346

http://www.yeslaw.net/help

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

**1**

**1** 3:15 83:21,22 112:6 120:15

**10** 46:6 66:17 97:22 130:24

**10,000** 21:24

**100** 121:24 122:17,18,20,21

**101** 10:20

**11** 98:5,11 131:8,18

**11,000** 93:2

**11-degree** 56:6 59:18

**11.04** 56:10,20

**112** 121:14

**12** 134:14,20,25 137:21

**12:05** 119:15

**12:55** 139:22

**13** 137:22

**139** 3:9

**14** 112:14, 120:15,22

**14-page** 27:13

**15** 25:11 37:15 43:4 46:7 113:12

**152** 121:14

**16** 58:12,14 101:5 103:24,25
108:16 116:9,10 120:3,5,16
124:10 126:12,16,17

**160** 115:25

**163** 125:18,22

**164** 121:14

**166** 44:8

**168** 121:14

**169** 121:14

**17** 25:11 138:18

**173** 121:14

**174** 121:14

**177** 125:17,21,22

**178** 128:10 130:11

**179** 130:17

**18** 117:7

**18-22** 60:17

**188** 130:24,25

**190** 122:16,20 131:8

**191** 131:14,18 132:6

**2**

**2** 104:8,10,19 112:6 120:24 121:2,
3

**20** 10:24 58:21,22,23 60:2 105:19
133:16

**200** 21:12 56:4

**200-acre** 20:8,9

**2000** 21:17

**2009** 30:9

**2010** 7:15 104:12

**2013** 35:5 37:14,15 40:12,16 71:7
123:20

**2014** 3:3 4:2

**208** 9:2,3,8 12:4,9,25 13:23
14:12,13,16 15:4

**21** 134:20,25

**22** 104:3 120:23 121:6,8 124:16
125:7 126:17,19 127:18

**224** 131:14,18 132:6

**22nd** 104:11

**23** 136:20,22 137:5

**234** 56:5

**24** 121:13,14

**25** 116:17,19,20 117:1 137:20

**26** 42:15

**28** 117:3

**29** 124:25 125:2,5,10

**3**

**3** 79:13 82:6 84:5 104:8,14,19
114:8 121:4

**30** 10:24 66:17 124:25 125:2,5,10

**30,000-foot** 52:20

**300** 4:3

**31** 3:3 4:2 138:18

**32** 70:24 72:6 75:5 76:25 117:3

**324** 34:12,20 35:1,7 125:1

**325** 134:3

**329** 108:14 116:17 125:18 132:7,
8

**33** 121:14

**331** 104:10

**332** 36:14

**333** 36:19 37:16 39:5 41:6,19
42:11,12,18 43:2,4,10 59:15
69:21,24 70:12 122:22 123:15

**334** 45:4

**335** 55:15

**34** 44:8 68:21

**342** 132:9

**345** 3:15

**346** 3:17 7:24 8:5,9 79:14 80:23
93:9

**347** 3:18 7:24 8:5,20 30:6 120:21
121:1

**348** 3:20 68:12,24,25 70:24 75:6
76:25

**349** 3:21 83:15

**34th** 4:2

**37.3** 42:15

**38.9** 43:22 44:4

**39** 117:4

**4**

**4** 3:9 70:24 72:6 75:5 81:2 87:9
132:17,19,20,21

**40** 10:24

**400** 4:17

**432** 70:25

**46.4** 43:23 44:4


DECLARATION OF CHARLES M. TEBBUTT - 347

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

**47.4** 41:22

---

**5**

**5** 134:2,11,12

**51** 122:23

**59** 60:17

---

**6**

**6** 93:12,13 94:9 104:11

**67** 105:18,19,20

**68** 3:20

---

**7**

**7** 3:17,18 76:25 132:21

**77.6** 41:2

---

**8**

**8** 96:6 121:5,6,8 124:15 125:7
126:19 132:20 134:3,13,15

**80** 67:7 121:23 122:16,17,21

**83** 3:21

**84** 35:7

**85** 59:16

**86.9** 40:16

**88.1** 41:22

**8:35** 4:2

---

**9**

**9** 128:10 130:16 138:17

**90** 35:7

**90s** 21:18

**936** 4:2

**95** 40:12 41:2

**98665** 4:18

---

**A**

**a.m.** 4:2

**ability** 92:20

**absent** 61:12 133:23

**abundantly** 78:12

**accept** 70:20

**acceptable** 84:15

**accommodate** 46:3

**accompanying** 58:11 59:7

**account** 61:21 112:4

**accounted** 61:12

**accurate** 55:19,24 56:4,19 77:6
92:17 112:5 114:10 122:24
133:20

**accurately** 86:4 88:1 95:3

**accusations** 115:5

**acknowledge** 43:17 76:20
110:21

**acknowledged** 89:4 121:22

**acknowledgment** 109:20 119:8
122:5,7

**acquire** 25:16

**Act** 9:8

**activities** 9:25 29:10,15 48:8
50:12,15 54:21 55:4,8 56:25
64:13 72:23 84:25 86:14 91:6,17,
18, 131:22,24

**activity** 49:22 84:11 118:10

**Adam** 6:13 22:16,17 100:8

**add** 79:20

**addition** 75:18

**additional** 38:8 84:23 108:9
119:5

**address** 4:16 68:9

**addressed** 75:4 78:6 112:22
132:1

**addressing** 17:16

**adequacy** 93:18

---

**adequate** 72:18 91:4

**administered** 9:21,23

**administrative** 5:6

**admissibility** 115:17

**affect** 62:8

**agency** 9:24

**agree** 76:8,19 77:8 88:9,13
110:16 113:13,23 122:24 133:7,
17

**agricultural** 29:3,8,21,25 64:13
71:17 91:18 93:24,25 112:24
113:1,5,7 117:9,21

**Agripac** 19:19,25 20:8

**ahead** 61:19 65:1 73:21 74:22
87:20 103:5 126:3

**air** 135:19,23 136:1

**Alongi** 22:24

**ambiguity** 69:13

**ambiguous** 36:2 38:22 51:15,20
52:8,16,17 71:10

**ammonia** 76:5

**amount** 21:22 38:8 109:15

**analyses** 95:11

**analysis** 3:20 78:7 98:20 99:18
103:21 104:6 124:17,19

**analytes** 76:10,17 77:4

**analytical** 26:18 70:25 71:2

**anecdotal** 29:20 117:14 119:6

**anecdotally** 29:6,7

**animal** 89:22 93:2 99:15,17,20

**animals** 96:9,10,18 107:3

**answering** 17:1 50:21 103:12
105:8,11,15 129:18

**answers** 5:20 7:5

**anticipate** 5:19 55:18

**anticipated** 10:6 117:11

**anticipation** 11:7

**AOC** 25:20 39:7 123:17 127:25

**apparent** 97:13

---



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                              James Maul 10/31/2014

appears 44:1 72:12 101:6

appendices 34:14,16,17,23

Appendix 33:22

applicable 121:10

application 20:8,9 117:21

apply 17:22 18:24 138:2

approval 120:14

approximate 43:5

approximately 10:22 21:16 23:20 69:22 70:13

aquifer 11:11 15:2,22 49:8,9 84:6 92:25 113:17 114:1 115:24 121:21 122:15 136:13

aquifers 9:4 13:23 19:2

Arcadis 23:24 24:5,9,12,13 25:20,22 26:1,6 28:3,5 32:10,24 33:9 36:11,21 37:15 38:7,23 39:7 44:15,25 45:10,20 55:17,20 60:10 80:16 124:2 135:14,16,20

Arcadis's 79:18

area 10:10,13,16,18,19,25 11:1 18:15,18 20:13,15 21:6 24:11 26:5 29:4,8,15,25 31:6 33:8 43:1, 9,14 46:17 47:4 64:3 70:4 74:10 75:8 85:5,21 88:8 89:20,21,22 90:23 112:10 115:8,25 121:23 122:12 126:24 128:9

area-wide 9:9 12:4

areas 33:5 130:18

argon 124:17,19,22 127:6

argument 118:12

Argumentive 78:9

artesian 131:10

articulated 86:19

assess 74:6 86:7 90:25 91:1,3 110:11

assessment 57:16,21 84:23,24 85:1 86:10,25 89:19 93:1

assigned 111:4

assist 100:17

assistance 19:11 26:13,17 33:23

assisted 25:18 26:10

Associates 9:14

assume 6:3 70:8 96:10 100:24 101:1

assumed 96:17

assuming 56:19

assumptions 96:8,15,19 100:3, 5,13,17,25

assurance 26:19 33:10,19,24

attachment 14:7 19:18

attempting 64:22

attempts 115:9

attention 109:13,15

attorney 22:25 61:3

attorneys 22:16 23:3 100:12

attributable 118:9

audible 5:24

August 63:2,5 64:17

aware 7:22 26:9 29:19 85:20 123:5 136:6

## B

back 12:2 40:1 43:18 44:6 48:14, 21,23 50:6,7 55:1,2 59:15 60:14, 16 61:6 68:1,2 75:20,21 80:3,23 83:17 89:12,14 90:22 94:15,16 95:24 96:1 97:4,17,19 103:6,7 106:20,22 111:14,15 119:10,19 120:2 121:15 126:17 127:13,21 128:24 130:8 131:21 136:23

back- 104:20

background 138:18

backing 35:12

barometric 47:13

base 135:7

based 24:22 54:12 60:5 61:25 64:16,23 70:17 73:6 75:14 77:11 79:3 80:7 81:13 95:1 102:12 114:13,18 115:12,13,15 126:17 130:4,13 138:19 139:1,17

baseline 20:7,14

basically 37:3 89:2 122:4

Basin 12:8 14:13 15:4

basing 130:14

basis 29:24 33:21 47:24 56:17 86:8 130:9,11,12 131:16

Bates 39:20 45:15 55:23 68:15, 18

beat 130:23

beating 12:17

Beck 9:16

begin 43:21

beginning 17:6 108:16 119:10

behalf 9:11

Bellingham 25:7

beneath 134:22

biased 84:16

big 10:7 20:21 21:11 51:25 52:20

biggest 97:12

BILL 6:13

binder 83:8

bit 17:7 107:18 139:9

black 42:25 43:6

blanket 131:15

bodies 114:7,9

body 113:18 114:2

Boivin 22:22

boring 35:25 36:3,4,10,15 51:7 85:17,21,25 123:8 135:11,18

borings 85:8 124:2

Bosma 8:15 26:7 44:20 62:22 69:10,25 70:2,3,6

bottom 79:16 80:25 94:9 104:4,5 120:10 123:3 134:13 137:21

Boulevard 4:17

boundary 42:23 43:6

break 45:25 46:2,4,6 66:4 93:6 119:17,18


DECLARATION OF CHARLES M. TEBBUTT - 349

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                    James Maul 10/31/2014

