1  CHARLES M. TEBBUTT, WSBA #47255
   DANIEL C. SNYDER, *pro hac vice*
2  Law Offices of Charles M. Tebbutt, P.C.
   941 Lawrence St.
3  Eugene, OR 97401
   Tel. 541.344.3505
4
   BRAD J. MOORE, WSBA #21802
5  Stritmatter Kessler Whelan
   200 Second Avenue West
6  Seattle, WA 98119
   Tel. 206.448.1777
7
   *Additional counsel on signature page*
8
                IN THE UNITED STATES DISTRICT COURT
9             FOR THE EASTERN DISTRICT OF WASHINGTON

10 COMMUNITY ASSOCIATION FOR          NO. CV-13-3016-TOR
   RESTORATION OF THE
11 ENVIRONMENT, INC., a Washington    [PROPOSED] CONSENT DECREE
   Non-Profit Corporation
12 *and*
   CENTER FOR FOOD SAFETY, INC.,
13 a Washington, D.C. Non-Profit
   Corporation,
14                        Plaintiffs,
15      v.
16 COW PALACE, LLC, a Washington
   Limited Liability Company, THE
17 DOLSEN COMPANIES, a Washington
   Corporation, and THREE D
18 PROPERTIES, LLC, a Washington
   Limited Liability Company,
19
                        Defendants.
20

   [PROPOSED] CONSENT DECREE                              - 1

WHEREAS the Plaintiffs, the Community Association for Restoration of the Environment, Inc., and Center For Food Safety, Inc., initiated the above-captioned action by filing a Complaint on February 14, 2013, alleging that certain Defendants had violated the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, seeking injunctive and declaratory relief and attorneys and expert witness fees and costs;

WHEREAS the Court entered an Order on January 14, 2015 (ECF No. 320), finding Defendants Cow Palace, LLC, The Dolsen Companies, and Three D Properties, LLC, (hereinafter "Defendants") in violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, by causing or contributing to an imminent and substantial endangerment to human health and the environment and by disposing of solid waste in such a manner as to constitute open dumping;

WHEREAS the Plaintiffs have agreed to forego their request for a complete RCRA Corrective Action study and instead work with Defendants to take immediate measures to address what Plaintiffs contend are the most significant and likely sources of contamination and to ensure that the local community is provided access to safe and clean drinking water;

WHEREAS the Parties mutually agree and request that the terms of this Consent Decree be presented to the United States Environmental Protection Agency

[PROPOSED] CONSENT DECREE                                         - 2

1  (EPA) for incorporation into the March 2013 Administrative Order on Consent

2  (AOC) between the EPA and Defendants.  It is the intent of the Parties that the terms

3  of this Consent Decree will be incorporated into a new AOC and that EPA be

4  appointed to oversee implementation of remedial actions set forth in this Consent

5  Decree, and incorporated into the new AOC, as further explained herein;

6      WHEREAS after consultation with their respective counsel, Plaintiffs and

7  Defendants (collectively referred to as the "Parties" and singularly as a "Party")

8  hereby wish to settle this lawsuit to avoid the risks of further litigation and appeal

9  and to resolve the controversy between them;

10      NOW, THEREFORE, upon the consent of the Parties, and upon consideration

11  of the mutual promises contained herein, it is hereby ORDERED, ADJUDGED, and

12  DECREED as follows:

13                    **<u>GENERAL PROVISIONS</u>**

14  1.    This Court has jurisdiction over the Parties and the subject matter of this

15  lawsuit pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 1331.  Venue is proper in

16  this Court pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 1391(b).  This Court

17  shall have continuing jurisdiction over this lawsuit for the purposes of interpretation,

18  enforcement, and, if necessary, modification of this Consent Decree.

19

20

[PROPOSED] CONSENT DECREE                                    - 3

2.     The undersigned representative for each Party certifies that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Consent Decree and to legally bind the Party to it.

3.     This Consent Decree shall apply to and be binding upon the Parties to this lawsuit and upon all successors and assigns of the Parties.  This provision is intended to require full compliance with this Consent Decree so long as any portion of the Dairy Facility[1] is used by any person or entity in the course of conducting dairy operations, including the application of manure.  However, nothing herein shall prevent Defendants from discontinuing their dairy operations, or from transferring any of the Dairy Facility to other owners for uses other than for dairy operations; this Consent Decree shall no longer apply to real property that is not being used for dairy operations or other agriculturally related operations that involve the application of nitrogen fertilizers.   Defendants, or any of their successors or assigns, may sell the Dairy, or any of the real property upon which the Dairy or its operations may currently be conducted, without Plaintiffs' consent and without

---

[1] The term "Dairy" or "Dairy Facility" shall refer to those facilities commonly known as the Cow Palace Dairy, as described in Appendix A of the AOC, as well as the properties owned or leased by Defendants named herein used by the Dairy for manure applications.

[PROPOSED] CONSENT DECREE                                        - 4

1  approval of the Court; provided, however, that Defendants provide a copy of the

2  Consent Decree to new owner and provide written notice to Plaintiffs of the sale

3  within 30 days of closing.

4  4.    This Consent Decree constitutes the final, complete, and exclusive agreement

5  and understanding of the Parties with respect to the settlement embodied in this

6  Consent Decree and the subject matter of this lawsuit.  The Parties hereby

7  acknowledge that there are no representations or understandings relating to the

8  lawsuit or its settlement other than those expressly contained within this Consent

9  Decree.  This Consent Decree expressly supersedes, extinguishes and replaces all

10  prior stipulations and agreements between the Parties.

