1  CHARLES M. TEBBUTT, WSBA #47255
   DANIEL C. SNYDER, *pro hac vice*
2  Law Offices of Charles M. Tebbutt, P.C.
   941 Lawrence St.
3  Eugene, OR 97401
   Tel. 541.344.3505
4
5  BRAD J. MOORE, WSBA #21802
   Stritmatter Kessler Whelan
6  200 Second Avenue West
   Seattle, WA  98119
7  Tel.  206.448.1777

8  *Additional Counsel on signature page*

9

10            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF WASHINGTON

11 | COMMUNITY ASSOCIATION FOR | No. 2:13-CV-3016-TOR |
12 | RESTORATION OF THE ENVIRONMENT, INC., a Washington | |
13 | Non-Profit Corporation *and* | AMENDED CONSENT DECREE |
   | CENTER FOR FOOD SAFETY, INC., | |
14 | a Washington D.C. Non-Profit Corporation, | |
15 | | |
16 | Plaintiffs, | |
   | v. | |
17 | | |
18 | COW PALACE, LLC, a Washington Limited Liability Company, THE | |
19 | DOLSEN COMPANIES, a Washington Corporation, and THREE D | |
20 | PROPERTIES, a Washington Limited Liability Company. | |
21 | | |
   | Defendants. | |
22

23

24

AMENDED CONSENT DECREE- 1

WHEREAS the Plaintiffs, the Community Association for Restoration of the Environment, Inc., and Center For Food Safety, Inc., initiated the above-captioned action by filing a Complaint on February 14, 2013, alleging that the Defendants named in this lawsuit ("Defendants" or "Cow Palace") had violated the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*., seeking injunctive and declaratory relief and attorneys and expert witness fees and costs.  Defendants have denied the allegations contained in the Complaint;

WHEREAS the Court entered an Order on January 14, 2015 (ECF No. 320) finding Defendants in violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*., by causing or contributing to an imminent and substantial endangerment to human health and the environment and by disposing of solid waste in such a manner as to constitute open dumping;

WHEREAS the Parties entered into a Consent Decree for the purpose of resolving all claims prior to trial.  The Consent Decree was approved by the Court on May 19, 2015.

WHEREAS the Parties requested and worked with the United States Environmental Protection Agency (EPA) for several months to incorporate the terms of the original Consent Decree into the March 2013 Safe Drinking Water Act (SDWA) Administrative Order on Consent (AOC) between the EPA and Defendants.  The Parties further requested that EPA assume oversight of the implementation of remedial actions

AMENDED CONSENT DECREE- 2

set forth in the original Consent Decree as incorporated into the new AOC. Despite these good faith efforts, EPA declined to assume oversight over any aspect of the original or this Amended Consent Decree;

WHEREAS after more than five years of activity under the Consent Decree, the Parties wish to formally restate, clarify, and amend the Consent Decree as stated below.

NOW, THEREFORE, upon the consent of the Parties, and upon consideration of the mutual promises contained herein, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

## <u>GENERAL PROVISIONS</u>

1.    This Court has jurisdiction over the Parties and the subject matter of this lawsuit pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 1331. Venue is proper in this Court pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 1391(b). This Court shall have continuing jurisdiction over this lawsuit for the purposes of interpretation, enforcement, and, if necessary, modification of this Amended Consent Decree.

2.    The undersigned representative for each Party certifies that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Amended Consent Decree and to legally bind the Party to it.

3.    This Amended Consent Decree is a settlement of disputed facts and law, without admission of any allegations, fact or law contained in the notices of intent to sue or Complaint. This Amended Consent Decree shall apply to and be binding upon the

AMENDED CONSENT DECREE- 3

Parties to this lawsuit and to their successors in interest, subject to the following.  This provision is intended to require full compliance with this Amended Consent Decree so long as any portion of the Dairy Facility is used by any person or entity in the course of conducting Dairy Operations.  For the purposes of this Agreement, the term "Dairy Facility" means the real estate depicted on the map attached hereto as Exhibit A, and any real estate added to the Dairy Facility for the purposes of conducting Dairy Operations after the date of this Amended Consent Decree.  The term "Dairy Operations" includes all aspects of the commercial production of milk from cows, including but not limited to the related operations of compost, manure management, manure storage in lagoons and catch basins, the production and storage of silage and other animal feed materials, and the production of agricultural commodities which use any manure products from the Dairy Operations.  However, nothing herein shall prevent Cow Palace from discontinuing any aspect of its Dairy Operations, or from transferring any part of the Dairy Facility to other owners for uses other than for Dairy Operations. This Amended Consent Decree shall no longer apply to real property that is not being used for Dairy Operations; provided, however, that in the case of agricultural fields, the nitrogen application limitations shall not be lifted until such time as it can be demonstrated in a post-harvest test that there is an average of 25 ppm or less nitrate plus ammonium in the top two feet of the soil in such agricultural fields.  Defendants, or any of their successors or assigns, may sell the Dairy Facility, or any part or parts of the real

AMENDED CONSENT DECREE- 4

property upon which the Dairy Facility or its Dairy Operations may be conducted, without Plaintiffs' consent and without approval of the Court; provided, however, that Defendants provide a copy of the Amended Consent Decree to the new owner prior to closing and provide written notice to Plaintiffs of the sale within 30 days of closing.