**briefly** 28:2 32:6,8 74:24

**bring** 26:6 82:23

**broad** 96:8 115:5

**brought** 34:22

**Brown** 7:14

**built** 65:22

**bullet** 93:12 96:11 98:5,11

**bullets** 81:9

**bush** 12:17

**business** 24:12

**Byron** 108:15

## C

**calculated** 12:18

**calculating** 16:22

**calculations** 12:24 13:7,10,12, 25 14:22 15:23 16:6,9,10,22 17:14

**call** 37:3 44:15 70:3 92:6 94:4

**called** 37:4

**calls** 78:3 89:23 92:5,14 94:2 102:1 123:14

**canal** 62:10,11 64:12,14 65:13 69:5,7,9, 70:10,13 71:1,5,9,12,17 72:8,23 73:8 75:7,13 77:2,5,7,11, 21 112:16,17,18,19

**canals** 55:8 63:22,23 67:11,12, 15,19 68:9 73:1,5,11,13,15 74:1, 2,7,16,17, 77:25 78:24 93:21

**capable** 67:5

**capacity** 122:10

**car** 22:13,14

**CARE** 3:2 8:13

**career** 4:24 66:16,25

**careful** 56:5 135:24

**Carter** 7:8 12:21 14:3,8,11,14 16:5,12 17:5 19:6 23:7 29:1 30:20 31:8 34:3,15,21 35:13,19 36:2 37:8,11,19,25 38:11,15,21 39:15, 18 40:2,6,18,22,25 45:6,9,12,17,

19,23 46:6,19 47:6,25 48:9,13 49:6,12,24 50:17 51:15,20 52:5,8, 15 53:5,16 54:23 55:22 56:1,15 57:1,4,19,22 58:2,17 59:1,23 60:3,11 61:16 62:14 64:20 65:19, 25 66:3,6,8,10 67:14,22 68:14,22 69:12 70:17,22 71:10,14,19,23 72:9 73:2 74:12,21 75:10,18 76:9, 11,14 77:12,14 78:2,9,15,16,22 79:9,10 81:4,15,24 82:6,12 83:2, 9,13 88:11,18 89:10,23 90:4,11 92:5,14 93:16 95:2 98:3,13 99:21 100:10 101:22 102:1,5,9,15 104:2 106:13,18 107:4,17, 108:23 109:7 110:18 111:1 113:19 114:3,12,20 115:2,4,10,19 116:3,14 118:22,25 119:15,23,25 120:8,12,20 121:5 123:14 132:8 139:6,20

**cartoonish** 86:23

**case** 8:2,5,14,21 9:12,19,22 14:21 21:9 23:10,13 25:14 26:11 27:4,24 34:13 46:21 49:14 53:7 55:16 68:20,24 70:3 100:18 102:16

**cases** 12:19,20 13:14 15:6 17:3 19:5 96:13 99:23

**causation** 52:10 102:21

**causing** 57:6 102:21

**Center** 8:14

**centigrade** 56:6

**century** 119:10

**certainties** 88:7

**certainty** 6:7 64:2

**Certified** 4:5

**chance** 46:12 139:13

**characteristics** 17:12 20:15 49:9 85:22 86:5

**characterization** 85:4

**characterize** 74:18

**characterizing** 49:8 72:15 85:6

**Charlie** 8:13

**chart** 43:18

**check** 97:4

**chemical** 106:24

**chemicals** 106:15 107:3,16 108:3

**chemist** 26:15,16,23

**chemistry** 26:25

**circle** 120:10

**circled** 120:14

**circuit** 5:14

**circular** 118:12

**circumstance** 61:22

**circumstances** 62:12,19

**citation** 30:10

**citations** 97:10

**cite** 27:17

**civil** 5:7

**claim** 121:9

**claiming** 128:11

**claims** 126:22

**clarification** 52:16 121:7 127:14, 16

**clarified** 12:21

**clarify** 34:3 103:1 127:12

**Clark** 20:16

**classified** 87:10

**Clatsop** 9:2,12,22 10:1,11 14:12 15:4 18:9

**clean** 9:8 34:22

**cleaning** 21:5

**clear** 35:23 53:25 67:24 78:12,24 82:1 105:24 107:19 111:3 127:7

**cleared** 108:7

**close** 77:23 119:22

**cluster** 44:16,17 45:1 88:8,24 89:9 103:21 104:6,23,25 105:4

**co-counsel** 101:21

**Coeur** 24:22,24,25 25:2 32:24

**colleague** 22:24

**collect** 18:10 48:7

**collected** 18:12 39:7 86:8,9



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                        James Maul 10/31/2014

**collecting** 13:9 14:25

**collection** 18:5 47:2

**color** 36:20

**column** 43:23 44:1 113:13

**combination** 129:15

**comfortable** 60:18

**comment** 28:7,21 126:17,18

**commented** 99:18

**commenting** 82:13 84:14 127:2

**comments** 28:2,5,8,10,19 29:22, 23 30:1 32:10,11 117:16 136:23

**common** 29:10

**communications** 100:11

**company** 9:13,15

**comparable** 109:17

**comparables** 98:8

**compare** 41:5

**compiled** 40:3

**complete** 8:6,9,20 31:22 32:15 34:9 60:6,9 72:15 83:9 84:5 87:1, 10,11,13,14,17

**completely** 79:6,8

**completeness** 34:21

**complex** 92:22 122:6

**complexity** 61:25

**complicated** 49:16

**component** 13:6

**components** 68:8

**Compound** 88:11

**compounds** 94:11,23 95:4,5,8

**conceivable** 62:16 65:18,20,23 71:25 72:4 78:14

**conceivably** 59:5 60:3 90:9

**concentration** 66:18 89:6 91:7

**concentrations** 71:5 72:1,14 73:6 76:3 88:25 98:6,8

**conceptual** 51:3 52:1,2,3 53:2,4 79:18 82:13,19 83:20,25 84:15,19 85:18,25 86:6,7,15 90:17,24

**Conceptually** 52:7

**concern** 75:7 84:8 93:14 97:12 133:20 138:10

**concerned** 71:16,24 75:16

**concluded** 91:4 104:20 139:22

**conclusion** 47:3 78:22,23 84:17 89:18 91:9 102:2 126:25 127:8 135:7 136:22 138:1

**conclusions** 38:3,9 52:11 53:19, 20 61:11 64:23 84:10 88:3,6 94:24 100:21 114:23 132:3,13,22 133:23 134:21 137:4,24

**conditions** 10:5 14:17 17:19 18:3,8 26:5 57:14 75:13 77:20 97:14 131:10 136:9 138:3,5

**conduct** 61:3

**conductivity** 122:9 138:3

**confirm** 37:17,22 38:9,17

**confirmation** 29:20

**confirmed** 29:6,22 133:17

**confirming** 43:25

**confirms** 44:3 59:2

**confuse** 48:18

**confused** 126:18

**confusing** 12:22 48:15

**consideration** 91:5

**considered** 9:5 65:21 114:22 129:11

**consistent** 38:16,18 68:4 101:22 121:19

**consists** 120:21

**constructed** 135:4

**consult** 25:13

**consulting** 9:13

**contained** 36:11

**contaminant** 17:19 82:15

**contaminants** 93:14 98:22

**contaminated** 87:4,22 105:20, 21

**contamination** 7:17 28:23 52:24

53:9 67:6,12,16 81:1,8,10,12,23 82:10,16,18 84:3 88:21 89:25 90:6,9 93:20 101:17 102:14,22 103:16 109:12,16,17 110:11,25 113:8 131:23 132:1 139:5

**content** 117:10 136:3

**context** 50:20 139:14

**continue** 15:19 64:22 113:15,24 115:10 119:17

**continuing** 38:13 119:16 121:4

**contour** 37:3,4,13,14,21 41:6 51:13

**contours** 37:20 38:7

**contract** 9:14

**contracted** 9:24

**contrasting** 111:20

**contributed** 117:22

**contributing** 139:4

**contributions** 131:2

**contributor** 76:2

**control** 95:10

**convenient** 124:11

**conversations** 100:7

**copies** 60:6,9 120:18

**copy** 8:6,9,20 34:23 83:4 120:19

**corner** 120:11

**correct** 5:5 12:13 13:24 15:9 17:3 18:4 19:15,20 20:17 26:23, 24 30:18 34:5,11 35:18,22 36:5 37:6,7 42:8 44:12,13 50:16 53:20 55:25 56:2 59:8,12,16 72:2,8 74:11 77:5,11 78:1 80:5 81:3 86:12 87:8 94:12,24 95:6,15,22 96:21 101:5 102:14 105:2,21,22 106:11 112:10 117:17 125:15 127:9 128:5,6,13,19,20,22 130:20,21 131:7,11,12 132:4,11 133:19 134:9 137:6,13,15,24 138:12,20 139:18,20

**correctly** 101:3 103:12

**correlate** 33:2 95:4

**correlation** 94:18 99:8



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

**counsel** 7:8 14:3 15:10 34:15,22
39:15,23 40:2,18 45:6,9 60:18
61:16 64:25 66:3 67:23 68:14
76:11 77:18 79:2, 100:5,9 102:3
115:2 117:11 118:25 119:15
120:19 139:20

**counsel's** 120:13

**counselor** 17:7

**County** 9:22 10:2 19:19,21,23
20:16

**couple** 5:18 10:23 22:9 36:20
50:1 65:7

**court** 4:5 5:2,4,10,11,12,14
11:18,21 66:9

**cover** 120:14

**Cow** 3:2 8:14 22:4 23:2 26:7
29:13 30:12,17,25 31:15,16 34:10
35:25 37:23 38:14,23 41:13,15
42:21,23 43:12,15,19 44:20
52:10,22,23 53:8 62:21 64:6,7,11
77:3,7 81:11,19 82:10,16 93:3
98:1 100:8,18 101:16,17 102:13,
21 103:15 104:7,23 105:9,13
106:10 108:3 109:23 110:8 111:4,
19 112:9,24 113:1,5 117:15
124:3, 127:5 128:12,20,24 129:8
130:5,8,9,14,18 131:10,11 133:18
134:22 135:6,8 138:5 139:4

**cows** 112:12

**CPR** 69:7

**Craver** 4:4

**create** 84:19

**creating** 85:18,25

**criticisms** 99:7 102:11

**critique** 26:25 28:1 35:18,23
53:18 54:2,6,12 68:7 80:5 108:17
111:11,23 112:14 125:9,12
133:16 137:5,9,10

**critiqued** 53:20 90:24

**critiques** 53:22 94:21 102:12
107:8

**critiquing** 28:5,20 33:7,16 35:8
37:5 67:18 80:12 110:23

**crop** 116:22,25 117:4

**cropland** 68:10 89:21 90:10 98:9

**croplands** 88:25 109:19

**crops** 116:12

**CSM** 81:1,7,12,23 82:1 87:16

**culture** 24:19

**current** 131:25

**CV-13-3016** 3:2

---

**D**

**d'alene** 24:23,24,25 25:2 32:24

**dairies** 28:24 44:16,17,20,21,22
45:1 64:14 82:18 88:8,10,15 89:9,
22 93:25 94:5,7,8,25 96:12,24
97:8 98:18,21,24 104:6 106:15
107:2,9,15 109:13,15,18 121:23
122:12 123:13

**dairy** 8:15 20:17 21:10,11 22:1,
25:20 29:14 38:20 43:6 44:20
57:15 69:10,25 70:2 88:24 94:11,
12 97:24 98:9 99:5 104:22,25
105:3 106:25 129:8 130:5

**data** 13:9 14:25 18:5,6,11,12,16
20:7 25:21 26:18,19,21,22 30:10
31:14,18 46:9,15,23 47:1,11 48:6
49:19 50:9,10 52:3 53:14,21
55:20,24 56:22 59:14 60:4 61:10
64:23 65:4 72:7,15,19,24 73:4,24
74:1,4,23 75:9,12,15,23,24 77:11
78:17,20 79:11 86:7,9 87:1,12,17
91:22 95:7,17 96:3,5 111:9,13,19,
20 112:16,25 113:9,11 114:22
115:6,13 121:10 124:17,20
125:24 126:5 128:14,18 131:1,4,
9,17 132:23 133:3,18 134:9,23
135:2,5 137:23 138:20 139:1,8,14