11  5.    This Consent Decree, and the AOC that incorporates its terms, may not be

12  modified in any material respect except by explicit written amendment agreed to by

13  the Parties.  Non-material modifications may be made by the Parties upon written

14  consent.

15  6.    This Consent Decree constitutes the full and complete settlement of all claims,

16  rights, demands, and causes of any action of any kind for Defendants' alleged

17  violations, through the date of entry of the Consent Decree, that Plaintiffs asserted or

18  could have asserted against the Defendants in this lawsuit.  Plaintiffs hereby release

19  all such claims and covenant not to sue Defendants in connection with them.  This

20  covenant not to sue in no way releases Defendants from compliance with this

[PROPOSED] CONSENT DECREE                                                - 5

Consent Decree or other applicable law.  Furthermore, this covenant not to sue shall in no way limit Plaintiffs' ability to enforce the terms of this Consent Decree, as incorporated into the new AOC, or any future and previously unalleged violations of law committed by Defendants.

7.      Each Party acknowledges and represents that it has relied on the legal advice of its attorneys, all listed at the end of the Consent Decree, who are the attorneys of its own choice, and that the terms of this Consent Decree have been completely explained to the Party by its attorney(s), and that the terms are fully understood and voluntarily accepted.

8.      In the event that any part of this Consent Decree is deemed by a court of competent jurisdiction to be unlawful, void, or for any reason unenforceable, and if that part is severable from the remainder of the Consent Decree without frustrating its essential purpose, then the remaining parts of the Consent Decree shall remain valid, binding, and enforceable.

9.      If for any reason the Court should decline to approve this Consent Decree in the form presented, then the Parties agree to continue negotiations in good faith in an attempt to cure the objection(s) raised by the Court to entry of this Consent Decree.

10.     This Consent Decree may be signed in counterparts, and such counterpart signature page shall be given full force and effect.

[PROPOSED] CONSENT DECREE                                              - 6

11.     The Dairy is presently located at 1631 North Liberty Road, near Granger, WA.  The Dairy meets the federal and state law definitions of a large concentrated animal feeding operation or "CAFO."

12.     In operating the Dairy, Defendants shall abide by this Consent Decree, the Resource Conservation and Recovery Act, the Federal Water Pollution Control Act ("Clean Water Act"), the Washington Dairy Nutrient Management Act, RCW 90.64 *et seq.*, and the Dairy's Nutrient Management Plan (NMP).  If any of the terms of this Consent Decree are stricter than the aforementioned laws, then the terms of the Consent Decree shall control.  If any of these laws are stricter than the terms of the Consent Decree, either now or in the future, such stricter laws shall apply.  Notwithstanding the foregoing, the Parties agree that nothing in this Consent Decree may be construed to obligate Defendants to violate any law, regulation, or the current terms of the AOC.  In the event of any perceived conflict, the Parties agree to submit the matter to the dispute resolution process described in paragraph 56.

13.     Defendants shall update their NMP to reflect the requirements set forth herein within 45 days of entry of the Consent Decree and provide a copy to Plaintiffs for review and comment.

## OVERSIGHT OF CONSENT DECREE IMPLEMENTATION

14.     At the request of the Parties and the Court, and to the extent agreed to by EPA, EPA shall oversee implementation and enforcement of the terms of the

[PROPOSED] CONSENT DECREE                                              - 7

1  Consent Decree.  Further, any and all reports and information required to be

2  produced to the EPA under the AOC shall hereafter be simultaneously provided to

3  Plaintiffs' designee(s).

4  ## SITE INSPECTIONS AND RECORD KEEPING

5  15.    For the duration of this Consent Decree, EPA shall be allowed to inspect the

6  Dairy Facility, including any application fields owned, leased, or otherwise

7  controlled by the Defendants, upon reasonable notice and at reasonably convenient

8  times.  Plaintiffs may designate up to four individuals to accompany EPA on any

9  such inspection; provided, however, that any such designated individuals shall

10 possess reasonable scientific or professional credentials so as to provide a

11 meaningful assessment of Defendants' progress under this Consent Decree.

12 16.    Inspections shall be conducted between the hours of 8:00 AM and 6:00 PM on

13 weekdays, unless otherwise agreed to by the Parties.  Plaintiffs' representatives shall

14 be accompanied at all times by a representative of Defendants' choosing.

15 17.    For the duration of this Consent Decree, Defendants agree to make available

16 to Plaintiffs, at no cost to Plaintiffs, electronic copies of any reports, correspondence,

17 sampling results, or other documents related to Cow Palace Dairy's Dairy Nutrient

18 Management Plan, the Administrative Order on Consent ("AOC") between

19 Defendants and EPA, and any documents generated as part of this Consent Decree.

20 Defendants may withhold from Plaintiffs documents that are legitimately protected

[PROPOSED] CONSENT DECREE                                      - 8

1  by attorney-client privilege or the attorney work product doctrine.  If Defendants

2  assert that a document is immune from production to Plaintiffs, then Defendants

3  shall provide to Plaintiffs a privilege log containing a description of the nature of the

4  document(s) withheld, its author and recipients, its date, the privilege or immunity

5  asserted, and a description of the content of the document which, without revealing

6  privileged or protected information, enables Plaintiffs to evaluate whether the

7  privilege or immunity is being properly asserted.