4.      This Amended Consent Decree constitutes the final, complete, and exclusive agreement and understanding of the Parties with respect to the settlement embodied in this Amended Consent Decree and the subject matter of this lawsuit.  There are no representations or understandings relating to the lawsuit or its settlement other than those expressly contained within this Amended Consent Decree.  This Amended Consent Decree expressly supersedes, extinguishes, and replaces all prior stipulations and agreements between the parties, and expressly resolves, settles, and releases any and all claims that could have been raised by Plaintiffs prior to court approval of this Amended Consent Decree.  Notwithstanding the foregoing, the Parties agree that in the event there is a disagreement as to the meaning or effect of any particular item in this document, the terms of the original Consent Decree may be utilized by either Party in an effort to illustrate the context or original intent of the Parties.

5.      This Amended Consent Decree may not be modified in any material respect except by explicit written agreement by the Parties.  The Parties may seek Court approval of significant or foundational amendments to this Agreement.

AMENDED CONSENT DECREE- 5

6.      This Amended Consent Decree constitutes the full and complete settlement of all claims, rights, demands, and causes of any action of any kind for any known or unknown acts, omissions, or any manner of actual or potential violations, through the date of entry of the Amended Consent Decree, that Plaintiffs asserted or could have asserted against the Defendants in this lawsuit or under the original Consent Decree. This covenant not to sue in no way releases Defendants from, and shall in no way limit Plaintiffs' ability to enforce, the terms of this Amended Consent Decree, or any future violations of law committed by Defendants.

7.      Each Party acknowledges and represents that it has relied on the legal advice of its attorneys, all listed at the end of the Amended Consent Decree, who are the attorneys of its own choice, and that the terms of this Amended Consent Decree have been completely explained to each Party by its attorney(s), and that the terms are fully understood and voluntarily accepted.

8.      In the event that any part of this Amended Consent Decree is deemed by a court of competent jurisdiction to be unlawful, void, or for any reason unenforceable, and if that part is severable from the remainder of the Amended Consent Decree without frustrating its essential purpose, then the remaining parts of the Amended Consent Decree shall remain valid, binding, and enforceable.

9.      If for any reason the Court should decline to approve this Amended Consent Decree in the form presented, then the Parties agree to continue negotiations in good

AMENDED CONSENT DECREE- 6

faith in an attempt to cure the objection(s) raised by the Court to entry of this Amended Consent Decree.

10.    This Amended Consent Decree may be signed in counterparts, and such counterpart signature page shall be given full force and effect.

11.    The Dairy Facility is presently located at and near 1631 North Liberty Road, Granger, Washington, 98932 as further illustrated and described in Exhibit A attached hereto.  The Dairy meets the federal and state law definitions of a large concentrated animal feeding operation or "CAFO."

12.    In operating the Dairy Facility, Defendants shall abide by this Amended Consent Decree and the ruling by Judge Rice in *CARE v. Cow Palace*, 80 F.Supp.3d 1180 (E.D. Wash. 2015).  If any of the terms of this Amended Consent Decree are stricter than the Resource Conservation and Recovery Act ("RCRA"), then the terms of the Amended Consent Decree shall control.  Notwithstanding the foregoing, the Parties agree that nothing in this Amended Consent Decree may be construed to obligate Defendants to violate any law, regulation, or the current or amended terms of the AOC.  In the event of any perceived conflict, the Parties agree to submit the matter to the dispute resolution process described in paragraph 47.

13.    Defendants shall update their NMP to reflect the requirements set forth herein and provide a copy to Plaintiffs for review and comment.  Such updates shall make clear that Defendants have agreed to comply with the terms of this Amended Consent Decree,

AMENDED CONSENT DECREE- 7

which shall be attached thereto (as permitted by the reviewing authority), as shall any updated provisions regarding lagoon construction.  Updates shall also identify all fields owned, leased or "controlled" by Defendants, to which Defendants apply manure.  For the purposes of this Amended Consent Decree, Defendants shall be said to "control" fields to which manure is applied when the following three elements are satisfied: 1) manure is applied by Defendants' employees or contractors using Defendants' or Defendants' contractor's trucks; 2) when the amounts/rates of application are not dictated by the recipient; and 3) when Defendants are not compensated for such manure (e.g., reimbursement for fuel costs is not considered compensation).  In all such instances, Defendants may only apply to such controlled fields when such fields can be demonstrated to have nitrate levels consistent with the thresholds set forth in paragraph 34, and when there is a demonstrated nutrient need for such field.  Exports of manure to fields not "controlled" by Defendants shall be documented in a manner consistent with 40 CFR 122.42(e)(3) and shall include the most recent nutrient analysis from the source of the manure.

14.    Defendants shall provide proposed updates to their NMP to Plaintiffs as set forth herein within sixty (60) days of entry of this Amended Consent Decree.  Plaintiffs shall provide review and comment within forty-five (45) days thereafter, and the Parties shall work collaboratively to present a mutually agreeable NMP to the Conservation District in a reasonable time frame.  Defendants shall thereafter periodically update their

AMENDED CONSENT DECREE- 8

NMP to specifically include reference to all fields owned or leased by Defendants, and to which they have applied or intend to apply manure products. Defendants shall not apply manure to any fields it owns or leases that are not listed in an approved NMP; provided, nothing shall prevent Defendants from submitting updates of their approved NMP and adding additional fields to it for the sole purpose of nutrient applications. A sample nutrient budget to be used for each field is further discussed herein and a form to be used for each field is attached hereto as Exhibit B. Prior to application of manure products to any fields newly owned, leased, or controlled by Defendants, Defendants shall conduct soil tests, obtain a recommendation, and adhere to the nitrate and phosphorus limitations set forth in paragraphs 34 and 37.