**data-gathering** 84:24 86:14

**date** 18:10 21:17 23:19,20 40:23,
24 77:2

**dates** 42:2

**day** 63:2,6,11 75:16,17 102:9

**days** 45:8 55:21

**DC** 123:18,20,24

**DC-03** 43:17,18 44:6,7 57:3
59:16

**DC-03D** 43:21,22

**DC-04** 42:12,14,17,19 122:23,25

**dealt** 12:12 21:19 133:15

**decades** 58:9 59:5,19

**December** 40:16 56:8,21

**deep** 124:2,5,6,7 137:2

**defend** 61:2

**defendant** 70:3

**defendants** 44:21 100:6

**deficiencies** 85:3

**degraded** 79:2

**degree** 6:7 56:20 84:9

**Degrees** 56:11

**denitrification** 115:6 121:9,12
126:1,13,22,24,25 127:8,10,11,18
128:4

**denitrified** 113:16,25

**depend** 76:1

**deposed** 4:20

**deposition** 4:3 6:15 15:17 45:5,8
52:12 55:16 78:25 101:16 115:11
139:22

**depositions** 3:16

**depth** 57:2,9 59:16 121:22
122:23

**Deruyter** 8:15 26:7 44:20 62:24

**Deschutes** 12:8 14:13 15:3

**describe** 24:18

**describing** 26:3

**description** 26:3

**descriptions** 69:1

**deserve** 109:14

**detail** 28:4

**detected** 76:1,21 95:8

**detection** 95:14,15

**detections** 95:4 106:24

**determination** 19:1 30:8 47:3
49:4 57:3 105:1 123:8



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                      James Maul 10/31/2014

**determinations** 27:5 50:14

**determine** 13:8 19:25 20:12 46:7,16 47:22 48:7 52:23 54:20 66:23

**determined** 101:4

**determining** 16:7 49:9,10

**develop** 11:10,12 15:24

**developed** 11:8,12 20:6 21:5 111:10

**developer** 9:18,19

**developing** 18:5 79:17 82:14

**development** 9:7 10:6,7,8,9 11:1 18:21

**devices** 66:9

**difference** 56:10,13,20 57:6,10 62:9

**differently** 87:24

**digest** 139:13

**direct** 31:14 58:20

**directed** 25:25

**direction** 37:18,23

**directional** 38:13

**directly** 41:13 84:16 86:24 87:22 105:9

**disagree** 59:4 79:6,8 113:23 115:22 129:9 132:12

**discharge** 17:11 20:24 114:7

**disclosed** 133:8,10

**disclosures** 14:7

**discount** 115:23

**discovery** 68:20 108:8 115:15, 18

**discuss** 65:6 82:17 85:22 101:7 121:12 126:13 132:21

**discussed** 26:22 29:13,18 33:22 41:3 71:1 75:2 99:13 100:7 117:10 118:1 124:22 132:15

**discusses** 71:4

**discussing** 79:11 110:20 111:17 124:16 126:5 131:1 132:5 136:24

**discussion** 70:21 82:3 86:2 107:24 109:20 111:24 121:20 125:25 127:4,6,17

**discussions** 11:17 24:6 29:21 117:14

**dismissed** 133:21

**dispute** 107:19

**disputing** 108:8,11 124:22

**distill** 53:3

**distinction** 37:11

**distinguish** 99:16,20

**district** 5:10,11,12 73:10,14

**ditches** 73:9,16 74:10,19

**document** 30:3 35:14 39:16 60:8 72:12 120:18

**documentation** 30:13 85:12

**documents** 27:4,7 30:4 31:22 32:15,18 34:9 45:22 79:4 80:16, 20 85:16 132:21 134:5,7,18

**Dolsen** 6:13 22:17 100:8

**domestic** 109:16

**down-** 98:8 104:17

**downgradient** 98:6,17 104:15, 21,24 105:5

**downstream** 20:24

**Drain** 73:12 74:20

**draw** 64:22 84:10 89:18 114:24

**drawing** 61:10 88:2

**drawn** 38:3 133:23

**drill** 135:19,23 136:4

**drilled** 87:4 123:13,16

**drilling** 18:12 85:9 127:24,25 135:15,16

**drink** 87:6

**drinking** 87:22 104:15,16,18

**drive** 63:8

**driving** 122:14

**dry** 136:8

**due** 129:6

**duly** 4:8

**dunal** 11:11

**dune** 10:11 11:8

**dunes** 14:13 17:12

---

**E**

**e-mailed** 34:22

**e.g.** 108:22

**earlier** 56:2 60:15 62:6 68:4 71:21 80:4 100:7 105:8 129:18 130:7 131:20 136:23 137:8

**Early** 21:17 66:25

**earthen** 65:22 135:4

**ease** 124:8

**easier** 120:10 124:14 125:2

**east** 4:17 24:20

**edge** 43:19 77:3

**Edwards** 9:14

**effluent** 18:13

**efforts** 13:10

**elevated** 91:6

**elevations** 135:3

**employ** 23:16,18

**employee** 23:1

**employees** 100:8

**employs** 97:7

**emptied** 71:12

**encompass** 43:1

**encountered** 26:4

**end** 22:17 42:21 70:6 71:13 120:7 134:13,15

**ended** 10:1

**engaged** 24:15

**engineering** 9:15

**ENTERED** 6:14

**entire** 83:4

**entities** 86:6



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                     James Maul 10/31/2014

entity 70:2

entry 42:12

environmental 26:16

EPA 3:21 25:18,24 27:1,15 28:1,
5,20 32:1, 33:7,11,18 34:13 35:3,
4,9,11 37:5,17,20,22 38:3,16
51:17 52:11 53:23,25 54:8 67:18
68:7 74:6 75:4 78:6, 79:17,23
80:1,8,13 81:18 82:1,10,13,20
83:1,20,24 85:3,17 87:25 88:3,12,
23 89:5,17,19 90:3,7 92:1,23
94:9,19 95:3,16 96:7,10,13,23
97:2,5,7,11 98:25 99:2,10,16
100:19 103:20 104:7,10,14,20
105:1,22,23 107:8,9,11 108:5
110:9,13,15,20 111:9,12,18,20,24
112:1,3,4,7 113:6 119:11,13
121:20 122:3 123:13,19,20,21
124:15,16,18,22,25 125:5 126:23
127:3 136:21,23,24 137:4,6,11,14
138:25

EPA'S 31:4 38:9 84:20 90:24
93:18 94:24 98:19 109:16 110:21,
24 117:23

equal 98:7

Erickson 35:24 36:5,23 53:14
80:7,13 99:25 133:12 134:19
135:4,10 136:21 137:3,11,20,23
138:11

Erickson's 53:19 54:6 133:11,16
134:2,4,20,21 136:20 138:14

Erik 26:12 33:23

erroneous 138:2

erroneously 120:16

erupted 31:7

essentially 9:18 10:1 70:2 72:7
77:10 132:12

established 84:18 101:15 104:1
109:21 113:17

estimate 18:21 97:7

estimated 96:4

estimates 18:24 96:8

et al 3:2

evaluate 13:3,10,22 14:20 15:1,5
16:1,10 17:1 19:4 21:7 31:17

52:21 53:8 56:18 65:2 81:18
88:23 92:21 93:5 100:20 110:13
111:9 118:2 131:13 133:22 139:8,
13

evaluated 10:4 13:13 14:16,17
15:21 16:13,15 19:13 62:20 66:15
97:23 110:13

evaluating 12:12 13:5 14:22
17:10 49:21 50:10 73:19 91:21

evaluation 17:13 31:5 32:9 47:8
49:18 50:24 66:25 91:12 92:9
93:18 133:23 138:25

evaluations 16:18 17:8,16
19:15,16 21:1 33:7 94:10

evening 63:9

event 61:23

eventually 116:1

evidence 57:14 58:5,6 92:12,13
97:14 115:23 117:8,13,16,25
118:7,11,14,15,19,24 119:4,5,6,7

exact 4:23 21:15,22 23:19,20

Examination 3:9 4:13

examples 14:10

exceeds 46:20 48:1 49:13,25
50:18 54:24 56:16 62:15 64:21
75:11 76:15 77:14 81:16 88:19
114:14

exception 123:6 132:25

excerpts 45:10 60:5

excess 67:7 104:13

exclusion 93:18

Exclusively 137:16

excuse 5:7 24:22 35:2 36:23
38:5 50:9 78:5 134:14

exhibit 3:17,18,20,21 7:24 8:20
30:6 34:12,20 35:1,7 36:14,19
37:16 39:5 41:6,19 42:11,12,18
43:2,4,10 45:4 45:4 59:15 68:12,24
69:15,21,24 70:12,24 75:6 76:25
79:14 80:23 83:3,8,15 93:9
108:14 116:17 120:6,17,21 121:1
122:22 123:15 125:1,18 134:3

exhibits 3:15 83:4,10

exist 108:22 111:7 129:10 130:6

existing 85:17 91:5

exists 118:10

expect 59:18,21

experience 22:1,2 27:24,25

experienced 136:1

expert 3:17,18 6:23,25 8:1,6,9
14:7 25:14 31:23,24 33:13,14
35:21 47:19 79:13 80:23 82:7
99:23 100:4 101:12 106:7 108:14
115:21

expertise 46:25 114:18 128:9

explain 89:25

explained 78:16

explanation 62:16

explanations 61:12,15 62:4

exposure 84:5,12 87:2,3,5,10,13

express 116:5

expressed 48:1 49:13 53:6
56:16 59:24 62:15 64:21 72:10
75:11 76:16 78:4,11 79:1 81:16
88:19 89:11 114:14 115:12,20
139:7

extensive 49:18

extent 39:18 94:7 101:9 108:4,5,
7 109:11 113:4

extrapolate 135:5

extrapolation 135:12

eye 19:18

────────────────

F

facilities 26:8 43:6 57:15 63:1,6
64:1,4,9,11,16 95:6 96:25 136:5

facility 20:8,10 30:12,17 36:1
41:13,15 62:21,22,24 63:16 64:6,
7 77:3 81:21 82:10 93:3 98:2

fact 8:24 13:22 106:10 108:9,11
117:20 121:12 122:8,22 125:25
128:16

fact-based 79:17



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                James Maul 10/31/2014

**factor** 57:9 65:24 66:1,2

**factors** 57:5,8

**facts** 100:3,4,12,17,24 101:1

**factual** 107:14 108:2 138:17

**failed** 78:17

**failure** 110:24 112:4

**fair** 11:25 12:4 16:21 17:20,23 19:4 24:17 29:2 46:5 47:24 48:8 50:16 53:4 54:22 57:16,21 63:18, 19 71:21 72:3,21 76:24 80:10 82:8 86:10 101:20,23 105:16 114:11 115:10,18