8  **LAGOON LINING AND MAINTENANCE**

9  18.    Defendants hereby agree to double line all lagoons with GCL liners and a 40

10  mil synthetic liner as set forth in the April 20, 2015 Dairy Lagoon Work Plan,

11  attached hereto as Exhibit 1, or as may reasonably be modified through the

12  discussions of Plaintiffs, Defendants, and the EPA.  The lining shall occur in the

13  following lagoons no later than the date set forth for each lagoon.  The name for

14  each lagoon corresponds to that on the Lagoon Review Report submitted to EPA

15  under the AOC on August 8, 2013.

16              a.  Settling Basin A, by no later than December 31, 2015;

17              b.  Settling Basin B, by no later than December 31, 2015;

18              c.  Catch Basin NW, by no later than December 31, 2015;

19              d.  Lagoon 1, by no later than December 31, 2016;

20              e.  Lagoon 4, by no later than December 31, 2016;

[PROPOSED] CONSENT DECREE                                            - 9

   f.  Lagoon 2, by no later than December 31, 2017;

   g.  Lagoon 3, by no later than December 31, 2017;

   h.  Safety Debris Basin, by no later than December 1, 2018;

 The Parties acknowledge that the above time-commitments are subject to the availability of materials, unanticipated weather or site conditions, and EPA's ability to review and approve the lagoon installation plans in a timely manner.  Should the EPA fail to timely review and approve the lagoon installation plans, and/or should unanticipated weather or site conditions or the unavailability of materials cause delay, the Parties agree to reconvene their discussions and agree to new date(s) or to otherwise submit this matter to the dispute resolution process set forth in Paragraph 56.  Notwithstanding the foregoing, Defendants hereby covenant to use their best efforts and to hire such consultants and contractors as may be reasonably necessary to accomplish the installations on the dates set forth above.

19.  Catch Basin NE is not included in the lining plan because it is slated for elimination and abandonment.  Such elimination and abandonment shall be completed prior to December 31, 2016, and shall be performed consistent with the requirements of NRCS Conservation Standard Practice No. 360.

20.  Defendants shall provide to Plaintiffs a copy of the Pre-Final (90%) Design addressed in Section 6.1 of Exhibit 1 within three (3) business days after such

[PROPOSED] CONSENT DECREE         - 10

1  document is provided to EPA.  Plaintiffs may provide comments to Defendants and

2  EPA within 30 days.

3  21.    At least 60 days prior to beginning work on any liner installation, Defendants

4  shall provide to Plaintiffs an installation plan and QAPP for review and comment.

5  Plaintiffs may provide comments to Defendants and EPA within 30 days

6  22.    To the extent EPA representatives are not present during liner installation,

7  Plaintiffs may have two representatives present as observers at the Dairy during each

8  distinct phase of liner installation: draw down and pump out; re-grading; addition

9  and compaction of fill material; installation of liner materials.  Such representatives

10  shall have applicable scientific or professional qualifications to make their review

11  meaningful and to confirm compliance with the Consent Decree and the Lagoon

12  Plan.  At least 48 hours prior to any such observation, Plaintiffs shall provide written

13  notice of such intent to observe directly to Cow Palace and its counsel.  Such notice

14  shall include the names of the proposed observers, a description of the observers'

15  qualifications (to the extent not already known), as well as the start and end time of

16  the proposed period of observation.  The representatives may not remain on site

17  outside of work hours and must be accompanied by a representative of Defendants at

18  all times (including being accompanied on and off the property).

19                              **GROUNDWATER MONITORING**

20

[PROPOSED] CONSENT DECREE                                              - 11

1    23.    Defendants and Plaintiffs disagree about whether it is reasonable or necessary

2    to install additional monitoring wells south or southwest of the Dairy Facility, and in

3    particular south of the Sunnyside Irrigation Canal.  Plaintiffs contend that such

4    monitoring wells are necessary to determine whether, how long, and in what

5    magnitude Defendants' operations continue to contribute to groundwater

6    contamination.  Defendants contend that the combined provisions of the Consent

7    Decree and the AOC eliminate any possibility of continuing or future contamination

8    and are concerned that such downgradient monitoring wells may be impacted by

9    significant contaminants from other sources.  For the purposes of compromise,

10   Defendants agree to fund the installation of a grid of 14 new monitoring wells.  Such

11   monitoring wells shall be installed as soon as practicable.  The locations of the new

12   wells are depicted in the map attached hereto as Exhibit 2 and are subject to location

13   refinement as site conditions or property rights require.   The Parties shall consult

14   and agree on the new well locations.  Plaintiffs shall have access to the actual

15   monitoring well installation to ensure that all wells are installed as agreed.

16   Defendants shall sample the new monitoring wells under the same terms and at the

17   same time as sampling occurs under the AOC for the other monitoring wells

18   installed on Defendants' property, and at least once per quarter during the term of

19   this Consent Decree regardless of whether the AOC continues.  At least 60 days

20   prior to beginning work on monitoring well installation, Defendants shall provide to

[PROPOSED] CONSENT DECREE                                      - 12

1  Plaintiffs an installation plan and QAPP for review and comment.  Plaintiffs shall

2  provide comments within 30 days and the Parties must agree on the QAPP in writing

3  at least 10 days before construction of the wells is allowed to commence.

4  24.    All aspects of Defendants' obligations with respect to groundwater

5  monitoring, as set forth above in Paragraph 23, are subject to review, approval, and

6  modification by EPA under the AOC.