## OVERSIGHT OF AMENDED CONSENT DECREE IMPLEMENTATION

15.     All Groundwater Monitoring of wells installed pursuant to the Consent Decree shall be conducted and reported quarterly to Plaintiffs in a manner consistent with the 2020 sampling and reporting protocols employed by Anchor QEA in its reports to CARE, subject to any future modifications to testing parameters as may be reasonably agreed by the parties. A representative and illustrative example of Anchor's 2020 Q1 report to CARE is attached hereto as Exhibit C. Plaintiffs recognize that the sampling and reporting done under this Amended Consent Decree will not conform to the technical and QA/QC requirements imposed by EPA under the AOC, but that the general AOC sampling and reporting protocols will be followed. Further, Plaintiffs

AMENDED CONSENT DECREE- 9

agree that Defendants will report only annually on phosphorus, anions, cations, and alkalinity. No groundwater sampling or reporting is necessary for nitrites, ammonia, or TKN (total Kjeldahl nitrogen). However, Defendants agree to re-initiate ammonia testing if the quarterly nitrate concentration in any of the following wells with higher than 10ppm nitrate shows a 20% increase over the average nitrate concentration in that same well over the prior two corresponding quarters: : YVD wells 9, 10, 15, 19, and DC-04. As an illustration, if the average concentration in YVD well 10 shows 50ppm nitrate in Q3 2021 and 60ppm nitrate in Q3 2022, then the average concentration is 55ppm. A nitrate concentration increase in Q3 2023 of more than 20% of that average, which would be an increase of 11ppm to 66ppm, would trigger a duty for ammonia testing in that well. In such an event, Defendants shall analyze the sample for ammonia in that well the following quarter. If a detection of ammonia occurs in the well at issue, then Defendants shall sample for ammonia at such well for each quarter until two consecutive quarters show "no detect" for ammonia, or as otherwise may be agreed by the parties. Further, any and all groundwater monitoring reports required to be produced to the EPA under the AOC shall be simultaneously provided to Plaintiffs' designee(s). The Parties disagree as to whether the Groundwater Monitoring reports that Defendants provide to the Plaintiffs from the monitoring wells installed under the Consent Decree must also be provided by Defendants directly to EPA. Plaintiffs reserve the right to bring this issue to the Court on motion for resolution.

AMENDED CONSENT DECREE- 10

1

## SITE INSPECTIONS, RECORD KEEPING, AND RECORD SHARING

2

16.    For the duration of this Amended Consent Decree, Plaintiffs shall be allowed to

3

inspect the Dairy Facility, including any application fields owned, leased, or otherwise

4

controlled by the Defendants, upon a minimum of 72 hours notice, not including

5

6

weekends and holidays.  Plaintiffs may designate up to four individuals on any such

7

inspection; provided, however, that any such designated individuals shall possess

8

reasonable scientific or professional credentials so as to provide a meaningful

9

assessment of Defendants' progress under this Amended Consent Decree.

10

17.    Inspections shall be conducted between the hours of 8:00 AM and 6:00 PM on

11

weekdays, unless otherwise agreed to by the Parties.  Plaintiffs' representatives shall be

12

accompanied at all times by a representative of Defendants' choosing.

13

18.    For the duration of this Amended Consent Decree, Defendants agree to make

14

15

available to Plaintiffs, in electronic form and at no cost to Plaintiffs, copies of any

16

reports, correspondence, sampling results, or other documents related to the Dairy

17

Facility's Dairy Nutrient Management Plans, the AOC, and any documents generated as

18

part of this Amended Consent Decree.  Defendants may withhold from Plaintiffs

19

documents that are legitimately protected by attorney-client privilege or the attorney

20

work product doctrine.  If Defendants assert that a document is immune from

21

production to Plaintiffs, then Defendants shall provide to Plaintiffs a privilege log

22

23

containing a description of the nature of the document(s) withheld, its author and

24

AMENDED CONSENT DECREE- 11

recipients, its date, the privilege or immunity asserted, and a description of the content of the document which, without revealing privileged or protected information, enables Plaintiffs to evaluate whether the privilege or immunity is being properly asserted.

## LAGOON LINING AND MAINTENANCE

19.    For the purposes of this Amended Consent Decree, the Parties agree that Cow Palace has thus far timely lined or abandoned its lagoons and catch basins in a manner generally consistent with the mutual understanding of the Parties under the original Consent Decree.  With the exception of Settling Basins A and B, the parties concur that Cow Palace's lagoon lining obligations under the original Consent Decree have been satisfied.  With respect to Settling Basins A and B, Cow Palace represents that such Basins were lined in accordance with EPA specifications prior to December 31, 2020. Plaintiffs have no reason to dispute this representation and the parties simply wait for Cow Palace's as-built completion report, which is due to be submitted to no later than February 28, 2021. If Plaintiffs have any questions or concerns about the lining of Settling Basins A and/or B, those shall be resolved informally with Cow Palace or brought to the attention of the Court no later than March 28, 2021.

20.    The Parties agree that the completion of Cow Palace's lagoon lining obligations eliminates the need for any further observation or monitoring of lagoon lining activities at Cow Palace, except insofar as Plaintiffs may wish to confirm any aspects of the completion of lining of Settling Basins A and B.

## GROUNDWATER MONITORING

21.     Defendants have joined with George DeRuyter & Son Dairy, LLC, and D&A Dairy, LLC, Henry Bosma Dairy, a Washington Proprietorship, and Liberty Dairy, LLC, a Washington Limited Liability Company, to fund the installation of a grid of 14 new monitoring wells, 12 of which were installed and finished as of early 2017 and one of which was completed in December 2017.  The first samples of the 12 installed wells were taken in March 2017 at the same time as the first quarter 2017 AOC sampling. The 13th well was installed and sampled in time for the fourth quarter 2017 AOC sampling. The 14th well was installed in time for first quarter 2018 AOC sampling and will be included in the First Quarter 2018 report and thereafter.  The locations of the 14 wells are depicted in the map attached hereto as Exhibit D.  All wells on Exhibit D other than wells YVD-19-32 were installed pursuant to the AOC.  Defendants shall sample the Consent Decree monitoring wells at the same time as sampling occurs under the AOC at least once per quarter during the term of this Amended Consent Decree.  To the extent the AOC terminates prior to the termination of the Clean Water Drinking Project created in the original Consent Decree, Defendants shall nevertheless continue to test at least YVD wells 9, 10, 15, 19, and DC-04 until such Clean Water Drinking Project terminates.