**fairly** 10:16,25 89:3 122:5 137:1, 2 139:18

**fall** 12:2

**familiar** 10:12 44:16 123:17

**familiarity** 66:11

**familiarize** 46:11

**farmer** 21:10

**farms** 22:2

**fast** 54:21 56:25 59:22

**favorable** 79:8

**February** 104:11

**federal** 8:2 9:11

**federally** 9:4,20

**feel** 14:6 24:15 99:4 102:25

**feet** 59:16 115:25 121:24 122:16, 19,21,23

**felt** 24:9,18

**Fereday** 23:8

**fertilizer** 117:21

**field** 7:14 46:25

**fields** 64:8,13 112:24 113:1,5,7, 11 133:18

**figure** 37:14,15 42:24 43:4 61:14 70:12 83:21,22 84:1 90:22 111:2, 22

**figures** 83:5,10

**figuring** 86:8

**files** 26:6

**fill** 52:2

**filled** 107:13

**filling** 51:19

**fills** 78:8

**find** 15:13 60:19,24 82:21 97:6 136:7

**finding** 115:24

**findings** 37:22 95:20,21 107:2 110:22,24

**fine** 46:2 58:3 61:1,4 82:24 83:1

**finish** 38:12 61:18 110:5,6 129:18

**finished** 5:21 79:15

**firm** 11:13 24:14,17

**fishing** 115:2

**fit** 24:12,16,17 50:23

**flagged** 96:3

**flood** 29:9 30:4,11,16,25 31:14

**Florence** 12:7 14:12,15,21

**flow** 37:18,23 38:14 73:9,16 74:9, 19 128:12 129:3,6,10,11,24 130:6 136:12,14

**flows** 38:4

**fluctuation** 61:22

**fluctuations** 47:20 48:6,25 55:17 62:16 64:18

**focus** 10:10 32:25 137:14

**focused** 32:3 74:9

**focusing** 111:18

**Food** 8:14

**foot** 22:13

**footnote** 132:8

**forget** 28:11

**forgot** 8:12

**form** 33:21 67:15 126:6 139:10, 15

**formations** 65:12

**forming** 67:11

**forward** 86:9

**Foster** 22:24

**found** 94:11,19,21 95:5 98:7 104:21 106:11,16,25 120:24 121:19 129:3,8,24 130:4,13

**foundation** 37:19 38:1 46:19 47:6,25 49:12,24 50:17 53:5 54:23 56:15 59:23 62:14 64:20 67:14 70:18 72:9,11 75:10 76:9, 15 77:12,14 78:10 81:15,24 88:18 89:10 98:3 99:21 113:19 114:13, 20,21 116:4 139:6

**fourth** 37:1,15

**frame** 79:7 111:23,24

**free** 14:6

**frequently** 34:17

**Friday** 4:1

**front** 27:5 93:9 114:15 125:20 138:14

**full** 4:15 71:13 127:3,4 139:14

**fun** 69:14

**funded** 9:4,20

**future** 84:24

## G

**gallons** 21:20,23

**gap** 31:4 78:6,8,17

**gaps** 107:11,13

**gas** 124:17,19,22 127:6

**gather** 92:12,13

**gave** 7:5

**Gearhart** 10:13

**general** 18:3 38:2 52:13 129:1,7, 9 136:25 138:12,19

**generalized** 138:21

**generally** 38:4 122:15 126:23

**generated** 97:8

**gentleman** 22:25 23:6



Case 2:13-cv-03016-TOR   Document 205-2   Filed 11/17/14

CARE vs. Cow Palace                                      James Maul 10/31/2014

geochemist 76:22

geologic 17:12 62:9 65:12

geologist 136:1

geology 26:5 128:1 135:13 136:19

geology/lithology 135:17

give 5:20,22,24 7:4 19:8 63:17 92:6,17

Givens 22:16 23:3,9

good 37:9 51:2 83:19 120:20

government 9:11

governmental 9:23

GPS 70:19

gradient 98:9 104:18

Granger 73:10,12,14 74:20

graph 47:13

greater 98:7

ground 5:18 37:4 85:11 104:21 116:1 121:23 134:22 136:25

groundwater 9:2,17 10:7 13:8, 18:11 20:2,13 28:23 37:18,20,23 38:4,13,19 44:14 46:17 47:20,23 48:6,7 49:1,11,19,22,23 50:11,16 51:10 52:24 53:9 54:18,19,22 55:9 56:14 57:15 58:5,6,11 59:7, 21 64:18 65:7 67:1,13,20 72:2,5 75:3,8,17 77:13 78:1 85:15 87:4 91:17 93:20,22 94:12 95:13,22 97:15 102:22 103:16 106:11,14, 16,25 110:10 111:5 113:14,24 114:5 116:13 117:23 118:9 121:21 122:1 123:10 129:23 136:17 137:1 139:4

grown 24:9

guess 21:22 24:16 42:19 70:11 91:10 100:25 114:9,10

guessed 138:9

guide 84:24 86:11,12

guys 45:16

---

**H**

---

Haak 134:23 135:5,8

half 119:18,21

hand 8:4 36:18 40:1 108:13 134:3

Handing 34:12 36:14 45:4 55:15 68:23

handle 15:18

handwrite 120:6

hang 11:15 13:19 94:13

happen 62:7

happened 30:17,25 31:10,15 85:10

happening 47:23

happy 117:10 119:17

hard 133:14

Harrington 22:25

he'll 70:1

head 5:25 92:21 122:14

health 101:11,18 105:25 106:3,7

hear 6:6 29:7,12

heard 16:24 29:6 117:15

heavy 42:25

HELD 107:25

helped 15:24 18:13 25:23

helpful 14:4 57:2 82:22 103:11 121:16,18

Henry 8:15

high 56:3,5 73:16 122:10

higher 73:7 74:2

highest 66:18 89:5,8

highly 6:6

Highway 10:20

Hills 38:6

hire 23:25 24:2

hired 24:3

hiring 24:1

historic 131:25

historical 28:22 29:3,14 30:5 91:16,21,22 92:3,8,24 119:8

history 28:25 29:7,21,24 30:4 91:18 123:17

hit 133:14 136:15

home 67:8

homes 11:7 104:13 105:19

homes' 105:20

horizontal 136:14

hour 46:8 63:16 119:21

hours 22:9 63:12,13

house 25:2

human 5:18 99:17,20

Hundreds 11:5

hydraulic 57:11 122:9,14 138:2

hydraulically 122:13

hydro- 17:11

hydrogeologic 10:4 14:16 17:18 18:3,8,25 20:15 46:18 57:10

hydrogeologist 114:16,19

hydrogeology 13:5 17:10 47:19

hydrographic 46:9 48:5 51:4

hydrographs 44:14,24

hydrology 18:11 62:7

hypothetical 52:1 70:23 71:11

---

**I**

---

Idaho 24:23

idea 67:5 120:20 130:18

IDENTIFICATION 7:25 68:13 83:16

identified 42:24 45:11 84:5 85:1 86:21 110:9 131:21

identify 85:3 105:17

identifying 88:5 100:12

ignore 108:25 109:6,9

ignores 108:20 110:14 112:16,18 131:24

ignoring 110:15 111:5



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

**impact** 10:5 13:3,8,14 14:17,20, 22 15:1,5 16:2,10,15 19:2,5 67:1 72:2 73:18 74:17 75:3,8,17 89:7 93:22 133:24

**impacted** 20:23 48:8 74:20 91:17

**impacting** 54:22 55:9

**impacts** 9:6 12:12,13 15:21 16:16,23 17:2,10,17 21:7 47:23 49:2,21 66:12 67:2 71:17 72:4,16, 81:19 84:6,17 88:23 89:3 92:24 97:15 106:7 117:9,14,23 118:7,8

**impede** 136:12

**imply** 122:9

**important** 33:19 47:2 136:12

**impose** 6:8

**improperly** 96:17

**inaccurately** 101:5

**inadvertently** 7:9

**inappropriate** 60:7,21,25 61:3 135:2

**incident** 58:10 59:6

**include** 81:2

**included** 82:14

**includes** 34:23 104:7,23

**including** 19:11 83:10 96:8 108:21 111:6

**incomplete** 70:23 71:11 91:12, 14,15

**inconsistent** 94:18,22 97:25

**incorrect** 14:1 19:22,24 95:1

**increased** 104:24 105:4

**indicating** 70:19 97:24 104:22 105:3

**indication** 138:7

**indications** 113:6 136:2

**indicative** 49:1 99:15

**indicator** 76:7,18

**influence** 49:22 50:15 65:18,20, 23 78:14

**influences** 56:24,25 57:3 59:20 64:18 65:7

**information** 15:24 25:16 30:10 47:1,5,21 48:5 49:3,15,20 50:13, 22 51:4,18 53:3 54:14,19,20 56:22 70:19 80:15 81:22 91:21 92:19 96:15,20 107:11 111:17 116:6 117:12 118:3 132:14,15 139:18

**initial** 8:6,9 27:4,11 30:2 31:23,24 33:7 34:4 37:12

**input** 19:11 50:21 75:3

**inputs** 50:20 68:6

**Insider** 7:15

**installed** 26:1 85:14

**instance** 6:16,22 57:2

**instances** 106:24

**instruct** 100:10

**instructed** 6:9 100:22

**instructions** 100:19,22

**Integrated** 7:14

**intending** 101:8

**interaction** 65:11

**interest** 34:21

**interjecting** 11:23

**interpret** 61:17

**interpretation** 18:6 105:22

**interrupt** 61:17

**interrupted** 73:23 77:15

**introduce** 83:3,7,11

**introduced** 34:19 39:5,23

**introduction** 34:16

**investigated** 84:9

**investigation** 9:17 46:18 86:11, 12 91:14 117:24

**investigations** 85:8 112:6

**involve** 102:21

**involved** 20:16 24:1 50:2

**involves** 103:14

**ironically** 124:9

**irrelevant** 101:25 102:4,6

**irrigated** 87:21 88:24 89:21 90:10 98:9 130:19

**irrigation** 28:22 29:9 30:4,11,16, 25 31:15 55:7 58:10 59:6,20 62:10,11 63:22,23 64:8 65:15,17 67:19 71:13,17 73:1,8,9,16,19 74:9,19 77:24 78:23

**isotope** 51:17 99:10,14,17

**isotopic** 99:19

**issue** 62:1 90:3 95:5,15 106:9,17 110:7,8 127:7,16 130:23

**issues** 95:10 108:7 130:22

**Item** 104:3 126:12

**iterations** 48:13

**J**

**James** 3:8,17,18 4:4,8,17

**Jeff** 22:22 23:8

**Jim** 4:18 98:13

**job** 20:12 48:17

**joining** 23:19 24:7

**K**

**keeping** 19:18

**Kellogg** 25:1,4

**kind** 5:22 10:8,17 24:19 27:21 33:15 43:9 46:10,15 47:1,21 48:5, 6 49:20 59:21 86:2,22 93:1

**kinds** 11:17

**Kjeldahl** 76:6,17

**knowing** 13:4

**knowledge** 39:21 110:3 112:25

**L**

**Laboratory** 3:20

**lack** 37:19,25 46:19 47:6,25 49:12,24 50:17 53:5 54:23 56:15



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace    James Maul 10/31/2014

59:23 62:14 64:20 72:9,11 75:10 76:9,14 77:12,14 81:15,24 85:4 88:18 89:10 94:3 97:13 99:21 114:13 115:6 116:3 122:4 127:3 139:6