7  25.    Defendants agree to provide to Plaintiffs in electronic form the laboratory

8  results of each groundwater sampling event at the same time the results are provided

9  to EPA.

10                    **CENTRIFUGE MANURE SEPARATOR**

11  26.    As part of their commitment to reducing the nutrients applied to their farming

12  operations, Defendants have installed and shall maintain a centrifuge manure

13  separator at the Dairy.  The Parties anticipate that operation of a centrifuge separator

14  will reduce the nitrogen and phosphorus content of the Dairy's liquid manure.

15  27.    The centrifuge separator shall operate "in-line" with the Dairy's existing

16  manure separator system.  "In-line" means that manure shall first be processed by

17  the Dairy's pre-existing manure separator, then processed in the centrifuge separator,

18  removing additional solids from the liquid manure.  This procedure shall remain in

19  place except for brief periods in which the centrifuge may be undergoing repair or

20  maintenance.

[PROPOSED] CONSENT DECREE                                    - 13

28.    Defendants shall provide Plaintiffs with data concerning nutrient removal and information about how the nutrients are to be used.  Such information shall be provided to Plaintiffs within 90 days of entry of this Consent Decree and as part of the annual information required to be provided to Plaintiffs.

## UNDERGROUND CONVEYANCE INSPECTION

29.    Defendants agree to inspect all underground conveyance systems (piping, joints, manholes, inlet structures and discharge structures).  Inspection shall consist of pressure testing of all transmission lines and/or video inspection and documentation of all underground structures.  Results of all such inspections shall be provided to Plaintiffs' designated representative(s) within five (5) business days of completion.  Leaks or improper piping shall be fixed so that all wastes are appropriately directed to lined lagoons.

## COW PENS

30.    No later than December 31, 2016, Defendants shall install concrete aprons along all water troughs within all the cow pens at the Dairy, with appropriate piping or diversion that redirects all collected wastewater to the Dairy's lagoon system. Aprons shall be constructed to generally applicable industry standards, with no less than ten (10) feet of concrete between the outside edge of the trough to the edge of the apron.

[PROPOSED] CONSENT DECREE                                    - 14

31.    No later than October 15, 2016, Defendants shall also install concrete at the terminal end of the alleyways in all of the cow pens at the Dairy, with appropriate piping or diversion that redirects all collected wastewater to the Dairy's lagoon system.  Such concrete shall be no less than 100 square feet in size, the final size to be determined after consultation with the Plaintiffs, and shall reasonably cover the historical high-traffic or bottlenecked areas at the terminal ends of the alleyways. The concrete shall be repaired and/or replaced as the herd's travel patterns may dictate.

32.    Effective upon entry of this Consent Decree, Cow Palace shall implement a protocol of regularly inspecting for and re-grading all low-lying or wet spots within all the cow pens at the Dairy.  Upon identification of any ponding of water Cow Palace shall promptly take reasonable steps to alleviate such ponding, including, as may be appropriate, vacuuming and removing any ponded water from the pens.  The re-grading process shall slope any low-lying or wet spots such that they no longer collect, or have the potential to collect, runoff from the cow pens.  Such inspection and re-grade shall occur at least monthly as weather conditions allow, and as practical in months where weather conditions make re-grading problematic.

33.    Manure shall be scraped in the cow pens at least weekly and any accumulated piles removed at least monthly.

## SILAGE AREA

[PROPOSED] CONSENT DECREE                              - 15

34.    Effective upon entry of this Consent Decree, Cow Palace shall ensure that its Silage Area is located entirely on an impervious surface.  For purposes of this section, the storage of natural products (hay, triticale, for example, but not corn) that are expected to be incorporated into silage are not considered located in the Silage Area, but rather are stored in synthetic AgBags in an area adjacent to the Silage Area.  So long as the natural products are stored in synthetic AgBags, or containers of similar construction that prevent regular contact with soils, such natural products need not be maintained on an impervious surface.  AgBags shall be positioned so that if there is any leachate it will be directed to an asphalt apron where it shall be collected and conveyed to the lagoons.

## COMPOST AREA

35.    No later than October 15, 2015, Cow Palace shall implement an Aerated Pile Pilot Project.  Such Pilot Project shall include at least the elements included the Project Memo attached hereto as Exhibit 3.  Upon completion of the Pilot Project, or by December 31, 2016, whichever is later, Cow Palace shall either: a) implement a comprehensive controlled aeration system, that measurably accelerates the reduction of moisture, increases oxygen levels, and provides temperature control; reduce the acreage of the Compost Operations to 30 acres or less; and conduct all Compost Operations on a surface with a permeability rating of at least $1 \times 10^{-4}$ cm/sec, on a slope of at least 2% leading to an asphalt apron for collection of any leachate or

[PROPOSED] CONSENT DECREE                                     - 16

1  runoff; or b) Cow Palace shall declare the Pilot Project as failed and immediately

2  resume settlement discussions on this issue with Plaintiffs.

3  ## MANURE APPLICATION & FIELD MANAGEMENT

4  36.     Defendants shall ensure that all future applications of liquid and solid manure

5  to agricultural fields owned, leased, or otherwise controlled by the Defendants are

6  based upon the nutrient management budget contained in Exhibit 4.  The nutrient

7  budget requires Defendants to determine all future manure application rates based on

8  residual soil nitrate and phosphorus levels, ensuring that manure is applied in

9  agronomic quantities and rates as defined herein.  Furthermore, the post-harvest

10  sampling contemplated under this Consent Decree shall be conducted consistent

11  with the post-harvest sampling requirements of the AOC.