/
/
/

AMENDED CONSENT DECREE- 13

1
2

## CENTRIFUGE MANURE SEPARATOR OR EQUIVALENT OR BETTER NUTRIENT REDUCTION TECHNOLOGY

3

22.    As part of their commitment to reducing the nutrients applied to their farming

4

operations, and pursuant to their obligations under the original Consent Decree,

5

Defendants installed and operated a centrifuge manure separator.  The centrifuge

6

manure separator has not performed to Defendant's expectations and they have replaced

7

it with an improved nutrient recovery system that utilizes polymers, screen separation

8

and mechanical dewatering.  Defendants shall continue to consider and assess other

9

10

technologies to reduce nitrogen and phosphorus content of their manure containment

and treatment systems.  Defendants may at any time replace their nutrient recovery

11

system with any new system or technology that they reasonably believe to be equal or

12

13

superior to the performance of the then-existing system, following disclosure and

14

discussion with Plaintiffs.

15

23.    Unless otherwise agreed by Plaintiffs, Defendants' nutrient recovery system shall

16

17

operate "in-line" with the Dairy's existing manure separator system.  "In-line" means

that any manure passing through the primary separator shall subsequently be subjected

18

19

to the nutrient recovery system (or its replacement), removing additional solids from the

liquid manure.  This procedure shall remain in place except for brief periods in which

20

21

the system may be undergoing repair or maintenance, and unless and until the system is

22

replaced by similarly efficient or improved equipment or technology.

23
24

AMENDED CONSENT DECREE- 14

24.     Defendants shall provide Plaintiffs with data showing the level of nitrogen and phosphorus in the liquid manure that is sent through the nutrient recovery systems both prior to and following the nutrient recovery systems.  Such information shall be recorded twice per year, once in May and once in November, during the term of this Amended Consent Decree, and provided to Plaintiffs annually and/or upon request.  The solids, prior to intended application to fields, shall be sampled to determine agronomic application rates pursuant to other parts of the Amended Consent Decree.

## UNDERGROUND CONVEYANCE INSPECTION

25.     Defendants have completed inspection of all underground conveyance systems (piping, joints, manholes, inlet structures and discharge structures).  Inspection included pressure testing of all transmission lines and/or video inspection and documentation of all underground structures.  Results of all such inspections were provided to Plaintiffs' designated representative(s) in 2016.  This portion of the original Consent Decree has been completed.  As a continuing obligation, Defendants shall repair any leaks in the ordinary course and shall ensure that all liquid manure is directed to lagoons.

## COW PENS

26.     Defendants have made modifications to their aprons and feed lanes (consistent with an oral agreement between the Parties) and water troughs within all the cow pens at the Dairy Facility, with appropriate piping or diversion that redirects all collected wastewater to the Dairy Facility's lagoon system.  Defendants are now in compliance

with all obligations under the original Consent Decree to pour concrete or otherwise reconfigure or modify their pens.

27.    Defendants have implemented a protocol of regularly inspecting for and re-grading all low-lying or wet spots within all the cow pens at the Dairy.  Upon identification of any ponding of water Defendants shall promptly take reasonable steps to alleviate such ponding, including, as may be appropriate, vacuuming and removing any ponded water from the pens.  The re-grading process shall slope any low-lying or wet spots such that they no longer collect, or have the likelihood to collect, runoff from the cow pens.  Such inspection and re-grade shall occur at least monthly as weather conditions allow, and as practical in months where weather conditions make re-grading problematic.

28.    Manure shall be scraped in the cow pens at least weekly and any accumulated piles removed at least monthly from March through October; provided, however, that Defendants shall be excused from scraping pens during those weeks where persistent weather events and/or ground saturation make it impossible to operate machinery in the pens without getting stuck or potentially causing harm to the machinery.  Defendants shall grade each cow pen before November 30 of each year so that any runoff from piled manure is routed to the alleys or other such drains in order that such runoff be conveyed directly to the lagoon system.  Defendants shall keep records, on the forms attached as

Exhibit E hereto, documenting all actions required by this subsection and provide them to Plaintiffs annually and/or upon request.

## SILAGE AREA

29.    Defendants' Silage Areas are located entirely on an impervious surface and have been since the original Consent Decree was entered.  Defendants shall continue to maintain their Silage Area on an impervious surface for as long as this Amended Consent Decree is in place.  For purposes of this section, the storage of natural products (hay, triticale, corn) that are expected to be incorporated into silage are not considered located in the Silage Area, but rather are stored in synthetic AgBags in an area adjacent to the Silage Area.  Defendants may store corn silage in AgBags so long as the dry matter content of such corn silage is maintained at 30% or higher.  So long as the natural products are stored in synthetic AgBags, or containers of similar construction that prevent regular contact with soils, such natural products need not be maintained on an impervious surface.  AgBags shall be positioned so that if there is any leachate it will be directed to an asphalt apron where it shall be collected and conveyed to the lagoons. Asphalt aprons shall be installed in a manner that harmonizes with the lagoon installation schedule.