**lacked** 96:20

**lacks** 82:1

**lagoon** 62:13 136:4

**lagoons** 63:25 64:3,4,5,7 65:22 94:12 135:4 138:5

**laid** 114:21

**land** 20:8,9 30:12

**Lane** 19:19,21,22,23

**large** 10:16,25 56:13,23 72:25 136:8

**largely** 129:6

**larger** 24:13

**late** 21:17

**lats** 70:18

**Lawrence** 23:12 80:5,6,12 101:11,15,25 102:13,17 103:15,19 104:5 105:13 107:1,13,15 108:2,4,9,12

**Lawrence's** 99:24 102:12,20 103:14 104:5 105:12,18 106:9,18 107:2,4,17

**lawyer** 129:13

**lawyer's** 48:17

**LB-SS** 69:5,9

**leaches** 59:11

**leaching** 87:21

**lead** 84:16

**leading** 85:16

**leakage** 62:10

**leaked** 93:22

**leave** 63:8

**leaving** 24:5

**led** 84:6 97:14

**left** 7:9,20 23:6

**legacy** 117:8,14 118:7

**legal** 102:1

**legend** 43:4,5

**lenses** 129:21

**level** 5:8 47:11 106:2

**levels** 20:13 41:21 43:22 44:7 49:1,22 75:6,7,9,15,16, 77:23 95:13 104:24 105:4 109:17

**LHG** 3:17,19

**Liberty** 69:10,25

**licensed** 114:16

**life** 120:9

**Lighten** 83:18

**likelihood** 117:22

**limit** 6:25 95:14 115:9

**limited** 64:23

**lines** 5:14 42:25 43:9,12,16 60:17

**liquid** 136:8

**list** 27:6 31:22 81:5,6 121:13

**listed** 32:21 33:9 80:20 81:9 123:15

**liter** 40:16 41:22 43:23 44:8

**literature** 27:18 66:22 128:17,19, 24

**lithology** 33:8 126:6

**live** 112:9

**load** 83:18

**loading** 10:5 11:3,11 12:13,14 13:3,4,7,11 14:18,20,24 15:2,5,22 16:2,7,16,23 17:2,9,15,17,22 18:21,24 19:5 20:1 66:23 76:3,7, 19 77:10 78:1 88:16 89:8 91:2 93:1 116:13

**loadings** 12:19,25 13:14,22 73:1 88:8,10

**local** 5:9 9:23 126:6

**located** 38:23 123:2

**locating** 25:23

**location** 80:17

**locations** 33:2 99:3

**log** 123:5

**logged** 128:1

**logging** 26:2

**logs** 18:12 25:23 26:1 33:3 35:25 36:3,4,10,15 51:7 80:17 85:18,21, 25 123:8 127:24,25 135:11,15,16, 18,20

**long** 10:20,21 22:8 23:18 49:21 91:18 92:2,7

**longer** 63:21

**longer-term** 47:24

**longs** 70:18

**looked** 17:18 18:3 19:10 32:5,8, 16,23 33:10 34:2 36:10,24 37:1 39:3 42:19 44:14 46:13 51:4,7 53:23,24 59:14 66:22 68:6 73:24 74:23 80:18 98:25 122:22 138:20

**lot** 13:17,19 52:25 115:5 124:14 137:23 138:20

**loud** 130:1

**low** 41:2,22 44:7 72:14 75:23 76:4

**lunch** 119:17

**Lykken** 4:4

---

## M

**made** 7:10 28:21 37:17 42:1 46:24 78:12 80:15 96:7 99:9 108:2,9,11 115:3 128:17

**magnitude** 21:21,24 56:18

**major** 131:22

**make** 18:25 27:5,8 49:4 50:14 57:3 60:4 70:1 78:22 84:10 94:13 95:16 97:9 99:7 103:11 105:14 114:23 115:13,19 118:6 120:9 125:3 128:7 131:15 133:25 135:12 138:9

**makes** 115:5 124:14

**making** 30:7 47:2 96:16,19 107:15 121:19 123:8 126:11 136:22

**manager** 22:20



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                    James Maul 10/31/2014

manure 20:19 21:6,8,19 94:11 136:8

map 36:24 41:6,7,17 42:6,18 123:2

mapping 99:4

maps 33:1 36:20,21 37:2,3,4,13, 14,21 51:13 80:18

March 104:11 123:20

marked 3:15 7:25 8:4 34:12 36:14,19 45:4 55:15 68:13,23 83:16 108:13

material 122:11 136:3

materials 26:4

matrix 128:13

Matt 22:25

matter 8:7 108:14

Maul 3:8,17,19 4:4,8,15,17,19 7:9 8:1 14:4,16 22:24 27:3 48:2 57:21,25 60:11,18,25 61:4,18 64:22 66:11 68:25 78:16 79:1,3 92:7 93:10 98:15 115:4,12 116:4 120:23

Maul's 34:17 59:2 78:12 120:15

MCL 104:13,22 106:5

means 6:1 39:17 83:14,17

mechanism 89:25 90:2 91:15 136:10

mechanisms 17:23 50:11 86:16, 18,20,25 93:19

mediums 94:19

Melvin 55:16

Melvin's 45:8 124:4,10

mentioned 74:8

MESSRS 6:13

met 8:18

methodologies 97:25

methodology 33:4 98:19

methods 84:15 100:20,22

MFA 23:19 24:7,18 26:15

micrograms 43:23

middle 43:10 116:11 118:25

migration 136:18

miles 10:18,20,21,23,24 20:23

Mill 4:17

milligrams 40:16 41:22 44:8

million 40:12 42:15 56:6 67:7

mind 110:3 114:10

minute 45:6 76:12 106:5 110:18

minutes 46:7 119:23

Mischaracterizes 16:19

mischaracterizing 80:6

misleading 122:4

Missed 125:11

missing 83:24

misstate 81:6

misstated 105:18

misstatement 13:13 119:2,3

misstates 14:14 29:1 30:20 35:13,19 37:8 53:16 59:2 67:22 71:19 73:2 74:12,21 78:2 81:4,25 82:6 88:11 90:4 93:16 95:2 102:15 106:18 107:4,17 108:23 109:7 110:19 111:1 118:22 126:8, 9

mistake 32:22 58:14

mobile 114:5

model 11:10, 24:12 51:3 52:2,3, 5,8 53:2,4 79:18,19 82:13,19 83:25 84:15,20 85:19,25 86:6,7, 15 90:17,24

modeling 11:2 13:7,10

models 83:20 100:24 101:1

moderately 122:10

moisture 136:3

moment 39:15 127:22

money 9:21

monitoring 18:11,17 32:25 33:1 36:13 38:19 51:10 80:17 85:8,14, 15 89:2 136:25

month 47:17,18

months 47:16 56:7 59:19 92:11

morning 7:21 63:8

move 15:8,9 19:17 39:24 113:15, 25 115:1,22

moving 86:9 117:7

Mullen 25:13,17,21 26:2,6 29:19 45:24

Mullin 22:24 23:15,25 24:3

multiple 41:9 90:5

MW06 104:20

## N

narrative 6:1 82:3,4 107:18

nature 5:18 10:10 11:17 91:21

Naylor 26:12,14,25 33:23

nearby 8:23

necessarily 27:22 47:8 49:1 89:24 92:20 137:25

needed 84:13 127:14

nitrate 7:17 10:5 40:12,16 41:21, 23 42:14,15 43:22,23,25 44:7,8 52:24 56:6 58:11 59:7,10 66:12, 23 98:6,8 109:12 111:5 131:23

nitrates 20:7 40:11 56:3 66:19 67:7 68:10 89:1 101:18 104:9,13 105:25 106:8 108:20,21 113:13, 14,24 114:5

nitrogen 11:3,11 12:13,14,19,25 13:3,7,11,14,22 14:17,20,24 15:2, 5,22 16:2,7,16,23 17:2,9,14,22 18:21,24 19:1,5 20:1 51:17 67:12, 20 71:5 72:2,4,8,13,16,25 73:4,17 74:10 75:6,15,16,23,24 76:1,3,5, 6,7,17,18 77:4,10,19,25 88:7,10, 16 89:6,8 90:20,23 91:1,7 93:2 99:9,14 104:24 105:4 116:12,23, 25 117:5 122:1

Nods 5:25

nomenclature 68:25

non-associated 98:20

non-detect 76:6 77:4

non-existent 75:24



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                    James Maul 10/31/2014

**north** 4:2 10:13 64:11,13,14 77:7 112:24 113:1,5

**northeast** 38:5

**northern** 77:3

**northernmost** 70:11,14

**nos** 5:24,25 7:24

**notation** 95:16

**note** 32:21 78:25 120:17

**noted** 39:24 96:19

**noticed** 32:14

**notwithstanding** 95:9

**November** 47:16

**number** 4:23 6:15,21 11:7 19:10 50:20 57:5 61:21 62:11,18 68:5 86:15 91:22 92:18 94:6 95:8,10 96:8,10,13,17 97:2,7 104:12 120:10 125:3 134:24

**numbered** 55:23

**numbers** 11:9 39:20 40:11 68:15,18 96:21 97:11 120:6

**numerous** 53:13

**nutrient** 21:1

**nutrients** 71:4

O

**OAC** 38:24 40:4

**oath** 7:6

**object** 12:21 14:3,14 15:19 30:20 31:8 34:15 35:13 36:2 37:19,25 40:18 47:25 48:9 51:15 55:22 57:19 58:17 59:1 64:22 68:14 69:12 70:17,22 71:10 76:14 81:4 82:3 115:11

**objected** 55:20

**objecting** 45:18 82:2 119:1

**objection** 12:22 15:7,14 16:4,11, 12,19 17:4,5 19:6 35:19 38:11,15, 21 39:24 46:19 49:6,12,24 51:20 52:5,8 53:5,16 54:23 55:18 56:15 57:22,24 59:2,23 60:19 62:14 64:20 67:22 70:1 71:19,23 72:9 73:2 74:12,21 75:10,18 76:9

77:12,16,17 78:2,9 81:15,24 82:4, 6 88:11,18 89:10,23 90:4,11 92:15 93:16 95:2 98:3 99:21 102:1,15 106:13,18 107:4,17 108:23 109:7 110:18 111:1 113:19 114:12,20 116:3 117:11 118:22 119:1 123:14 126:8 139:6

**objections** 6:8, 48:9 49:6 50:17 57:1,4 65:19,25 71:14 82:4 114:3, 13

**objectively** 111:9,19

**objectives** 26:20 46:23

**observation** 95:1

**obtained** 104:14

**obvious** 139:11,18

**occur** 64:8 72:23 127:1,9 128:4 129:7

**occurred** 20:25 29:10 31:5 119:9

**occurrence** 127:11

**ocean** 10:20

**October** 3:3 4:1 47:16 68:20 71:7

**OFF-THE-RECORD** 107:24

**offensive** 60:20,24

**offer** 53:13 62:1 65:4 76:20 107:18

**offered** 24:18,19

**office** 23:7 24:10,24,25 25:1,3,8, 9

**offices** 25:3

**ongoing** 68:20

**opened** 115:7

**opening** 24:25 136:15

**operations** 20:2 22:20 31:16 97:24 98:9 99:5

**opine** 6:24 48:2 127:10

**opined** 6:24

**opining** 101:16 105:24 114:18 128:3 137:12

**opinion** 47:3 49:17 60:5 62:2 65:5 67:11,15 76:20 78:5,18 82:15 115:20 128:7 139:3,10,15, 17

**opinions** 46:20 48:1 49:13,25 50:18 53:6,13,15 54:24 56:16 59:24 62:15 64:21 72:10 75:11 77:15 78:4,11 79:1,3 81:16 88:19 89:11 113:20 114:14 115:2,12,13 116:4 134:5 139:7