12  37.     As required by the AOC, Defendants shall take soil tests in all manure

13  application fields following the 2015 harvest.  To the extent any field that is owned,

14  leased, or otherwise controlled by the Defendants has been shown, post-harvest, to

15  have an average of greater than 40 ppm residual nitrate plus ammonium in the top

16  two feet of the soil column, Defendants shall not apply to such field in 2016 until

17  and unless the average is shown by subsequent test to be below 40 ppm.  Thereafter

18  Defendants may apply to agronomic rates and in accordance with the nutrient

19  budget.  In addition, for fields with more than 40 ppm phosphorus in the upper foot,

20  based on a valid sample obtained during the 2015 calendar year, manure may only

1   be applied in a manner that, based upon a nutrient budget, seeks to reduce

2   phosphorus application to less than 66.66 percent of crop removal.  In addition,

3   fields that exceed any of the numbers listed above shall be considered for planting in

4   alfalfa during 2016.

5   38.     To the extent any field that is owned, leased, or otherwise controlled by the

6   Defendants which was shown, post-harvest 2016, to have an average of greater than

7   35 ppm residual nitrate plus ammonium in the top two feet of the soil column,

8   Defendants shall not apply to such field in 2017 until and unless the average is

9   shown by subsequent test to be below 35 ppm.  Thereafter Defendants may apply to

10  agronomic rates and in accordance with the nutrient budget.  In addition, for fields

11  with more than 40 ppm phosphorus in the upper foot, based on a valid sample

12  obtained during the 2017 calendar year, manure may only be applied in a manner

13  that, based upon a nutrient budget, seeks to reduce phosphorus application to less

14  than 66.66 percent of crop removal.

15  39.     To the extent any field is owned, leased, or otherwise controlled by the

16  Defendants which has been shown, post-harvest 2017, to have an average of greater

17  than 30 ppm residual nitrate plus ammonium in the top two feet of the soil column,

18  Defendants shall not apply to such field in 2018 until and unless the average is

19  shown by subsequent test to be below 30 ppm.  Thereafter Defendants may apply to

20  agronomic rates and in accordance with the nutrient budget.  In addition, for fields

[PROPOSED] CONSENT DECREE                                              - 18

1    with more than 40 ppm phosphorus in the upper foot, based on a valid sample

2    obtained during the 2018 calendar year, manure may only be applied in a manner

3    that, based upon a nutrient budget, seeks to reduce phosphorus application to less

4    than 66.66 percent of crop removal.

5    40.     To the extent any field owned, leased, or otherwise controlled by the

6    Defendants has been shown, post-harvest 2018, to have an average of greater than 25

7    ppm residual nitrate plus ammonium in the top two feet of the soil column,

8    Defendants shall not apply to such field in 2019 and thereafter until and unless the

9    average is shown by subsequent test to be below 25 ppm.  Thereafter Defendants

10    may apply to agronomic rates and in accordance with the nutrient budget.  In

11    addition, for fields with more than 40 ppm phosphorus in the upper foot, based on a

12    valid sample obtained during the calendar year at issue, manure may only be applied

13    in a manner that, based upon a nutrient budget, seeks to reduce phosphorus

14    application to less than 66.66 percent of crop removal until such time as phosphorus

15    levels are reduced to 40 ppm or less phosphorus in the upper foot of the soil column,

16    based on a valid sample obtained during the calendar year of planting.  Once 40 ppm

17    is achieved, no applications of manure will be allowed that cause residual

18    phosphorus levels to once again exceed 40 ppm.

19    41.     In addition to the above limitations, if it appears that additional nutrients are

20    required during the spring/summer growing season to any crop, Cow Palace shall

[PROPOSED] CONSENT DECREE        - 19

1   first take tissue samples to determine whether additional nutrients may be applied

2   agronomically.

3   42.    Furthermore, in the event any given field fails to meet the post-harvest nitrate

4   limit in two consecutive years, then the nutrient budget shall be modified in a

5   manner designed to consistently reach the post-harvest limit.  Plaintiffs shall be

6   consulted on any such modifications.  If the Parties cannot agree to an acceptable

7   modification prior to March 31st of the year following the second non-compliant

8   test, then the matter shall be submitted to mediation and/or binding arbitration, at

9   Cow Palace's expense.

10  43.    It is Plaintiffs' position that the limits for application set forth herein are a

11  compromise intended to achieve significant reduction of ongoing impacts but may

12  not represent the scientific standards that may be needed to provide full, long-term

13  environmental protection.  Plaintiffs have agreed to limitations set forth herein, in

14  conjunction with the Clean Water Project, in order to provide immediate relief to

15  potentially impacted residents while the regulatory agencies address the longer-term

16  standards necessary to protect human health and the environment.