## COMPOST AREA

30.    Defendants have completed the reconfiguration of their compost facility in a manner consistent with the original Consent Decree.  All compost facilities are now

AMENDED CONSENT DECREE- 17

sloped, graded and compacted in a manner designed to prevent pooling, and with

leachate flowing to a collection system that directs any runoff to the Dairy's lagoon

system.

31.    Should Cow Palace seek to use other areas for compost, Cow Palace shall notify

Plaintiffs in writing and the Parties shall work in good faith to ensure that any additional

compost areas meet at least the minimum requirements set forth in paragraph 32.

32.    For any such additional compost areas used henceforth at the Dairy Facility,

Defendants shall (1) re-grade, as necessary, the area to a slope of at least 2% and (2)

compact, as may be necessary, the area to 95% of standard proctor compaction to reduce

permeability and ensure a permeability value of no less than $1 \times 10^{-4}$ cm/sec.  The

Parties recognize that the permeability value of $1 \times 10^{-4}$ cm/sec is a negotiated value,

and Plaintiffs' acceptance of this value for the purposes of settlement may not be

construed as an admission that such value will prevent leaching.  The Parties also

recognize that compaction to 95% of standard proctor may well result in a permeability

value significantly greater than $1 \times 10^{-4}$ cm/sec.

33.    Upon entry of this Amended Consent Decree, all composted manure shall be fully

cycled annually such that no compost shall remain at the facility for longer than one

calendar year.  This requirement is subject to reasonable extensions of up to 90 days in

the event precipitation shortens the typical compost season.

/

AMENDED CONSENT DECREE- 18

## <u>MANURE APPLICATION & FIELD MANAGEMENT</u>

34.     Defendants shall ensure that all future applications of manure to agricultural fields owned, leased or controlled by the Defendants are based upon the nutrient management budget as described in paragraph 14.  The nutrient budget requires Defendants to determine that nutrient application rates are based on residual soil nitrate and phosphorus levels, ensuring that manure is applied in agronomic quantities and rates as defined herein.  For all fields owned, leased, or controlled by Defendants, the post-harvest sampling contemplated under this Amended Consent Decree shall be conducted consistent with the post-harvest sampling protocols that have been observed since the original Consent Decree was entered.  Future applications of manure products to agricultural fields owned, leased, or controlled by Defendants shall be made at agronomic rates, and shall be supported by a recommendation by a qualified agronomist as well as post-harvest soil tests from the top two feet of fields demonstrating compliance with the nitrogen and phosphorous thresholds set forth in the following paragraphs.  All deliveries of liquid or solid manure, and all sales of separator solids, straw manure and compost (except for uses for fields owned, leased, or otherwise controlled by Defendants), shall be considered exports that are not subject to the requirements of this Amended Consent Decree, provided that Defendants shall maintain records of such exports that are consistent with 40 CFR 122.42(e)(3) and paragraph 13

herein.  In addition to the requirement to always apply at agronomic rates and consistent with the nutrient budget, Defendants shall comply with the following restrictions:

    a.     To the extent any field owned, leased, or otherwise controlled by the Defendants has been shown, post-harvest 2019, to have an average of greater than 25 ppm residual nitrate plus ammonium in the top two feet of the soil column, as determined by the fall post-harvest and spring pre-plant sampling, Defendants shall not apply to such field in 2020 and thereafter until and unless the average is shown by subsequent test to be below 25 ppm.  Thereafter Defendants may apply to agronomic rates and in accordance with the nutrient budget.

35.    Any fields subsequently purchased, leased, or otherwise controlled by Defendants, shall be subject to the limitations set forth in paragraph 34.  In addition to the above limitations, if it appears that additional nutrients are required during the spring/summer growing season to any crop, Defendants shall first take tissue samples to determine whether additional nutrients may be applied agronomically.

36.    Furthermore, in the event any given field fails to meet the post-harvest nitrate limit for any field in two consecutive years, then the nutrient budget shall be modified in a manner designed to consistently reach the post-harvest limit.  Plaintiffs shall be consulted on any such modifications.  If the Parties cannot agree to an acceptable modification prior to March 31st of the year following the second non-compliant test, then the matter shall be submitted to the Court for resolution.

37.    All of the fields owned, leased or controlled by Defendants shall be subject to the

following phosphorus requirements, with the goal of getting phosphorus levels in the

top two feet of soil to agronomic levels at or below 40 ppm:

    a.    Based on the average phosphorus levels measured in the 1- and 2- foot

        intervals during the fall, post-harvest sampling, Defendants shall not

        exceed the phosphorus application restrictions defined in the table below:

| Fall Average Available P in Upper 2 feet (mg Olsen P/kg) | Total annual application based on P (Crop years 2020+) |
|---|---|
| < 40 mg ppm | Control for N |
| 41-100 ppm | 90% of crop extraction |
| 101-180 ppm | 66.6% of crop extraction |
| >181 ppm | No application |

38.    It is Plaintiffs' position that the limits for application set forth herein are a

compromise intended to achieve significant reduction of ongoing impacts but may not

represent the scientific standards that may be needed to provide full, long-term

environmental protection.  Plaintiffs have agreed to limitations set forth herein, in

conjunction with the Clean Drinking Water Project, in order to provide immediate relief

to potentially impacted residents.

39.    Defendants shall make available to Plaintiffs copies of all manure management

documents created by the Dairy Facility, including but not limited to, field application

summaries, export records, regularly-maintained moisture sensor data, soil sampling,

manure sampling, handwritten field application logbooks, crop yield data, tissue

AMENDED CONSENT DECREE- 21

sampling data, nutrient budgets, and nutrient planning and application documents generated by Defendants.