**opportunity** 24:19 79:2 139:8

**order** 21:21 52:2

**orders** 21:24

**Oregon** 5:17 7:15,16 12:7,8 14:13,16 19:21,23 25:12

**organized** 125:21

**original** 33:12,14

**outcome** 67:4

**overarching** 51:21

**overestimated** 97:2

**overestimates** 96:9

**overland** 93:13

**overlapping** 129:21

**overly-conservative** 96:7

**ownership** 43:15

P

**P.M.** 139:22

**pages** 35:7,11,15,16 36:20 42:11 102:19 103:13 120:17,22 124:25 125:2,5,10 134:4

**paginated** 101:5

**paid** 9:24,25

**Palace** 3:2 8:14 22:4 23:2 26:7 29:14 30:12,17,25 31:15 34:10 36:1 37:23 38:14,23 41:13,15 42:22,23 43:12,15,19 44:20 52:10,22,23 53:8 62:21 64:6,7,11 77:3,7 81:11,19 82:10,16 93:3 98:1 100:8,18 101:17,18 102:13, 21 103:15 104:7,23 105:9,14 106:10 108:3 109:23 110:8 111:4, 19 112:10,24 113:1,5 117:15 123:4 124:3, 127:5 128:12,20,24 129:8 130:5,8,10,14,19 131:10,11 133:18 134:22 135:6 138:5 139:4

**Palace's** 31:16 135:8



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                    James Maul 10/31/2014

**Palumbo** 15:7,10,14,18,19 16:4, 11,19 17:4 60:18 61:2,5

**par** 126:2

**paragraph** 58:23 108:19 109:2,8 112:14,15 113:12 116:9,17,19,22 117:1,7 120:23 121:6,8,15 124:16 125:7,17,22 126:4,19 128:10 130:11,17 131:8 132:20 133:16 134:14,20,24,25 136:20,22 137:5, 18,20 138:18

**paragraphs** 101:9 117:3 121:13 131:14

**parameters** 19:11 50:2

**paraphrase** 71:21 72:3

**Paraphrasing** 104:17

**pardon** 77:18 113:14 116:9,19

**part** 13:18 15:1,21 17:12,15 18:5, 20 19:9,13,14 33:19 38:23 39:5,7 41:19 48:17 49:8 68:19 79:20,24 80:1,3 91:14 96:23 115:24 123:16 132:4

**participated** 12:10 14:25

**parts** 40:12 42:15 56:5 67:7

**pass** 139:17

**path** 129:12

**paths** 129:6,10

**pathway** 87:2,5 136:16

**pathways** 17:19 84:6,12 87:3,10, 13,17

**patterns** 130:6

**paying** 139:16

**pen** 70:14

**pending** 46:5 92:16

**people** 11:2 25:8,9,10,11 87:6 112:9 139:16

**percent** 105:19 128:12

**perched** 58:5,6 134:22 135:18, 22 136:2,7,10,11,18

**perform** 15:23 17:8,16

**performed** 19:10 25:19 51:17 85:13

**period** 28:7 47:15,17,21 56:7,14 92:11

**permission** 120:19

**permit** 15:14

**person** 14:24 26:12 101:8

**personally** 23:25 24:1

**pharmaceutical** 94:10 130:22

**pharmaceuticals** 94:25 95:13, 21 106:11 107:10

**Phase** 84:5 104:14,19 112:6

**Phases** 104:8

**Phrase** 104:10

**Phyllis** 4:4 48:21 60:14

**physical** 83:12

**picked** 64:24 79:4

**picture** 52:20 69:22

**piece** 49:3 51:5,8,11,13 54:20 83:12 121:11

**pieces** 51:1 52:25

**place** 4:6 20:9,10

**places** 41:9

**Plain** 4:17

**Plains** 9:2, 14:12 18:9

**PLAINTIFF** 7:24 68:12

**plaintiffs** 42:1

**plaintiffs'** 64:24 79:4 83:15

**plan** 21:5 26:19 33:10,19,24 46:6

**planing** 12:4

**planning** 9:9 83:2 119:16

**plans** 85:16

**Planting** 7:14

**play** 57:5 62:19

**plethora** 134:8

**point** 15:3 24:10 52:14 53:2 56:17 58:19 69:24 70:11,14 71:3, 9 75:2,9,15 97:9 118:19 121:18 133:25

**pointed** 95:19

**pointing** 22:17 31:4 68:7 70:13

**points** 56:22

**pond** 62:13

**porosities** 129:22

**portion** 9:17

**Portland** 25:11

**posed** 5:20

**position** 77:24 112:17

**positive** 9:16

**possibilities** 110:25 114:5,6

**possibility** 27:20 129:2

**possibly** 131:25

**potential** 9:5 12:13,20 17:8,17, 19,22 20:1 49:2 50:11,12 52:22 61:11,14 62:4 65:7,11,12,14 67:1, 12,16 71:17 72:16,19,25 74:17 75:3 76:18 80:25 81:8,19 82:15 84:3,4 86:16 90:5,8 91:5 92:24 93:19 94:5 108:21 109:12 113:7 131:22,24 133:21,24

**potentially** 6:18 87:4,10,13 92:19 93:22 95:14 110:10

**potentiometric** 36:24 37:1,4 80:18

**practice** 27:21 29:10

**practices** 28:22 29:4,8,21,25 30:5,11 55:7 59:20 64:8 65:15,18 92:25 93:24 94:1 119:9

**precipitation** 58:10 59:6,20 65:16

**precise** 13:15,20 19:8

**precision** 13:16,19 38:8

**predicted** 17:9

**prefer** 83:6

**preferential** 129:6,10,11,25 136:15

**premise** 102:13

**preparation** 19:12

**prepared** 18:12 28:3,5,8,11 32:10, 33:11 44:15,25 53:10 81:17



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                          James Maul 10/31/2014

**preparing** 25:13,17 26:10 30:2 32:23 84:15

**presence** 67:6

**present** 25:21 88:1 94:23 97:3 101:18 105:25 106:3 115:14 118:15 124:17,19

**presented** 60:11 61:10 64:24 100:3,5 139:2

**presents** 73:4 87:16

**pressure** 47:14

**Preston** 23:5 101:14

**pretty** 20:22 49:16 53:25 133:14, 21 139:11

**previous** 3:15 48:23 50:7 55:2

**previously** 32:5 34:22 39:21 60:12 61:20 108:13

**primarily** 26:18 54:9,10,11 74:9 80:8

**primary** 81:10,12,22 82:9,17 110:10 111:5

**principles** 138:19

**printing** 58:15

**prior** 20:7,11 29:1 30:20 31:15 35:19 37:8 71:19 74:12,21 75:18 119:2,4,9

**private** 9:13

**privileged** 100:11

**problem** 51:2 52:1,2,22 82:24 84:1 98:14 105:17

**problems** 96:4 99:1

**proceeding** 5:6,7

**proceedings** 4:6

**process** 69:9

**processes** 121:24

**processing** 20:2

**produce** 83:9

**produced** 39:21,22 55:23 68:16, 19

**professional** 22:2

**program** 9:4,20

**project** 11:3 12:7,8 13:18 14:10 17:15 19:9 20:16 26:13,15,19 33:10,24

**projects** 8:25 18:22 24:13,16

**proper** 82:4

**properties** 129:16 131:4

**property** 31:15 37:24 42:22,23 43:12,15,19 70:4,6 77:8 109:23 123:4 124:3 138:6

**proposed** 9:19 11:1

**propositions** 27:18

**provide** 26:17 38:7 118:5 126:4 130:9,12

**provided** 8:21 19:11 26:12,21 37:13 45:15 100:19

**public** 28:7 101:11,18

**publication** 7:10,12,13,16

**published** 7:15

**purport** 43:1 47:20

**purported** 88:23

**purports** 39:19

**purpose** 74:5

**purposes** 11:18 20:14 38:18 53:9 70:8,21 125:1

**Pursley** 22:16 23:3,9

**put** 18:17 20:8 81:23 82:11 91:24 92:2,8 121:13

**putting** 27:19 31:23 32:19 95:14

**puzzle** 51:1,5,8,11,13,16,19,22, 25 54:21

### Q

**QC** 96:4

**qualifications** 14:6

**qualified** 128:7

**qualify** 114:4

**quality** 26:19 33:10,19,24 67:10 74:6,16,25 75:3 95:10

**quarter** 32:25 37:1,14, 40:15,20

**quarters** 40:15 41:25

**question** 5:20,21 6:2,3,10 11:15, 24 12:23 14:19 15:11,16 17:1,6 30:23 31:8,18 38:12 44:2 46:4 48:3,12,16,22,24 49:16 50:2,6,8, 51:21,23,24 52:13,16,17 54:4 55:1,3,6,12 58:3 60:15,16 61:6,7, 8 68:1,2,3 70:8 72:6 75:20,21,22 76:13 77:17 89:12,14,15 90:14 92:16 93:17 94:14,16,17 95:20 96:1,2 97:16,17,19,20 98:23 100:14 101:2 102:10,23,25 103:7, 8 105:6,8,15 106:20,22,23 109:10 111:15,16 113:22 114:12 116:24 119:2,4 127:21 129:18 130:25 131:8 134:6 137:3,10 139:19

**questioning** 115:8,9

**questions** 5:19 39:25 50:1 61:17 102:4,8 108:15 115:18 124:14

**quickly** 48:7

**quickness** 124:9

### R

**R.W.** 9:15

**ran** 20:22

**range** 21:25 44:2,4 72:22 104:21

**ranging** 40:11 41:21 42:14 43:22 44:7 115:25

**rapid** 129:22

**rate** 46:16 47:4

**Rattlesnake** 38:6

**raw** 67:7

**re-ask** 51:24

**reach** 20:24 58:11 59:7,21 113:17 114:2

**reaches** 116:1

**read** 48:21,23 50:6,7 55:1,2 60:14,16 61:6 68:1,2 75:20,21 89:12,14 94:15,16 95:24 96:1,23 97:17,19 99:23,24 100:14 103:5,7 105:23 106:20,22 109:8 111:14, 15 130:1

**reader** 84:16



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                    James Maul 10/31/2014

**readily** 59:11

**reading** 59:1 130:3

**real** 29:10 86:25

**reason** 27:6 130:3

**reasonable** 6:7

**rebut** 78:19 101:9 117:8 131:16

**rebuttal** 3:18 8:20 30:3,6 32:18, 19,23 33:12 34:4,7 35:24 36:5,22 37:12 53:11,12,15,17 54:1 57:13, 17 58:12 61:9 73:3 80:5,20 99:12 101:4,24 102:17,19 103:13 108:4 112:2,23 116:11 118:17 120:15, 25 124:10 125:8 128:10 130:16, 24 134:21