17  44.    Beginning immediately, Cow Palace shall ensure that all liquid manure

18  applications to its fields are measured by flow meters, and that all application fields

19  are equipped with at least two moisture sensor stations.  The application and

20  irrigation monitoring will be conducted in accordance with EPA-approved Cow

[PROPOSED] CONSENT DECREE                                    - 20

Palace "Irrigation Water Monitoring Quality Assurance Plan", dated November 20, 2013.  Each sensor station shall include a data logger with sensors at 1', 2', and 3' of depth, as well as a rain gauge.  The data shall be transmitted via cell modem to a web-based software application that presents the data in tabular and graphical form.  The water measurements shall be considered against projected evapotranspiration and anticipated crop needs, and irrigation recommendations will be made accordingly for each field, each week, for the entire irrigation season.  The sensor system shall be outfitted with an alarm function that will immediately notify Cow Palace representatives if the moisture level in the third foot sensor reaches field capacity.  If the third foot in any field reaches field capacity then irrigation shall be promptly discontinued.

45.     Defendants shall make available to Plaintiffs copies of all manure management documents created by the Dairy, including but not limited to, field application summaries, third-party manure application summaries, soil sampling, manure sampling, regularly maintained moisture sensor data, handwritten field application logbooks, crop yield data, tissue sampling data, nutrient budgets, and nutrient planning and application documents generated by Defendants.

### PROVISION OF BOTTLED WATER OR REVERSE OSMOSIS SYSTEM

46.     Defendants agree to fund the provision of clean drinking water to eligible residences identified within the geographical area depicted on Exhibit 5 ("Covered

[PROPOSED] CONSENT DECREE                                      - 21

1    Area").  Eligible residences are those that have a valid test result from their drinking

2    water source in the prior 5 years showing a nitrate level of 10 ppm or higher and no

3    reverse osmosis system, and residences that do have a reverse osmosis system but

4    that have a similarly valid test result showing nitrate level of 60 ppm or higher.  This

5    program is hereafter referred to as the "Clean Drinking Water Project."

6    47.    The Parties hereby agree to have the Clean Drinking Water Project be

7    administered by a third party, in consultation with CARE.  For purposes of funding

8    such Project, Defendants shall contribute $3,000 per month for the first three months

9    of this Consent Decree, and $2,000 per month thereafter until the Consent Decree is

10   terminated with respect to nitrates in drinking water.  To the extent the contributions

11   of Defendants and other parties do not cover all of the reasonable costs of the

12   Project, Defendants agree to contribute additional monies as reasonably requested

13   and supported by the third party administrator up to a limit of an additional $25,000

14   over the course of the Consent Decree.

15   48.    The Parties agree that the purpose of the Project is to ensure that all eligible

16   residences within the Covered Area are provided access to either bottled water or

17   reverse osmosis systems.  Bottled water must be obtained from a reliable

18   commercial source, and the water must meet all applicable drinking water standards.

19   Reverse osmosis systems may be installed instead of bottled water but bottled water

20   must be provided until such systems are in place and functioning.  All costs of

1 installation, maintenance and repair of alternative water systems shall be covered, to

2 the extent funds are available, by the Project.

3 49.    Bottled water service and/or reverse osmosis systems shall be offered to any

4 eligible residence within the Covered Area.  The Parties shall jointly propose that

5 GWAC help facilitate the Project, and that a mutually agreed third party administer

6 the Project.  The specific protocols of the Project shall be determined by the third

7 party in consultation with CARE, and CARE shall have authority to oversee and

8 monitor the Project.

9 50.    If CARE and the third party agree that the funds from Defendants or any other

10 sources have fulfilled the purpose of the Project, then CARE and the third party may

11 utilize any excess funds to supply clean drinking water to such persons or residences

12 in the Granger/Outlook/Sunnyside area that they believe, in their joint discretion, to

13 be most impacted by contaminated groundwater.  In no event may any excess funds

14 be refunded to Defendants.

15 51.    Defendants' obligation to contribute to the Clean Drinking Water Project shall

16 terminate only as provided below in paragraph 54(C).

## PAYMENT OF ATTORNEYS' FEES, EXPERT WITNESS FEES, AND
## COSTS

19 52.    Within 60 days of entry of this Consent Decree by the Court, Defendants shall

20 pay an initial amount of Plaintiffs' attorneys' fees, expert witness fees, and costs

[PROPOSED] CONSENT DECREE                                        - 23

1    incurred in association with this lawsuit, in the amount of $300,000, to the Law

2    Offices of Charles M. Tebbutt, P.C.  Within 60 days such payment, Plaintiffs may

3    petition the Court for an award of further reasonable attorneys' and expert fees and

4    costs.

5    53.    Defendants also agree to contribute a reasonable and limited sum for fees and

6    costs that may be incurred in monitoring compliance with this Consent Decree in an

7    amount not to exceed $9,000 per year for 2015-2017 and $4,000 per year thereafter

8    until termination.  Plaintiffs shall submit to Defendants' counsel, no later than

9    January 30 of each year, an invoice for Plaintiffs' fees and costs related to the

10   Consent Decree for the prior year.  Payment shall be made within 30 days of the date

11   of the invoice.  If there is a dispute about the fees, then such dispute shall be

12   resolved through the dispute resolution provisions set forth in Paragraph 56.