40.     Notwithstanding the foregoing, the Defendants contend that there may be extreme circumstances that warrant an Emergency Winter Land Application so as to ensure that lagoons do not breach.  In such event, Defendants shall provide written notice to Plaintiffs prior to such application.  In the event such Emergency Winter Land Application occurs at such hours that prior notice is not possible, then notice shall be provided immediately following such application.  Such notification shall include the anticipated date, location, and volume of such Emergency Winter Land Application and assurance that all reasonable steps have been taken to ensure that discharges off the field do not occur during thawing or precipitation events until the manure is properly incorporated into the soil.  In the event of such application, the Parties shall confer and discuss whether the need for an Emergency Winter Land Application requires any modification of the storage capacities called for in the approved Lagoon Plan.  Given the more frequent heavy precipitation events of the past few years, and their expected continued occurrence, the present 25-year/24-hour storm event used for storage capacity calculation shall be revised upward.

## PROVISION OF BOTTLED WATER OR REVERSE OSMOSIS SYSTEM

41.     Defendants agreed under the original Consent Decree to provide $2,000 per month to support a complementary Clean Drinking Water Project.  Such obligations

AMENDED CONSENT DECREE- 22

were intended to supplant the duties assumed by Defendants on February 6, 2015, under the Stipulation reached by the Parties (ECF No. 336).  Such Stipulation required Defendants to provide bottled water service to persons in a defined area near the Dairy Facility. Defendants have complied in all respects with both obligations, resulting in payments by Defendants in the amount of $43,117.03.  The Clean Drinking Water Project has been in place since at least May of 2015 and shall remain in place until terminated pursuant to paragraph 45(C) below. However, given Defendants' past payment for bottled water service, Defendants shall have a credit in the amount of $43,117.03 (the "Overpayment Credit").  Defendants may temporarily suspend payments to the Clean Drinking Water Project, with the $2,000 per month otherwise due being deducted from the Overpayment Credit.  After a period of 21 months, the next month's payment due from Defendants shall be $882.97 ($2,000 minus the remaining $1,117.03 in Overpayment Credit).  Thereafter, Defendants shall resume the $2,000 monthly payments, which shall remain in place until termination pursuant to paragraph 45(C) below.  The parties agree that Cow Palace's last $2,000 payment was December of 2019, meaning they are relieved of further payments through September 30, 2021. On October 1st of 2021 Cow Palace shall pay $882.97, and shall resume $2,000 monthly payments on the first of each month thereafter until the Clean Water Provision has been terminated.  Provided, however: If the Amended Consent Decree with respect to the water payments terminates prior to November 1, 2021, Plaintiffs shall reimburse

AMENDED CONSENT DECREE- 23

Defendants in an amount equal to the remaining Overpayment Credit. The Clean Drinking Water Project shall be solely responsible for administering the funds. The Clean Drinking Water Project provides bottled water and/or reverse osmosis systems to residents whose residential water has tested at or near 10 ppm nitrate.

42. As long as the funds from Defendants or any other sources can be shown to have fulfilled the purpose of the Project, then the Clean Drinking Water Project may utilize any excess funds to supply clean drinking water to such eligible persons or residences in the Granger/Sunnyside area believed to be impacted by contaminated groundwater. Except as provided in paragraph 41 above, in no event may any excess funds be refunded to Defendants. Plaintiffs shall provide a report by March 31, 2021 for funds used through 2020 for the Clean Drinking Water Project. Such report shall include the number of homes reached, the number of homes provided with alternative drinking water, and the funds expended. A list of the homes that the Dairies must maintain has been agreed upon and is attached as Exhibit F.

43. Defendants' obligation to contribute to the Clean Drinking Water Project shall terminate only as provided below in paragraph 45(C).

**PAYMENT OF ATTORNEYS' FEES, EXPERT WITNESS FEES, AND COSTS**

44. Plaintiffs' attorneys' fees, expert fees, and costs incurred in association with the underlying lawsuit have been paid consistent with the earlier Court Order. ECF No. 305 (Order) and ECF No. 309 (stipulation on fees). The Parties disagree as to the amount of

AMENDED CONSENT DECREE- 24

any additional fees that may be owed to Plaintiffs since January of 2016.  The original

consent decree provided that Defendants would pay Plaintiffs an amount not to exceed

$9,000 per year for monitoring costs.  Plaintiffs have provided records to Defendants

indicating the nature of work their lawyers and experts have performed from 2016-2019

and contend that such additional work was necessitated by the EPA's decision not to

participate in the oversight of the Consent Decree and that Plaintiffs should be

compensated for that additional work.  Further, Plaintiffs contend that they are entitled

to recover the additional fees they have incurred in the course of negotiating and

drafting this Amended Consent Decree.  Plaintiffs contend that the total costs and fees

associated with such work and payable by Defendants through November 30, 2020 are

$52,000.00.  Defendants contend that the Plaintiffs agreed to cap their fees at $9,000 per

year through 2017 and at $4,000 in 2018 and 2019 and that the additional fees requested

are not reasonable.  In order to resolve outstanding claims fees and costs for 2016

through the date of entry of this Amended Consent Decree, Defendants agree to pay to

Plaintiffs a total of $48,000.00 over the course of six monthly installments in the

amount of $8,000 each.  The first installment payment is due thirty days following the

Court's entry of this Amended Consent decree.  Separately, Defendants shall pay

Plaintiffs up to a total of $3,000 per year in attorneys' fees and any other expenses

(travel costs, expert fees, etc.) for 2021 and again for 2022, for Plaintiffs' reasonable

and necessary oversight of Cow Palace's performance of its duties herein.  Plaintiffs

AMENDED CONSENT DECREE- 25

shall submit their billing and expense records to Cow Palace no later than by February 1 of 2022 and 2023 respectively, and such sums shall be paid within 30 days. Plaintiffs reserve the right to seek additional fees if Defendants unreasonably fail to provide the documents or information required herein, or materially breach any of the terms of this Amended Consent Decree in a manner that reasonably requires additional oversight by Plaintiffs. Cow Palace similarly reserves the right to dispute the reasonableness or necessity of any such claimed fees or expenses.