**rebuttaled** 58:8

**rebutting** 102:20 107:14 108:1 126:24

**recall** 21:22 29:17 36:25 64:15 67:3 73:10,25 80:4 99:11,13,16 100:21 124:1

**receive** 68:11 109:19

**receiving** 109:13

**receptors** 86:24 87:6

**RECESS** 66:7 93:8 120:1

**recharge** 46:16 47:4,9 49:11,21 50:11 55:7 57:12 62:8 65:14,15, 17 67:20 72:5 136:13

**recognize** 95:12

**record** 4:16 7:23 8:13 39:24 82:25 107:21,23 120:2,13 134:14

**recording** 66:9

**red** 43:9,14,16

**reduce** 73:20

**reducing** 116:12

**redundant** 100:25

**refer** 32:12 126:10

**reference** 27:14,25 29:9,18 32:22 34:3 56:17 58:21 73:3 80:15 103:20 111:23,24 123:11 124:18 130:7 134:10 138:9

**referenced** 25:24 28:22 30:3 32:24 33:22 34:17 60:7 119:11,12

123:19,23,24 124:3

**references** 27:7,9,10 35:7,8,11, 15,18 54:13 97:10 122:9 132:2,5, 7,10 134:19

**referencing** 101:10 128:23 130:25 131:8

**referred** 32:14 80:16

**referring** 8:23 36:3 55:4 57:19,23 58:22 67:23 69:3,4,7 98:18 104:25 128:16,19 138:11

**refers** 126:17

**reflect** 86:4

**reflected** 55:10 84:2

**refrain** 11:23

**refute** 77:24 97:11

**refuting** 107:2 126:21

**regard** 61:13 130:24 131:14

**relate** 47:8 137:25

**related** 9:10 13:5 87:22 125:6 130:9

**relates** 81:7 105:11,12 127:2 135:8

**relating** 105:9 126:14 128:24

**relation** 98:24

**relationship** 57:10,11 81:17

**relationships** 62:8

**relative** 12:15 17:9 18:8,9 25:20 57:6 73:13 85:12 88:2,5

**release** 86:16

**releases** 86:24

**Relevant** 51:14

**reliance** 53:24 80:7,13 108:6 110:20 112:3 125:25 127:2 136:24 137:6,14

**relied** 26:25 27:7,24 28:25 29:2 30:7 32:1 126:5 131:17 132:22 137:11,12

**relies** 108:5 135:10 136:21 137:3, 7

**rely** 28:19 100:13 110:24 135:2,5

**relying** 105:1 117:12 128:15 134:23

**remember** 9:22 22:20,23 23:1

**REMEMBERED** 4:1

**remind** 12:1

**remove** 120:19

**rendered** 46:21 49:25 50:18

**repaginated** 120:25

**repeat** 12:23 17:25 30:23 48:3 113:22 114:12

**repeating** 58:2

**rephrase** 18:1 100:15 102:11 103:9 107:6

**rephrasing** 48:11

**report** 3:17,18,21 6:23 7:11,20 8:1,6,10,21 14:7 19:12 25:17,18, 25 27:1,4,11,13,15 28:1,6,20 30:2,3,6 31:23,24 32:1,7,13,18, 20,23,25 33:3,7,12,13,14,18,20, 21 34:2,13,18,23 35:3,4,5,9,11, 12,21,24 36:5,11,22 37:12,16,17, 20,22 38:3,7, 45:10,12,20 53:10, 11,12,15,17,25 54:1,8,15 57:13, 18 58:1,13,22 59:3 61:9 67:18,25 68:7 71:15 73:3,4 74:6 77:15 78:6,24 79:12,14,23 80:1,5,8,14, 21,23 81:18 82:7,11,14 83:1,4,9 84:2,5,9 85:4 86:3 87:9,16 88:3, 12,23 89:17,18 90:24 91:4,8 93:9 96:6,18,23 97:4,11,22 98:5 99:2, 12,16,25 100:4,20 101:4,8,11 102:12,18,20 103:14,20 105:18, 22,23 106:10 108:5,14,17 109:2 110:12,13,20 111:12,18,24 112:1, 3,4,15,20 113:12 114:14,24 115:3,5 116:10,15,18 117:7 119:11,13 120:16,23,24,25 121:8, 20 122:3 123:19,20 124:4,10,15, 16,17,18,23,25 125:5,7,8,18 126:8,9,13,22 127:3 128:10,11 130:16,17,25 131:9,15,16,21,24 132:3,18 133:11,15,16 134:2,4, 20,25 135:10 136:20,21,24 137:4, 6,11,14,21,22 138:12,14,25 139:15

**reported** 73:6 95:17,18

**reporter** 4:5 11:22 48:23 50:7 55:2 60:16 61:6 66:9 68:2 75:21


DECLARATION OF CHARLES M. TEBBUTT - 363

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

89:14 94:16 96:1 97:19 103:7
106:22 111:15

**reporter's** 11:18

**reports** 3:20 6:25 25:14 26:10
32:24 33:9 36:22 40:3 48:2 53:24
54:7 55:18 60:6,10 80:7,13 82:1
99:23 137:7

**reports'** 52:11

**represent** 8:13 41:14 43:8,14
55:19 68:18 69:8 71:2,8 72:14
77:1

**representation** 28:25 29:3,5
55:24 70:21

**representations** 46:24 79:9

**representative** 72:22 74:25
75:12 77:20

**representing** 40:2,19 45:9

**represents** 40:19

**RESERVED** 139:23

**residences** 89:20

**residential** 66:19,24 104:8,11,16
110:24 111:25

**residual** 21:7

**respect** 25:21 26:7 27:3 32:18
54:7 113:12 127:10,17 133:11,15
137:20

**responding** 102:17

**response** 21:5 58:21 59:10

**result** 9:6 56:24 104:19

**results** 15:25 38:20 39:6,19,20
42:14 67:10 70:25 71:2 110:21
129:22

**resume** 4:19 7:11 14:1,15

**return** 73:9,16,19 74:9,19

**review** 14:5 25:18 27:15 29:22
32:3,6,12,19,22 33:16,17 34:14
35:8 36:21 39:16 46:12 67:17
74:5 81:17 85:11,21 89:17 100:19
110:7 112:6 113:2 118:18 138:19

**reviewed** 26:18 30:2 31:22 32:1
33:24 34:10 36:15 60:4,13 81:21
85:11,15,17,24 111:13 112:1
116:6 118:16 123:7 127:24,25

132:2,10,23 133:3,9 134:5,8,18
137:23 138:1

**reviewing** 28:4 79:23

**reviews** 27:17

**rig** 136:2

**rigorous** 99:4

**rigorously** 97:23

**risk** 105:25 106:3

**River** 73:19 74:18 116:2

**role** 26:2

**ROOM** 6:14

**rotary** 135:19,23 136:1

**rough** 121:11

**roughly** 10:11 20:23

**Roza** 63:22 64:12,14 65:13 73:8
77:2,4,7,11 112:16,17,18,19

**Rule** 68:21

**rules** 5:18

**running** 134:3,13

**runoff** 68:10 93:21,23 94:5,6,8

**runs** 132:20

---

# S

**Safety** 8:14

**sample** 69:22 72:12,16,18 76:3
77:1,19,21,22

**sampled** 104:7,10,18

**samples** 18:12 21:7 69:1 95:9
104:14 106:25 124:6,7

**sampling** 71:3 104:10,19

**saturated** 57:14 138:2,4

**scanned** 28:2

**scenarios** 90:5

**Schuman** 32:21

**scientific** 6:7 27:14,18,21 29:24
33:16 65:5 97:10 128:16,19,23
138:17

**scientifically** 52:7 81:1,7

**scientist** 33:15 50:25 52:21

**scientist/project** 26:16

**scope** 6:23 46:20 50:18 67:17
78:10,15,17 79:21,22 85:13 91:25
92:3,8 93:4,17 113:2 115:21
118:18,23 128:6

**scoped** 133:22

**season** 71:13

**seasonal** 65:14,15,17

**seasonally** 62:7 65:12

**Seattle** 4:3 25:4,9

**section** 9:8 138:12

**seek** 92:13

**seeking** 52:15

**select** 79:3

**selected** 89:1

**selecting** 98:19

**selectively** 111:4,18

**sense** 33:4

**sensitive** 9:5

**sentence** 87:16 112:23 125:8

**September** 40:12 56:8,20

**septic** 9:6 12:15 18:13 66:12,13,
15,19,24 67:1,5,8 88:25 90:9
97:22,23 98:1,6,17,20,24 99:3
108:22,25 109:5,6,10,11,14,22
110:8,9,14,15,25 111:7,10,25

**set** 28:10 68:18 72:15 75:25
110:11

**settings** 135:22

**shallow** 10:6 121:21 136:25

**shallower** 115:24

**Shaw** 35:24 36:5,22 53:13 57:17
58:8,22 61:10 78:19,20 79:11
80:7,12 108:15,17,20,25 109:2
110:14 111:12,17 112:3,15,18,19
116:11,22,25 121:12 125:7,24
126:5 128:11 131:17 132:2,14,22
134:1,6

**Shaw's** 53:18 54:6 57:17 99:24
110:20,23 113:12 116:15,18
117:7 120:23 121:6,8,9 122:8



DECLARATION OF CHARLES M. TEBBUTT - 364

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                  James Maul 10/31/2014

124:16 125:17,25 126:7,12,22,25
127:8 128:11 130:17,25 131:9,14,
16 132:13,17 133:15

**short** 47:21 56:14 66:7 93:8
120:1

**short-term** 47:23 48:25

**show** 7:5 30:11 31:14 35:2 69:3,
21 102:19 116:13 124:8 131:1,9

**showing** 62:3

**shown** 37:16 84:22 87:21 112:16

**shows** 72:7 84:2

**side** 24:20

**SIGNATURE** 139:23

**significant** 38:8 67:19 68:9 71:8,
10 72:1 77:25 88:7,9,15 122:2,5

**similar** 89:2 130:5,25 131:8
134:1 135:3,7

**similarity** 38:2

**similarly** 135:4

**simply** 31:4 84:14

**single** 10:9 27:14 72:12

**sir** 4:21 37:13 40:7 46:14

**site** 68:20,21 79:19 80:17 81:13
82:19 83:20,25 84:15,19 128:14,
18 139:5

**sites** 63:12

**siting** 66:25

**sitting** 23:6 39:23 65:3

**situation** 19:25 92:22 135:6

**situations** 15:23

**sixth** 81:2

**size** 20:22 24:13

**skipped** 79:17

**slowly** 11:19

**sludge** 67:8

**smaller** 24:14

**so-called** 94:10,22

**soil** 51:7 59:11 65:22 113:13
123:7,9 124:2,6,7 126:6 127:24
128:1,13 129:15,23 130:4,13

135:3,8 138:3,5

**soils** 18:11 88:16 121:10 129:7,
10,21 138:10

**solely** 64:24

**sort** 24:11 72:22 105:18 131:15
138:11,18

**sorts** 55:8

**source** 21:6 28:23 52:24 53:9
67:12,16,19 68:10 72:5 77:25
84:11 88:16 89:8 91:6 94:5,25
104:23 105:4 109:12 130:7
133:21 136:8

**sources** 81:1,8,10,12,23 82:9,15,
17 84:3,4 88:22 90:23 91:1,5
98:18,21 104:18 108:20,21
110:10 111:6,20 131:2,22, 133:25

**south** 41:13 42:8

**southeast** 38:5

**southern** 42:21 70:6

**southwest** 38:6 43:19

**speak** 51:22 52:9,10

**speaking** 52:6

**specific** 30:13 84:11 89:7 96:14,
20 97:5 118:3,9 128:14,18 138:9

**specifically** 43:13 53:24 73:25
127:3 128:20

**specifics** 67:3

**speculating** 30:16,22,24 138:8

**speculation** 78:3 89:23 92:5,6,
14 94:2,4 123:14

**speed** 49:10 69:8

**spend** 133:4

**spending** 12:17

**spent** 63:11,12

**spill** 20:19,21 21:8

**spills** 81:2

**spin** 49:17

**Spokane** 24:11

**spot** 125:13

**square** 10:18,24

**SS** 69:11

**stand** 61:9

**standing** 45:24 60:20

**stands** 69:11

**start** 8:24 53:1 61:8 96:9 132:7

**started** 7:9 99:2

**starting** 14:9 32:6 104:4 120:6,
14,24 121:3,8 132:20 134:2,11,12
137:21 138:17

**state** 4:15 5:2,3,9,12 15:14 96:6
116:10 129:15 130:4

**stated** 14:15 38:4 61:20 62:6

**statement** 16:21 17:20,24 29:2
50:16 51:2 59:3 61:9 104:6,25
105:13 113:24 117:13,17 118:6
126:12,14,15,16 128:17,25 129:7,
130:9, 131:15,20 138:12 139:19