13                                        **<u>TERMINATION</u>**

14   54.    This Consent Decree shall terminate as follows:

15          A.     With the exception of the Clean Drinking Water Project and

16   phosphorus, this Consent Decree shall terminate five years after entry if Defendants

17   have complied with all material terms.  Compliance with material terms means that

18   Defendants will have, at a minimum:

19          a.     Provided reasonable and timely access to EPA and Plaintiffs

20   representatives as contemplated in the Consent Decree;

[PROPOSED] CONSENT DECREE                                    - 24

b.    Substantially and in good-faith complied with all record-keeping, notice and document production obligations;

c.    Substantially and in good-faith complied with all obligations under the AOC, including in particular the Immediate Source Control Actions;

d.    Timely installed lagoons in a manner consistent with an approved lagoon plan, and maintained and repaired the lagoons in a manner consistent with industry standards;

e.    Installed, maintained, monitored and reported information from the new monitoring wells in a manner consistent with their obligations herein;

f.    Managed the centrifuge, compost, pens, underground conveyances, silage, and other dairy operations in a manner consistent with best dairy practices, the nutrient management plan, and their obligations herein;

g.    Substantially complied with their obligations under the Application Management and Irrigation Water Management Plans, and **strictly** complied with their duty to **only** apply at agronomic rates, within the nutrient budget, and exclusively as allowed under this Consent Decree;

h.    Consistently achieved post-harvest limits of 25 ppm nitrate average, including ammonium, in the top two feet, in at least half of their fields, with demonstrable downward trends in all other fields; and provided that all obligations

[~~PROPOSED~~] CONSENT DECREE                    - 25

1  as they relate to nitrates shall continue to be honored and observed under the Dairy's

2  nutrient management plan.

3        B.    This Consent Decree shall terminate with respect to obligations relating

4  to phosphorus only when at least 50% of Defendants' fields have tested post-harvest

5  at or less than 40ppm average in the top two feet of the fields, and with

6  demonstrable downward trends in all other fields.  Notwithstanding the termination

7  of this Consent Decree, the provisions herein as they relate to phosphorus shall

8  continue to be honored and observed under the Dairy's Nutrient Management Plan.

9        C.    With respect to the Clean Drinking Water Project, and for those

10  provisions that have not otherwise terminated with respect to the other obligations

11  set forth in paragraph A, above, this Consent Decree shall terminate only when the

12  13 "Determinative Wells" test at 10 ppm nitrate for 8 consecutive quarters; or when

13  the collection of data from all wells shows a consistent downward trend, such that a

14  reasonable person would conclude that the Dairy is no longer a significant source of

15  nitrates to groundwater.  The 13 Determinative Wells include the following: new

16  wells 2-8 as shown on Exhibit 2, and YVD wells 8, 9, 10, 15, DC-03, DC-03D.  To

17  the extent the Parties do not agree as to whether or when this Consent Decree shall

18  terminate, the matter shall be submitted to the dispute resolution process, and if need

19  be to the Court for hearing and resolution.

20  **INTEGRATION**

55.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement reflected in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter in this Consent Decree.

## DISPUTE RESOLUTION

56.    In the event of any dispute regarding implementation, interpretation, or compliance with this Consent Decree, the Parties shall first attempt to informally resolve that dispute through meetings of the Parties.  Any Party may initiate the informal dispute resolution process by serving written notice of a request for dispute resolution on the other Party.  If no resolution is reached within thirty (30) calendar days of the date that the notice of a request for dispute resolution is served, then the Parties may resolve the dispute by filing motions with the Court.

## EFFECTIVE DATE

57.    The effective date of this Consent Decree shall be the date upon which the Court enters in the civil docket a copy of this Consent Decree signed by the Court.

## FINAL JUDGMENT

58.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final, non-appealable judgment of the Court under Rules 54 and 58 of the Federal Rules of Civil Procedure.

## NOTICES

59.    Whenever notice is required to be given or a document is required to be sent by one Party to another under the terms of this Consent Decree, it shall be directed to the individuals at the addresses specified below, unless prior notice of a change has been given to the other Party.  A notice is sufficient under this Consent Decree if it is provided in writing through U.S. mail, hand-delivered, or provided electronically by e-mail, with e-mail being the first choice for all communications. If notice is provided via U.S. mail, it shall be considered effective upon the date of mailing.

> For Plaintiffs CARE and CFS:
>
> Charles M. Tebbutt, Law Offices of Charles M. Tebbutt (e-mail to be provided), attention: Yakima Valley Dairies Consent Decree)
>
> For Defendants:
>
> Brendan Monahan, Stokes Lawrence Velikanje Moore & Shore (e-mail to be provided), attention: Yakima Valley Dairies Consent Decree

The Parties shall exchange designated e-mail addresses to be used in accordance with this Section no later than three (3) business days after entry of this Consent Decree.  Any Party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.

[PROPOSED] CONSENT DECREE                                                      - 28

1   WE HEREBY CONSENT to the Entry of this Consent Decree.

2   COMMUNITY ASSOCIATION FOR
    RESTORATION OF THE ENVIRONMENT, INC.

3

    By: _____

4        Helen Reddout, President

5   CENTER FOR FOOD SAFETY, INC.,

6   By: _____
       George Kimbrell, Senior Attorney

7

  *Plaintiffs*

8

  COW PALACE, LLC

9   By: _____

10      R. William Dolsen, Manager

11   THE DOLSEN COMPANIES

12   By: _____
       R. William Dolsen, President

13

  THREE D PROPERTIES, LLC

14   By: _____

15      R. William Dolsen, Manager

16   *Defendants*

17

  IT [CT] IS SO ORDERED THIS _____ Day of May, 2015.