## **TERMINATION**

45.    This Amended Consent Decree shall terminate as follows:

A.    With the exception of the Clean Drinking Water Project and phosphorus, this Amended Consent Decree shall terminate no later than March 1, 2021, provided that Defendants have certified to EPA that they've completed the lining of Settling Basins A and B consistent with the terms of paragraph 19, above, and subject to Defendants' continued compliance from the date of entry of this Amended Consent Decree with the material terms herein.  Compliance with material terms means that Defendants will have, at a minimum:

1.    Provided reasonable and timely access to Plaintiffs' representatives as contemplated in the Amended Consent Decree;

2.    Substantially and in good-faith complied with all record-keeping, notice and document production obligations;

AMENDED CONSENT DECREE- 26

3.     Completed the lining of the final lagoons as set forth herein, and maintained and repaired the lagoons in a manner consistent with industry standards;

4.     Maintained, monitored and reported information from the new monitoring wells in a manner consistent with their obligations herein;

5.     Managed the nutrient recovery system, compost, pens, underground conveyances, silage, and other dairy operations in a manner consistent with the obligations herein;

6.     Substantially complied with their obligations under the Application Field Management Plans and Irrigation Water Management Plans, and substantially complied with their duty to only apply at agronomic rates, within the nutrient budget, and exclusively as allowed under this Amended Consent Decree; and

7.     Consistently achieved post-harvest limits of 25 ppm nitrate average, including ammonium, in the top two feet, according to the time frames set forth in this Amended Consent Decree; and provided that all obligations as they relate to nitrates shall continue to be honored and observed under the Dairy's nutrient management plan.

B.     This Amended Consent Decree shall terminate with respect to obligations relating to phosphorus only when at least 50% of Defendants' fields have tested post-harvest at or less than 100 ppm average in the top two feet of the fields, and with demonstrable downward trends in all other fields.

AMENDED CONSENT DECREE- 27

C.    With respect to the Clean Drinking Water Project for these Defendants, this Amended Consent Decree shall terminate only when the five (5) wells shown on the map attached hereto as Exhibit D (including YVD wells 9,10,15,19, and DC-04) test lower than 10 ppm nitrate for 8 consecutive quarters; or when the collection of data from all wells shows data that, in conjunction with other available information and data points, a reasonable person would conclude that the Dairy Facility is no longer causing or contributing nitrate to groundwater in excess of the maximum contaminant level of 10 ppm.  To the extent the Parties do not agree, the matter shall be submitted to the dispute resolution process, and if need be to the Court for hearing and resolution.

## **INTEGRATION**

46.    This Amended Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement reflected in this Amended Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter in the original Consent Decree (expect as otherwise specifically referenced herein).

## **DISPUTE RESOLUTION**

47.    In the event of any dispute regarding implementation, interpretation, or compliance with this Amended Consent Decree, the Parties shall first attempt to informally resolve that dispute through meetings of the Parties.  Any Party may initiate the informal dispute resolution process by serving written notice of a request for dispute

AMENDED CONSENT DECREE- 28

resolution on the other Party.  If no resolution is reached within thirty (30) calendar days of the date that the notice of a request for dispute resolution is served, then the Parties may resolve the dispute by filing motions with the Court.

## EFFECTIVE DATE

48.    The effective date of this Amended Consent Decree shall be the date upon which the Court enters in the civil docket a copy of this Amended Consent Decree signed by the Court.

## FINAL JUDGMENT

49.    Upon approval and entry of this Amended Consent Decree by the Court, this Amended Consent Decree shall constitute a final, non-appealable judgment of the Court under Rules 54 and 58 of the Federal Rules of Civil Procedure.

## NOTICES

50.    Whenever notice is required to be given or a document is required to be sent by one Party to another under the terms of this Amended Consent Decree, it shall be directed to the individuals at the addresses specified below, unless prior notice of a change has been given to the other Party.  A notice is sufficient under this Amended Consent Decree if it is provided in writing through U.S. mail, hand-delivered, or provided electronically by e-mail, with e-mail being the first choice for all communications.  If notice is provided via U.S. mail, it shall be considered effective upon the date of mailing.

AMENDED CONSENT DECREE- 29

For Plaintiffs CARE and CFS:

Charles M. Tebbutt and B. Parker Jones, Law Offices of Charles M. Tebbutt (e-mail already provided) attention: Yakima Valley Dairies Consent Decree.

For Defendants:

Brendan Monahan, Stokes Lawrence Velikanje Moore & Shore (e-mail already provided), attention: Yakima Valley Dairies Consent Decree.

The Parties have exchanged designated email addresses to be used in accordance with this Section. Any Party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.


WE HEREBY CONSENT to the Entry of this Amended Consent Decree.

COMMUNITY ASSOCIATION FOR RESTORATION OF THE ENVIRONMENT, INC.

CENTER FOR FOOD SAFETY, INC.

By:_____
        Helen Reddout, President

By:_____
        George Kimbrell, Senior Attorney

*Plaintiffs*; and

COW PALACE, LLC

THE DOLSEN COMPANIES

By:_____
        Adam P. Dolsen, Manager

By:_____
        Adam P. Dolsen, President

THREE D PROPERTIES, LLC

AMENDED CONSENT DECREE- 30

1   For Plaintiffs CARE and CFS:

2   Charles M. Tebbutt and B. Parker Jones, Law Offices of Charles M. Tebbutt (e-

3   mail already provided) attention: Yakima Valley Dairies Consent Decree.