**statements** 11:22 14:1 37:17
97:13 99:9 107:14 108:2,9,11
132:16 138:19,21

**states** 103:19

**stating** 86:1,2

**step** 79:17

**stipulate** 102:3,5 104:2

**stipulated** 133:2 134:7,17

**stipulation** 101:20

**Stokes** 23:12

**stop** 10:15

**storm** 93:14 94:5

**stratigraphy** 33:4

**stream** 20:22,24 21:2

**Street** 4:2

**stretch** 46:1

**strike** 99:12

**strong** 38:17

**structure** 129:15

**Stu** 117:15 119:6

**Stuart** 28:13,14,15,16 29:22,23
32:11



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                              James Maul 10/31/2014

**studies** 12:4,9,25 13:23 19:2 66:23 104:7 137:8

**study** 9:3,4,17,25 10:10 13:6 15:1,4,21,25 19:19 33:16 37:6 73:18 74:8 75:4 89:5 96:10 97:24 107:8 109:16 129:24

**subcontracted** 9:16

**subdivisions** 11:8

**subject** 52:12 73:18 117:23 136:19

**subsequent** 40:19

**subsequently** 32:12

**substantial** 20:22

**subsurface** 26:5 114:9 127:5 135:9

**succeeding** 40:14,15

**successive** 41:25

**suggest** 119:20

**suggests** 86:23 89:2

**Suite** 4:3

**sum** 57:17

**summaries** 39:6 40:3,21

**summarize** 104:12

**summarizing** 104:17

**summary** 42:2 55:16,19 122:24

**summer** 22:7

**Sunnyside** 63:23 70:10,12 71:9 73:8 75:7

**supplies** 105:20

**support** 53:14 72:24 87:17 91:8 113:9

**supported** 29:23 135:14,16

**supports** 129:24

**supposed** 78:25 102:10 115:11

**surface** 36:24 49:2 50:12 55:4,9 80:18 97:14 113:18 114:2 116:1

**surfaces** 129:23

**surficial** 47:22 48:8 49:21 50:15 54:21 55:8 56:25 65:6

**suspect** 95:22

**SW** 69:5,7

**Sweet** 9:13

**swing** 56:7,18

**swings** 56:23 62:5

**sworn** 4:8

**system** 66:20,24 67:5 110:25 136:18

**systems** 9:6 18:13 66:12,13,15 90:9 97:22,23 98:1,7,17,24 99:3 108:22,25 109:5,6,10,11,14,22 110:8,9,15,16 111:7,10,25

**T**

**table** 22:17 40:8,9 123:10 124:12

**tables** 57:16

**tabulate** 18:14

**tabulated** 18:16 39:19

**takes** 50:15

**taking** 46:6 90:2 106:9,16 125:17 127:7

**talk** 11:21 54:18 69:19 71:15 79:16 87:9 93:13 117:4

**talked** 24:6 56:2 134:1

**talking** 10:7 13:1,17,20 14:11 29:14 44:19 100:5 115:17 126:18 138:8

**talks** 97:22 112:23 116:22,25 129:3

**tanks** 12:15 18:13 67:1 88:25 98:20

**targeting** 24:13

**tasked** 130:19 131:5 133:22

**team** 17:15 19:9,13,14

**Tebbutt** 3:9 4:14 7:23 8:13 14:9, 12,19 15:12,17 34:19,24 35:3 39:17,22 40:5,7,21,23 41:1 45:11, 14,18,21,24 48:11,21 52:13 59:4 60:9,14,22,24 61:4 66:5,8,11 68:17,23 70:20 76:12 77:18 78:13,19 79:6,13 82:2,8 83:7,11, 14,17 93:7,9 97:17 101:20 102:3,

7,11 107:21 108:1 109:9 114:25 115:4,15,22,23 119:20,24 120:2, 4,13, 139:21

**temperature** 49:19 50:9,10,13 54:19 55:10,17 56:10,13,24 57:7 59:14,18, 61:22 62:2 64:18

**temperatures** 62:17

**ten** 7:10 10:19,21

**tens** 21:20

**term** 5:5 44:16

**terms** 28:23 65:21 72:15 86:4,13 97:7 112:2 122:4 129:1 132:6 138:1

**tested** 90:7

**testified** 4:11,25 5:1 60:12 71:15

**testify** 6:22

**testimony** 6:18 7:1 16:20 29:1 30:21 35:19 37:8 67:22 68:4 71:20,21 73:2 74:13,22 78:2 80:4 81:25 90:4 93:16 95:2 102:15 105:12 106:19 107:5,18 108:24 109:8 110:19 111:1 119:3 122:8 126:9

**testing** 51:17 99:10,19

**tests** 99:14

**That'll** 125:2

**thick** 121:24 122:19,21 137:2

**thickness** 86:5 122:6 127:4

**thing** 33:15 46:4 56:5

**things** 53:22 55:8 69:5,8 96:7 108:19 113:16 114:8 116:10 121:11

**thinking** 21:25

**thought** 74:2 97:5 122:3 127:14, 20

**thousand** 21:23

**thousands** 11:5 21:20

**threat** 101:19

**three-plus** 134:4

**time** 7:12 9:1 11:23 12:17 25:22 47:21 49:11,16 50:14,22 56:14 65:4 72:20 77:21 91:6,24 129:22



Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                          James Maul 10/31/2014

133:5 139:2,9

**times** 4:22,24,25 7:6 16:24
104:22

**today** 6:8 13:20 39:3 44:11 64:24
86:1 118:10,15 139:2

**today's** 38:18

**told** 29:16 32:5

**Tom** 22:24 24:10 25:1 29:19

**top** 92:21 98:11 123:1 137:22

**TOR** 3:2

**total** 63:11,12 76:6,17,18

**tour** 22:13,16 29:13 64:16

**toured** 22:12 64:3,5

**tracer** 94:10

**tracers** 94:18

**transfer** 17:20

**transmit** 122:11

**transparent** 88:4

**transport** 17:23 86:18,20 91:15
93:13 122:1 129:22

**trial** 4:25 5:1 6:16,19,22,24 7:1,4
115:16

**truck** 22:14

**truth** 4:9,10

**turn** 40:7 44:6 70:10,24 93:12
116:17

**Turner** 28:8,9,13,14,15,16 32:11
119:6

**Turner's** 28:19 29:4,22,23,25
117:15

**type** 18:10 25:16 30:24 47:4
50:23 51:18 62:1

**types** 12:4 92:18 114:22 123:8
126:6 127:24 130:4,13 135:3,8

**typically** 73:7 121:23

---

**U**

**Uh-huh** 16:25 35:17 39:8,10
40:13 42:3 51:9 54:17 56:12
57:13 63:24 69:6,23 70:7,9 80:2,

24 105:10 132:9 134:16 135:1

**unartful** 103:9

**unavailable** 6:17,18

**uncertainties** 88:2,5 108:6

**uncertainty** 84:22

**underlying** 72:11

**understand** 6:2,3,11 7:1,3,6
8:16,17 11:20 16:13 17:6 18:2
37:21 44:22 45:23 48:17,18 51:23
52:15,18 55:5 57:24 58:3 74:15
81:20 94:13 101:2,21, 102:23,24
137:9

**understanding** 29:11 46:23
74:18,23 98:19 101:24

**understands** 57:25

**understood** 48:4 70:22 105:21

**unfounded** 134:23

**units** 62:9 89:22 93:2

**universe** 32:15 34:9

**unsaturated** 59:11 85:5,6,23
86:5 121:25 122:2,6,9,12,13
127:4 137:2 138:3,9

**unsupported** 121:10

**unusual** 27:13

**Updated** 35:5

**upgrade** 104:20

**upgradient** 94:23 104:15 130:18
131:2,4 133:18,24

**uppermost** 137:1

**upstream** 133:24

**uptake** 116:12,22,25 117:4

**USGS** 115:24 116:6

**usual** 27:21

---

**V**

**vadose** 57:14 58:5, 115:7 123:9

**vague** 38:21

**valid** 81:1,7 88:1 91:24 92:2
109:10

**validated** 95:17

**validation** 26:20 95:17

**Valley** 29:11 30:5 88:21 89:4
91:19 117:22 118:8 119:9

**values** 40:14 41:1

**Vancouver** 4:18 25:10 83:18

**variability** 74:3

**variables** 61:21,25

**variation** 59:18 62:2,5

**variations** 55:10

**variety** 95:8

**vegetable** 20:1

**verified** 126:22

**version** 83:1

**vicinity** 130:5,13

**virtually** 72:13 75:24

**visit** 68:21

**visited** 22:4

**volcano** 31:7,9,11

**volume** 21:19 76:2 132:13

**VYD-17** 70:5

---

**W**

**wait** 5:21 11:15 76:12

**wanted** 105:14 127:12,13

**Warrenton** 10:14

**Washington** 4:3,18 5:16 19:19,
23 20:16 24:20,23 25:10

**waste** 97:8 99:15,17,20

**water** 9:8 47:11 55:9 57:2,9 59:16
67:10 71:7,8 74:6,16,24,25 76:2
84:7 87:22 93:14 94:5 104:15,16,
18 105:20 113:18 114:2,7,9
121:23 122:11,14 134:22 135:18,
22 136:3,7,10,11 137:1

**water-bearing** 57:11

**ways** 6:21 61:16 73:20 91:23

**week** 101:16


DECLARATION OF CHARLES M. TEBBUTT - 367

Case 2:13-cv-03016-TOR    Document 205-2    Filed 11/17/14

CARE vs. Cow Palace                                    James Maul 10/31/2014

**wells** 18:17 25:24 26:3 36:13
38:20 46:12 84:7 85:8,14 87:3,23
89:1 90:6 91:7 94:23 98:6 104:8,
11,16,21,24 105:5 109:16,17
113:16 114:1 123:12,15,16,18,20,
21,24 124:5 128:1,2 136:25

**whatsoever** 30:14

**whichever** 83:5

**wide** 10:21,23 62:5

**widespread** 88:21 89:3 117:8,13
118:7

**witness's** 16:20

**wondering** 21:24

**word** 5:8 38:17

**words** 46:14

**work** 5:25 9:11 17:18 18:20,25
23:9,12 24:15,20 25:19 26:8
79:22 85:12,16 91:25 92:3,8
100:18

**worked** 9:1,18 10:1 25:22

**working** 9:13 44:22

**works** 22:24 24:23 25:1 26:15

**wrap** 119:21

**wrong** 84:21 125:12

---

### Y

**Yakima** 28:17 30:5 73:19 74:18
88:21 89:4 116:1 117:22 118:8

**year** 21:13 23:22 71:12 77:2

**year-round** 77:21,23

**years** 7:10 58:9 59:5,19 117:20

**yeses** 5:24,25

**yesterday** 39:6,22 77:2

**yesterday's** 45:5

**YVD** 123:16

**YVD-10** 39:11,12 40:7 41:11 42:8

**YVD-15** 41:18,21 42:4,6

---

### Z

**zone** 58:6,7 59:11 85:5,7,23 86:5
121:25 122:2,12 123:9 137:2

**zones** 57:12,15 115:7

**Zuroske** 30:9 34:2 73:4 74:8