18

19                    _____
                    THOMAS O. RICE
                    United States District Judge

20

  [PROPOSED] CONSENT DECREE            - 29

1    WE HEREBY CONSENT to the Entry of this Consent Decree.

2    COMMUNITY ASSOCIATION FOR
     RESTORATION OF THE ENVIRONMENT, INC.

3
     By:_____
4          Helen Reddout, President

5    CENTER FOR FOOD SAFETY, INC.,

6    By:  _____
           George Kimbrell, Senior Attorney

7
     *Plaintiffs*

8
     COW PALACE, LLC
9    By:_____
10         R. William Dolsen, Manager

11   THE DOLSEN COMPANIES

12   By:_____
           R. William Dolsen, President
13

     THREE D PROPERTIES, LLC
14
     By:_____
15         R. William Dolsen, Manager

16   *Defendants*

17
     IT[CTI] IS SO ORDERED THIS _____ Day of May, 2015.
18

19                                      _____
                                        THOMAS O. RICE
                                        United States District Judge
20

     [PROPOSED] CONSENT DECREE                              - 29

1    WE HEREBY CONSENT to the Entry of this Consent Decree.

2    COMMUNITY ASSOCIATION FOR
     RESTORATION OF THE ENVIRONMENT, INC.

3
     By:_____
4          Helen Reddout, President

5    CENTER FOR FOOD SAFETY, INC.,

6    By:    _____
           George Kimbrell, Senior Attorney
7
     *Plaintiffs*

8
     COW PALACE, LLC
9    By: _____
10         R. William Dolsen, Manager

11   THE DOLSEN COMPANIES

12   By: _____
           R. William Dolsen, President
13
     THREE D PROPERTIES, LLC
14
     By: _____
15         R. William Dolsen, Manager

16   *Defendants*

17
     IT[CTI] IS SO ORDERED THIS __19th__ Day of May, 2015.
18
                                    _____
19                                  THOMAS O. RICE
                                    United States District Judge
20

     [PROPOSED] CONSENT DECREE                          - 29

1

2     Respectfully submitted this 11th day of May, 2015 and effective on the date

      entered by the Court.

3

4     s/ Brad J. Moore                          s/ Charles M. Tebbutt
      BRAD J. MOORE, WSBA #21802                CHARLES M. TEBBUTT
      Stritmatter Kessler Whelan                WSBA #47255
5     200 Second Ave. W.                        DANIEL C. SNYDER
      Seattle, WA 98119                         OR Bar No. 105127 (*pro hac vice*)
6     Tel. 206.448.1777                         Law Offices of Charles M. Tebbutt, P.C.
      E-mail: Brad@stritmatter.com              941 Lawrence St.
7                                               Eugene, OR 97401
      *Local Counsel for Plaintiffs*            Tel. 541.344.3505
8                                               E-mail: charlie.tebbuttlaw@gmail.com
                                                dan.tebbuttlaw@gmail.com
9
                                                *Counsel for Plaintiffs*
10

11    s/ Jessica L. Culpepper                   s/ Elisabeth A. Holmes
      JESSICA L. CULPEPPER                      ELISABETH A. HOLMES
12    NY Bar Member (*pro hac vice*)            OR Bar No. 120254 (*pro hac vice*)
      Public Justice                            GEORGE A. KIMBRELL
13    1825 K Street NW, Ste. 200                WA Bar No. 36050
      Washington, DC 20006                      Center for Food Safety, 2nd Floor
14    Tel. 202.797.8600                         303 Sacramento Street
      E-mail: jculpepper@publicjustice.net      San Francisco, CA 94111
15                                              Tel. 415.826.2770
      *Counsel for Plaintiffs*                  Emails:
16                                              eholmes@centerforfoodsafety.org
      s/ Toby James Marshall                    gkimbrell@centerforfoodsafety.org
17    TOBY J. MARSHALL, WSBA # 32726
      BETH E. TERRELL, WSBA # 26759             *Counsel for Plaintiff Center for Food*
18    Terrell Marshall Daudt & Willie PLLC      *Safety*
      936 North 34th Street, Suite 300
19    Seattle, WA 98103
      206-816-6603
20    Emails: bterrell@tmdwlaw.com

[~~PROPOSED~~] CONSENT DECREE                                              - 30

1   tmarshall@tmdwlaw.com

2   *Counsel for Plaintiffs*

3   s/Debora K. Kristensen                    s/Brendan V. Monahan
    Debora K. Kristensen                      Brendan V. Monahan
4   Jeffrey C. Fereday                        Sean A. Russel
    Preston N. Carter                         Stokes Lawrence
5   Givens Pursley LLP                        120 N. Naches Avenue
    601 W. Bannock St.                        Yakima, WA 98901
6   Boise, ID 83702                           bvm@stokeslaw.com
    dkk@givenspursley.com                     sean.russel@stokeslaw.com
7   jefffereday@givenspursley.com
    prestoncarter@givenspursley.com           Mathew L. Harrington
8                                             Olivia Gonzalez
    *Counsel for Defendant Cow Palace LLC*    Stokes Lawrence
9                                             1420 Fifth Avenue
    s/Ralph H. Palumbo                        Seattle, WA 98101
10  Ralph H. Palumbo                          MLH@stokeslaw.com
    Summit Law Group                          olivia.gonzalez@stokeslaw.com
11  315 Fifth Avenue S., Suite 1000
    Seattle, WA 98104
12  ralphp@summitlaw.com                      *Counsel for Defendant Cow Palace LLC*

13  *Counsel for The Dolsen Companies and*
    *Three D Properties*

14

15

16

17

18

19

20

[PROPOSED] CONSENT DECREE                                          - 31