4   ~~For Defendants:~~

5   ~~Brendan Monahan~~, Stokes Lawrence Velikanje Moore & Shore (e-mail already

6

7   provided), attention: Yakima Valley Dairies Consent Decree.

8   The Parties have exchanged designated email addresses to be used in accordance with

9   this Section. Any Party may change either the notice recipient or the address for

10  providing notices to it by serving the other Parties with a notice setting forth such new

11  notice recipient or address.

12

13  WE HEREBY CONSENT to the Entry of this Amended Consent Decree.

14  COMMUNITY ASSOCIATION FOR     CENTER FOR FOOD SAFETY, INC.
15  RESTORATION OF THE
     ENVIRONMENT, INC.

16  By: _____   By: _____
17     Helen Reddout, President     George Kimbrell, Senior Attorney

18  *Plaintiffs*; and

19  COW PALACE, LLC     THE DOLSEN COMPANIES

20  By: _____   By: _____
21     Adam P. Dolsen, Manager    Adam P. Dolsen, President

22  THREE D PROPERTIES, LLC

23

24

    AMENDED CONSENT DECREE- 30

1  By: _____

2       Adam P. Dolsen, Manager

   *Defendants*.

3

4

5       Respectfully submitted this __th day of January, 2021 and effective on the date

6  entered by the Court.

7  s/ Brad J. Moore                          s/ Charles M. Tebbutt
8  BRAD J. MOORE, WSBA #21802                 CHARLES M. TEBBUTT
   Stritmatter Kessler Whelan                 WSBA #47255
9  200 Second Ave. W.                         DANIEL C. SNYDER
   Seattle, WA  98119                         OR Bar No. 105127 (*pro hac vice*)
10 Tel. 206.448.1777                          Law Offices of Charles M. Tebbutt, P.C.
   E-mail: Brad@stritmatter.com               941 Lawrence St.
11                                            Eugene, OR 97401
   *Local counsel for Plaintiffs*            Tel. 541.344.3505
12                                            E-mail: charlie.tebbuttlaw@gmail.com
                                              dan.tebbuttlaw@gmail.com
13

14                                            *Counsel for Plaintiffs*

15 s/ Jessica L. Culpepper                    s/ George A. Kimbrell
   JESSICA L. CULPEPPER                       GEORGE A. KIMBRELL
16 NY Bar Member (*pro hac vice*)            WA Bar No. 36050
   Public Justice                             Center for Food Safety, 2nd Floor
17 1825 K Street NW, Ste. 200                 303 Sacramento Street
   Washington, DC 20006                       San Francisco, CA 94111
18 Tel. 202.797.8600                          Tel. 415.826.2770
19 E-mail: jculpepper@publicjustice.net
                                              Emails:
20                                            gkimbrell@centerforfoodsafety.org
   *Counsel for Plaintiffs*
21                                            *Counsel for Plaintiff Center for Food
                                              Safety*
22 s/ Toby James Marshall
   TOBY J. MARSHALL, WSBA # 32726
23 BETH E. TERRELL, WSBA # 26759

24

   AMENDED CONSENT DECREE- 31

By: ~~Adam P. Dolsen, Manager~~

*Defendants*.

Respectfully submitted this 28th day of January, 2021 and effective on the date entered by the Court.

s/ Brad J. Moore
BRAD J. MOORE, WSBA #21802
Stritmatter Kessler Whelan
200 Second Ave. W.
Seattle, WA 98119
Tel. 206.448.1777
E-mail: Brad@stritmatter.com

*Local counsel for Plaintiffs*

s/ Jessica L. Culpepper
JESSICA L. CULPEPPER
NY Bar Member *(pro hac vice)*
Public Justice
1825 K Street NW, Ste. 200
Washington, DC 20006
Tel. 202.797.8600
E-mail: jculpepper@publicjustice.net

*Counsel for Plaintiffs*

s/ Toby James Marshall
TOBY J. MARSHALL, WSBA # 32726
BETH E. TERRELL, WSBA # 26759

s/ Charles M. Tebbutt
CHARLES M. TEBBUTT
WSBA #47255
DANIEL C. SNYDER
OR Bar No. 105127 (*pro hac vice*)
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Tel. 541.344.3505
E-mail: charlie.tebbuttlaw@gmail.com
dan.tebbuttlaw@gmail.com

*Counsel for Plaintiffs*

s/ George A. Kimbrell
GEORGE A. KIMBRELL
WA Bar No. 36050
Center for Food Safety, 2nd Floor
303 Sacramento Street
San Francisco, CA 94111
Tel. 415.826.2770

Emails:
gkimbrell@centerforfoodsafety.org

*Counsel for Plaintiff Center for Food Safety*

AMENDED CONSENT DECREE- 31

1

Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
206-816-6603
Emails: bterrell@terrellmarshall.com
tmarshall@terrellmarshall.com

2

3

4

5

*Counsel for Plaintiffs*

6

7

s/Brendan V. Monahan

8

Brendan V. Monahan
Sean A. Russel
Stokes Lawrence
120 N. Naches Avenue
Yakima, WA 98901
bvm@stokeslaw.com
sean.russel@stokeslaw.com
Mathew L. Harrington
Olivia Gonzalez
Stokes Lawrence
1420 Fifth Avenue
Seattle, WA 98101
MLH@stokeslaw.com
olivia.gonzalez@stokeslaw.com

9

10

11

12

13

14

15

*Counsel for Defendants*

16

17

18

IT IS SO ORDERED:

19

DATED February 18, 2021

20

21

22

THOMAS O. RICE
United States District Judge

23

24

AMENDED CONSENT DECREE- 32